✎JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

APPENDIX H

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

BABYAGE.COM, INC.; THE BABY CLUB OF AMERICA, INC.

**(b)** County of Residence of First Listed Plaintiff  LUZERNE
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
BERGER & MONTAGUE, P.C., 1622 Locust Street Philadelphia, PA 19103 (215)875-3000

## DEFENDANTS

TOYS "R" US, INC. d/b/a BABIES "R" US; BABIES "R" US, INC.

County of Residence of First Listed Defendant  PASSAIC
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN  (Place an "X" in One Box Only)

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Sections 1,2
Brief description of cause:
Violation Of Sherman/Clayton Antitrust Acts

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
12/29/05

SIGNATURE OF ATTORNEY OF RECORD
ERIC L. CRAMER

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BABYAGE.COM, INC., )<br>360 Stewart Road )<br>Wilkes-Barre, PA 18706, )<br>)<br>and )<br>)<br>THE BABY CLUB OF AMERICA, INC., )<br>738 Washington Avenue )<br>West Haven, CT 06516, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>TOYS "R" US, INC., d/b/a Babies "R" Us, )<br>One Geoffrey Way )<br>Wayne, NJ 07470, )<br>)<br>and )<br>)<br>BABIES "R" US, INC., )<br>One Geoffrey Way )<br>Wayne, NJ 07470, )<br>)<br>Defendants. )<br>) | C.A. No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs, for their Complaint, allege as follows based upon personal knowledge, the
investigation of their counsel, information and belief, and publicly-available information:

### INTRODUCTION

1.      Babyage.com, Inc. ("Babyage") and The Baby Club of America, Inc. ("Baby Club")
(collectively "Plaintiffs"), which are highly-efficient internet-based baby and juvenile product
retailers, file this lawsuit against defendants Toys "R" Us, Inc., doing business as Babies "R" Us,

and Babies "R" Us, Inc. (collectively, "BRU"), to obtain damages and equitable relief under, *inter alia*, Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2.  As detailed below, Plaintiffs allege that BRU, a dominant, multibrand retailer, coerced and induced various manufacturers of high-end baby and juvenile products (the "Baby Product Manufacturers") to agree to enter into, maintain, and enforce minimum resale price maintenance agreements with retailers of such products, including Plaintiffs and BRU (the "Retailers").[1]  The Baby Product Manufacturer-Retailer Agreements prevented the Retailers, on penalty of termination (*i.e.*, being refused supply), from charging prices that were lower than the agreed minimum prices.

2.      The Baby Product Manufacturers include Britax International Ltd. ("Britax"), a manufacturer of high-end car seats; Peg Perego Inc. ("Peg Perego"), a manufacturer of high-end strollers; Kids Line Inc. ("Kids Line"), a manufacturer of high-end crib bedding; Medela Inc. ("Medela"), a manufacturer of high-end breast pumps; Babybjorn AB ("Baby Bjorn"), a manufacturer of high-end baby and infant carriers, by and through its former United States agent Regal Lager Inc. ("Regal Lager") and its current United States agent BabySwede LLC ("BabySwede"); and Maclaren USA Inc. ("Maclaren"), a manufacturer of high-end strollers.  The relevant high-end products manufactured by the Baby Product Manufacturers are carried by specialty baby retailers such as Plaintiffs and BRU, but not typically by general discounting retailers like Wal-Mart, K-Mart, or warehouse clubs like Sam's Club.

---

[1]The agreements between BRU and the Baby Product Manufacturers that the Baby Product Manufacturers would impose minimum resale price maintenance agreements upon the Retailers shall hereinafter be referred to as the "BRU-Baby Product Manufacturer Agreements."  The agreements between the Baby Product Manufacturers and the Retailers to maintain minimum resale prices shall hereinafter be referred to as the "Baby Product Manufacturer-Retailer Agreements."  Where appropriate, both types of agreements relevant here shall be referred to collectively as "the Agreements."

3.    Both the BRU-Baby Product Manufacturer Agreements and the resulting Baby Product Manufacturer-Retailer Agreements are comprised of contracts, combinations and/or conspiracies, whether oral or written, express or tacit.

4.    The Agreements are *per se* illegal under Section 1 of the Sherman Act. Alternatively, they unreasonably restrain trade in the relevant market(s) (defined below), causing substantial anticompetitive effects and net losses in consumer welfare. And, given the substantial market power of BRU and the Baby Product Manufacturers, by the Agreements and other anticompetitive conduct, BRU has illegally maintained and enhanced its monopoly power, conspired with the Baby Product Manufacturers to illegally maintain and enhance its monopoly power, and, alternatively, attempted to maintain and enhance its monopoly power in the relevant market(s).

5.    The Agreements, and BRU's conduct, have harmed competition in the relevant market(s) and caused prices to be higher in the relevant market(s) than they otherwise would have been. The Agreements, which were specifically intended to protect BRU from price competition from highly efficient retailers like Plaintiffs, and to preserve and enhance BRU's market dominance and monopoly power, did so, and thereby substantially inflated prices to consumers, and reduced consumer welfare.

6.    Because Plaintiffs are highly efficient internet retailers, Plaintiffs win sales and grow their businesses by dropping their prices lower than those of competitors (such as BRU). Conversely, Plaintiffs lose sales if they are prevented from dropping their prices lower than competitors such as BRU. Thus, the Agreements, and BRU's conduct, have injured Plaintiffs by (a) depriving them of sales and profits that Plaintiffs would otherwise have garnered by lowering their respective prices below the artificially-high levels required by the Agreements, and (b)

-3-

diminishing of the capital value of Plaintiffs' respective businesses. The Agreements, and BRU's conduct, impair Plaintiffs' ability to compete with BRU and take sales from BRU by preventing Plaintiffs from exploiting their highly efficient business models. In fact, prior to the imposition of the Agreements, Plaintiffs were rapidly growing their respective sales of the relevant products through, among other things, aggressive price competition. However, the Agreements, and other alleged BRU conduct, were intended to, and did, reverse those trends, and substantially harmed Plaintiffs thereby.

6.    BRU's conduct has also tortiously interfered with the contractual relationships between Plaintiffs and the Baby Product Manufacturers and unjustly enriched BRU at the expense of Plaintiffs.

## JURISDICTION AND VENUE

7.    Original jurisdiction over Plaintiffs' claims vests in this Court under 28 U.S.C. § 1331, inasmuch as this action arises under the laws of the United States. For those claims arising under state law, all of which are so related to the claims arising under the laws of the United States as to constitute the same case or controversy, Plaintiffs invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a).

8.    Venue is proper in this federal judicial district under 15 U.S.C. § 15(a) because BRU resides, or is found, or has an agent here. Alternatively, venue is proper in this judicial district under 15 U.S.C. § 22 because BRU is found or transacts business here. Alternatively, venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because BRU resides in this judicial district within the meaning of 28 U.S.C. § 1391(c). Alternatively, venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this lawsuit occurred here.

**PARTIES**

9.     Plaintiff Babyage.com, Inc. ("Babyage") is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business located at 360 Stewart Road, Wilkes-Barre, PA 18706.

10.     Plaintiff The Baby Club of America, Inc. ("Baby Club") is a corporation duly organized and existing under the laws of the State of Connecticut, with a principal place of business located at 738 Washington Avenue, West Haven, CT 06516.

11.     Defendant Toys "R" Us, Inc., which does business as Babies "R" Us, is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business located at One Geoffrey Way, Wayne, NJ 07470.

12.     Defendant Babies "R" Us, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business located at One Geoffrey Way, Wayne, NJ 07470.

13.     Babyage and Baby Club shall hereinafter be referred to collectively as "Plaintiffs."

14.     Toys "R" Us, Inc., doing business as Babies "R" Us, and Babies "R" Us, Inc. shall hereinafter be referred to collectively as "BRU."

**FACTS**

15.     BRU is a dominant, multibrand retailer of baby and juvenile products, which opened its first stores in 1996. As of January of 2005, BRU operated over 200 Babies "R" Us stores throughout the United States. In its most recent form 10-Q filing with the United States Securities and Exchange Commission, BRU stated that it considers itself the "largest specialty retailer of baby-juvenile products in the United States" and the "only specialty retailer in its category that operates

on a national U.S. scale."

16.    BRU sells juvenile furniture, such as cribs, dressers, changing tables; bedding and related accessories; baby gear, such as play yards, booster seats, high chairs, strollers, and car seats; toddler and infant plush toys; gifts; clothing; infant feeding supplies; health and beauty aids; and infant care products. In addition to its stores, BRU retails over the internet, at www.babiesrus.com, a site administered by and with Amazon.com.

17.    Relative to BRU, Plaintiffs are small companies that compete in the relatively new trade channel known variously as "electronic commerce," "e-commerce," "e-tailing," "internet retail," *etc*. Specifically, Plaintiffs are internet retailers of high-end baby and juvenile products.[2] Plaintiffs are highly efficient competitors because, among other reasons, their operating expenses are low. This allows them to compete vigorously on price, both with other internet retailers and with retailers in other trade channels, such as BRU. Like many other efficient internet retailers, Plaintiffs win sales by dropping their prices lower than those of competitors such as BRU; conversely, Plaintiffs lose sales if Plaintiffs are prevented from dropping their prices lower than those of competitors.

18.    When allowed to compete freely, the price competition in which Plaintiffs and other internet retailers engage enhances consumer welfare by bringing down prices. For instance, if Plaintiffs' competitors, such as BRU, did not lower their prices to match or beat Plaintiffs' prices, those competitors would lose sales to Plaintiffs. Absent BRU's anticompetitive conduct, this would put enormous pressure on Plaintiffs' competitors, such as BRU, to lower prices, so as not to lose

---

[2]The term "high-end" is meant to include the highest quality, higher price-point models of the baby and juvenile products sold by the Baby Product Manufacturers.

those sales. This is a classic example of the pro-competitive benefits of price competition.

19.    BRU has known for quite some time that the increasing popularity of "e-commerce," with its associated increase in price competition, would pose a substantial threat to BRU's sales and profits. For example, recently BRU has made public statements admitting its fear of price competition from efficient competitors like Plaintiffs. In January of 2005, BRU wrote in a form 10-K filing that "[s]ome of our competitors may have greater financial resources, lower merchandise acquisition costs, and lower operating expenses than our Company. If we fail to compete successfully, we could face lower net sales and may decide to offer *greater discounts to our guests*, which could result in *decreased profitability*" (emphasis added).

20.    BRU thus stated its fears that competitors like Plaintiffs would force it to give greater discounts to its customers and thereby lower BRU's profits. BRU reacted aggressively to this important threat to its pricing freedom and profitability. BRU sought to avoid such competitive constraints on its ability to garner inflated prices and, therefore, enhanced profitability.

21.    The tremendous pressure upon a dominant retailer (like BRU) in a traditional trade channel (like the "brick and mortar" trade channel) to react anticompetitively to threats to its pricing freedom, such as those posed by retailers in a new and efficient trade channel (like Plaintiffs), have been the subject of study by, and recent testimony before, the Federal Trade Commission ("FTC"). As one participant in the FTC's 2002 public workshop, entitled "Possible Anticompetitive Efforts to Restrict Competition on the Internet," stated:

> The promise of the world of electronic commerce is to create an environment where consumers can freely shop between various competitive alternatives. By reducing transaction costs and improving transparency, the Internet offers the potential of dramatically improving competition in various retail markets.

> \* \* \* [But] *as new market forces arise, . . . "traditional" competitors often respond to the threat by trying to create barriers to thwart those new entrants*.

*See* David A. Balto, Testimony Before the FTC, Office of Policy Planning, Public Workshop on E-Commerce, at 1-2 (October 10, 2002) (emphasis added).

22.     In particular, because suppliers of products (like the Baby Product Manufacturers) depend on retailers (like BRU) to sell their products, it is not surprising that a dominant retailer in a traditional trade channel like BRU would use that dominance to protect against price competition by coercing suppliers like the Baby Product Manufacturers into disadvantaging retailers (like Plaintiffs) in the new, efficient trade channel.  For instance, speaking at that same FTC public workshop, FTC Commissioner Shiela Anthony underscored the potential threat to competition posed by a dominant retailer (like BRU), whom suppliers (like the Baby Product Manufacturers) cannot do without.  The concern is that a dominant retailer like BRU could use its market power to coerce key suppliers into disadvantaging competing retailers (like Plaintiffs), and thereby protect and preserve its market dominance:

> Competition among distributors for a given manufacturer's favor is almost certainly healthy.  But problems may arise where distributors in one channel exercise their market power to disadvantage distributors in another channel. \* \* \* [C]an Internet distribution ever gain a strong foothold in some product areas where the entrenched distribution channel, members who manufacturers cannot do without, at least until e-commerce matures, use hardball tactics to make sure that the transition period never begins?

*See* FTC, Public Workshop:  Possible Anticompetitive Effects to Restrict Competition on the Internet, transcript of proceedings, at 797:12-16, 799:7-12 (October 10, 2002) (remarks of Commissioner Shiela F. Anthony).

23.     Indeed, because of BRU's position as a dominant multibrand retailer in the relevant

market(s), BRU was able to, and did, require the creation of the BRU-Baby Product Manufacturer Agreements. Among the relevant provisions of the BRU-Baby Product Manufacturer Agreements was that, in consideration of BRU's continuing to stock and sell the products manufactured by the Baby Product Manufacturers, the Baby Product Manufacturers had to ensure that Retailers, such as Plaintiffs and BRU, would charge a minimum resale price for the products supplied to them by the Baby Product Manufacturers.

24.    The Baby Product Manufacturers then entered into the Baby Product Manufacturer-Retailer Agreements, including with Plaintiffs and BRU, respectively. Among the relevant provisions of the Baby Product Manufacturer-Retailer Agreements was that, in consideration of the Baby Product Manufacturers' continuing to supply the Retailers with product, the Retailers were prohibited, on penalty of termination, from lowering, past a certain price floor, the prices at which they sold the Baby Product Manufacturers' goods to consumers.

25.    The Baby Product Manufacturer-Retailer Agreements came about not through the independent conduct of the Baby Products Manufacturers, but instead at BRU's request and demand.

26.    As to the provisions of the Baby Product Manufacturer-Retailer Agreements, BRU was the undisclosed principal of the Baby Product Manufacturers.

27.    BRU caused the Baby Product Manufacturer-Retailer Agreements to be created, maintained, and enforced to further its dominance in the relevant market(s) and for the clearly anticompetitive purposes of earning excess profits and insulating itself from price competition from other Retailers, such as Plaintiffs herein.

28.    The Baby Product Manufacturer-Retailer Agreements, while directly benefiting BRU, harmed the Baby Product Manufacturers, which lost substantial sales and profits as a direct result

of the Agreements.

29.     At the behest of BRU, which threatened the Baby Product Manufacturers with termination (*i.e.*, being deprived of the ability to retail the relevant products by being refused supply thereof) if they did not enter into the Agreements, the Baby Product Manufacturers maintained and enforced the Baby Product Manufacturer-Retailer Agreements, and did so in a complex manner, often utilizing intermediaries.

30.     Specifically, the Baby Product Manufacturers, by and through their various representatives, met with, exhorted, threatened, warned, cajoled, and/or negotiated with Retailers, including Plaintiffs herein, on an individualized basis, concerning the prices at which the Retailers sold their products, sought the Retailers' acquiescence to and assurances of compliance with the terms of the Baby Product Manufacturer-Retailer Agreements, and threatened the Retailers with termination for noncompliance. For instance:

(a)     In or around November of 2003, representatives of Britax visited Babyage's Moonachie, New Jersey facility to seek agreement that Babyage would raise its prices on Britax products and not thereafter lower its prices below a certain level. Babyage acquiesced in and agreed to Britax's sought minimum pricing for fear that Britax would otherwise terminate Babyage;

(b)     Between approximately December of 2004 and January of 2005, representatives of Britax contacted Babyage several times concerning Babyage's subsequent noncompliance with minimum pricing, seeking Babyage's cooperation with minimum pricing;

(c)     In or around June of 2005, representatives of Britax contacted Babyage, again

-10-

seeking its agreement to raise prices, and attempted to use Babyage's pending request for additional credit from Britax to negotiate Babyage's acquiescence in its demands that Babyage raise its prices;

(d)    From December of 2003 through February of 2004, representatives of Britax contacted Baby Club several times, seeking Baby Club's cooperation with and acquiescence in minimum pricing, and threatening the cancellation of orders if Baby Club did not so agree;

(e)    In or around December of 2003, a representative of Britax told Baby Club that the reason Britax was attempting to secure agreement with Baby Club regarding minimum pricing was that Britax was fearful of BRU;

(f)    In or around October of 2003, representatives of Peg Perego contacted Babyage, seeking Babyage's agreement to raise price on a particular stock keeping unit ("SKU"), stating that Peg Perego was receiving pressure from BRU, which was threatening to cancel orders and issue massive "chargebacks" (demands for refunds) if Peg Perego did not obtain Babyage's agreement to raise its price to agreed levels;

(g)    After Babyage agreed to, and did, raise its prices on the particular SKU and then lowered the price again, in or around November of 2003 representatives of Peg Perego contacted Babyage, again seeking Babyage's acquiescence to raise its price to the agreed-upon levels;

(h)    In or around February of 2004, a representative of Peg Perego contacted Babyage, threatening that if Babyage did not raise its prices on Peg Perego products to the manufacturer's suggested retail price ("MSRP") level, Peg Perego would terminate Babyage

-11-

as a dealer of Peg Perego products;

(i)    In or around the year 2000, a representative of Peg Perego informed Baby Club of the identity of Peg Perego SKUs that BRU would carry that year so that Baby Club would know that, as to those SKUs, it was required to maintain minimum pricing;

(j)    In or around June of 1999, a representative of Peg Perego contacted Baby Club, seeking Baby Club's agreement to raise prices, and explaining that termination would result otherwise. In response, Baby Club acquiesced in Peg Perego's demand by raising its prices;

(k)    In or around May of 2005, in response to an inquiry from Babyage, representatives of Kids Line stated that it would consider permitting Babyage to price lower than minimum resale price, inasmuch as BRU was doing so;

(l)    In or around June of 2005, a representative of Kids Line told Babyage that Babyage should not consider lowering its prices past minimum agreed resale prices to match BRU prices, because it would force Kids Line to choose between Babyage and BRU;

(m)    In or around November of 2005, Kids Line contacted its manufacturer's representative for Babyage, and instructed him to obtain Babyage's acquiescence in raising its prices to the agreed minimum resale price, and the manufacturer's representative did so;

(n)    In or around December of 2005, a representative of Kids Line, in response to an inquiry from Babyage about increasing its credit line with Kids Line, told Babyage that Babyage would first have to increase prices on certain products;

(o)    In, among other years, 2003 and 2004, a representative of Kids Line personally visited Baby Club approximately twice a year, each time seeking Baby Club's

acquiescence in Kids Line's minimum pricing agreements, to which requests Baby Club ultimately agreed;

(p)    Between 1999 and 2001, representatives of Regal Lager and Baby Bjorn met with Baby Club several times, seeking Baby Club's agreement to raise prices on various Baby Bjorn products, to which requests Baby Club agreed;

(q)    At several times during the year 2005, a representative of Maclaren contacted Baby Club by telephone and email, seeking Baby Club's agreement to raise its prices to the MSRP.    Based upon Baby Club's negotiations with the Maclaren representative, the Maclaren representative objected to Maclaren executives, stating that it was unfair to ask Baby Club to raise its prices when others, notably BRU, had not.

31.    The acquiescence and compliance by Retailers (like Plaintiffs) in minimum pricing, was, to the Baby Product Manufacturers, preferable to termination or non-supply of noncompliant Retailers, because the Baby Product Manufacturers wanted and profited from sales to the Retailers. Nevertheless, the Baby Product Manufacturers did not benefit from the higher prices at the retail level, nor did they benefit from the Agreements more generally, except insofar as by entering into the Agreements, the Baby Product Manufacturers avoided harsh retaliation.

32.    The Baby Product Manufacturers did not simply or unilaterally:

(a)    refrain from selling to uncongenial Retailers;

(b)    suggest resale prices that were widely followed;

(c)    sanction and/or terminate Retailers who failed to maintain a minimum resale price;

(d)    announce and enforce policies of sanctioning and/or terminating Retailers

-13-

who failed to maintain a minimum resale price; or

     (e)    sanction and/or terminate other Retailers following, or in response to, complaints by Retailers such as BRU.

33.    The Agreements represent a conscious commitment to a common scheme, designed to achieve an unlawful objective, between BRU, the Baby Product Manufacturers, and other Retailers. The Agreements were intended to, and did, benefit BRU, and not the Baby Product Manufacturers, and were only created because of the coercion by BRU.

34.    Certain Retailers, including Plaintiffs, have, in fact, communicated their acquiescence in, and assurances of compliance with, the Baby Product Manufacturer-Retailer Agreements, as a result of the Baby Product Manufacturers' sought acquiescence and compliance.

35.    Plaintiffs were terminated (that is, refused supply) by certain of the Baby Product Manufacturers unambiguously because of, pursuant to, and as a part of the Baby Product Manufacturer-Retailer Agreements, and for no other (non-pretextual) reason. Specifically:

     (a)    in or around February of 2004, Peg Perego terminated Babyage as a retailer of its products;

     (b)    in or around March of 2005, Medela terminated Babyage as a retailer of its products; and

     (c)    in or around July of 2002, Medela terminated Baby Club as a retailer of its products.

36.    With respect to Medela's termination of Baby Club, representatives of Medela told Baby Club that the reason for the termination was that BRU was angry about Baby Club's low prices.

-14-

37.     Plaintiffs did not violate any "non-price" restriction sought by the Baby Product Manufacturers, whether contained in the Baby Product Manufacturer-Retailer Agreements or otherwise.

37.     The Baby Product Manufacturers did not act unilaterally or independently, or in their own economic interests, when seeking the Retailers' acquiescence to and compliance with the terms of the Baby Product Manufacturer-Retailer Agreements, when seeking Plaintiffs' charging a minimum resale price, and/or when terminating Retailers, such as Plaintiffs, for violating the Agreements.  In fact, absent threatened penalties or sanctions by BRU, it would not be in the Baby Product Manufacturers' economic interests to enter into, maintain, or enforce the Agreements.

## MONOPOLY/MARKET POWER

38.     The relevant product market in this case is retail sales of high-end baby and juvenile strollers, breast pumps, bedding, car seats, and infant carriers.  Alternatively, there are several relevant product markets pertinent to this case, including the separate markets for retail sales of high-end baby and juvenile strollers; for retail sales of high-end breast pumps; for retail sales of high-end baby bedding; for retail sales of high-end car seats; and for retail sales of infant carriers.

39.     The relevant geographic market in this case is the United States of America.

40.     By virtue of its power to control prices and exclude competition in the relevant market(s), BRU at all relevant times possessed monopoly power in the relevant market(s). Moreover, at all relevant times BRU possessed dominant shares of the market(s) for retail sales of high-end baby and juvenile strollers, breast pumps, bedding, car seats, and infant carriers, respectively, and was a critical outlet for the Baby Product Manufacturers.

41.     Likewise, the Baby Product Manufacturers at all relevant times each possessed

-15-

substantial market power in the market(s) for their respective products, due, in part, to the high level of product differentiation in the industry. Specifically, the Baby Product Manufacturers: (a) sold their respective high-end baby and juvenile strollers, breast pumps, bedding, car seats, and infant carriers at prices in excess of marginal costs, (b) enjoyed high profit margins thereon, (c) sold such products substantially in excess of the competitive price, and (d) enjoyed substantial barriers to market entry and growth. Despite this market power, the Baby Product Manufacturers were and are nevertheless substantially reliant upon BRU for their respective sales, sales growth, and profitability.

42.    There is substantial concentration among the firms that manufacture baby products.

## ANTITRUST INJURY AND OTHER COGNIZABLE HARM

43.    BRU's anticompetitive conduct as hereinbefore described was a material cause of substantial harm to competition in the relevant market(s). The Agreements have made prices for products sold in the relevant market(s) supracompetitive. But for the Agreements, competition would increase, and prices for products sold in the relevant market(s) would fall substantially.

44.    BRU's violations of §§ 1 and 2 of the Sherman Antitrust Act, and of state law, as herein described, are a material cause of injury to Plaintiffs' business and property, in the nature of lost profits and the diminished capital value of Plaintiffs' businesses. Specifically, the Agreements have materially caused Plaintiffs to enjoy fewer sales and lower profits. But for the Agreements, Plaintiffs would have enjoyed far greater sales. Indeed, prior to the creation of the Agreements, Plaintiffs' sales in the affected products were growing at high rates due to low prices, efficient sales practices, and excellent customer service. But, after the imposition of the Agreements, sales growth has either slowed or gone substantially negative in the affected products, which make up a significant part of their respective businesses.

-16-

45.     The Agreements occurred in and/or affected interstate commerce.

## CLAIMS FOR RELIEF

## CLAIM ONE:  VIOLATION OF 15 U.S.C. § 1 (AGREEMENTS RESTRAINING TRADE)

46.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

47.     The Agreements, and their enforcement, constitute contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiffs thereby.

48.     The Agreements cover a sufficiently substantial percentage of the relevant market(s) to harm competition.

49.     BRU is *per se* liable for the creation, maintenance, and enforcement of the Agreements.

50.     Alternatively, BRU is liable for the creation, maintenance, and enforcement of the Agreements under a "quick look" and/or rule of reason standard.

51.     There is no legitimate, procompetitive business justification for the Agreements, or any of them, that outweighs their harmful effect.  Even if there were some conceivable such justification, the Agreements are broader than necessary to achieve such a purpose.

## CLAIM II:  VIOLATION OF 15 U.S.C. § 2 (MONOPOLIZATION AND MONOPOLISTIC SCHEME)

52.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

53.     At all relevant times, BRU possessed monopoly power in the relevant market(s). BRU possessed the power to control prices in, prevent prices from falling in, and exclude

-17-

competitors from the relevant market(s).

54. At all relevant times, the Baby Product Manufacturers possessed monopoly power in the relevant market(s).

55. By the Agreements, BRU wilfully maintained its monopoly power in the relevant market(s) using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiffs thereby. It was BRU's conscious object to further its dominance in the relevant market(s) by and through the Agreements.

56. BRU's conduct, including the BRU-Baby Product Manufacturer Agreements, the Baby Product Manufacturer-Retailer Agreements, their enforcement, and BRU's coercion of the Baby Product Manufacturers, constitutes an anticompetitive scheme to acquire and maintain monopoly power in the relevant market(s).

57. BRU's willful maintenance of monopoly power has made it difficult or impossible for competitors, such as Plaintiffs herein, to engage in fair competition.

### CLAIM III: VIOLATION OF 15 U.S.C. § 2 (ATTEMPTED MONOPOLIZATION)

58. Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

59. The Agreements were unreasonably exclusionary.

60. By the BRU-Baby Product Manufacturer Agreements, BRU induced the Baby Product Manufacturers to enter into the Baby Product Manufacturer-Retailer Agreements, with the specific intent to achieve monopoly power in the relevant market(s). It was BRU's conscious object to control prices and/or to exclude competition in the relevant market(s).

61. The natural and probable consequence of the Agreements, which was plainly

-18-

foreseeable to BRU, was to give BRU control over prices and/or to exclude or destroy competition in the relevant market(s), or any of them, to the extent it has not already succeeded.

62.     There is a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that BRU will succeed in and achieve its goal of obtaining monopoly power in the relevant market(s).

## CLAIM IV: VIOLATION OF 15 U.S.C. §§ 1 AND 2 (CONSPIRACY TO MONOPOLIZE)

63.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

64.     Through the Agreements, BRU and the Baby Product Manufacturers conspired to maintain and enhance BRU's monopoly power in the relevant market(s).

65.     BRU and the Baby Product Manufacturers knowingly and intentionally entered into the Agreements.

66.     BRU and the Baby Product Manufacturers specifically intended that the Agreements would maintain BRU's monopoly power in the relevant market(s), and injured Plaintiffs thereby.

67.     BRU committed at least one overt act in furtherance of the conspiracy.

## CLAIM V:  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

68.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

69.     Plaintiffs had existing and prospective contractual relationships with the Baby Product Manufacturers pursuant to which Plaintiffs would charge prices to their customers that were less than the prices BRU charged.

70.     BRU purposefully induced the Baby Product Manufacturers to enter into the

Agreements, with the specific intent to harm the existing relationship, and/or to prevent the prospective future relationship, between Plaintiffs and the Baby Product Manufacturers.

71.   BRU's conduct was neither privileged nor justified, but instead was improper.

72.   BRU has acted outrageously, with an evil motive, and with reckless indifference to, and disregard of, the rights of Plaintiffs and, accordingly, an award of punitive damages is necessary and appropriate.

## CLAIM VI:  UNJUST ENRICHMENT

73.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

74.   BRU was unjustly enriched at Plaintiffs' expense to the extent of sales and sales revenues it garnered as a material result of the illegal conduct complained of herein.

75.   In equity and good conscience, BRU should be required to return to Plaintiffs such ill-gotten gains.

## ENTITLEMENT TO INJUNCTIVE RELIEF

76.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

77.   BRU's conduct is ongoing, likely to recur, and, unless enjoined, will continue into the future, causing irreparable further injury to Plaintiffs' business and property.

78.   Plaintiffs pray that the Court enjoin the Agreements, and their enforcement, pursuant to 15 U.S.C. § 26.

79.   With respect to its claims arising under state law, Plaintiffs further aver that, in light of BRU's ongoing conduct, an action at law affords Plaintiffs an inadequate remedy.

-20-

## RELIEF REQUESTED

80.     Plaintiffs demand the following relief:

       A.      Judgment in their favor and against BRU;

       B.      Compensatory damages in an amount in excess of the limits for mandatory arbitration, trebled on the federal antitrust claims;

       C.      Punitive and exemplary damages on appropriate claims;

       D.      An order or decree permanently enjoining the Agreements and their enforcement;

       E.      Restitution and/or disgorgement of BRU's unjust enrichment;

       F.      Costs, including reasonable attorneys' fees;

       G.      Pre- and post-judgment interest;

       H.      Such other and/or further relief as the Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

**BERGER & MONTAGUE, P.C.**

By: _____
      Eric L. Cramer (Pa. I.D. 69289)
      Peter Kohn (Pa. I.D. 65454)
      1622 Locust Street
      Philadelphia, PA 19103
      (215) 875-3000
      (215) 875-4604 (fax)

*Attorneys for Plaintiffs Babyage.com, Inc.*
*and The Baby Club of America, Inc.*

**SCHIFFRIN & BARROWAY LLP**

By: _____
      Kendall S. Zylstra (Pa. I.D. 64006)
      Steven Connolly (Pa. I.D. 86130)
      Katie L. Anderson (Pa. I.D. 90820)
      280 King of Prussia Road
      Radnor, Pennsylvania 19087
      (610) 667-7706
      (610) 667-7056 (fax)

*Attorneys for Plaintiffs Babyage.com, Inc.*
*and The Baby Club of America, Inc.*

Dated December 29, 2005
at Philadelphia, Pennsylvania.