# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BABYAGE.COM, INC. and | : | |
| THE BABY CLUB OF AMERICA, INC., | : | |
|     Plaintiffs, | : | CIVIL ACTION |
| | : | |
|     v. | : | No. 05-6792 |
| | : | |
| TOYS "R" US, INC., d/b/a Babies "R" Us, | : | |
| and BABIES "R" US, INC., | : | |
|     Defendants. | : | |

| | | |
|---|---|---|
| JAMES L. MCDONOUGH et al., | : | |
| individually and on behalf of all others | : | |
| similarly situated, | : | |
|     Plaintiffs, | : | CIVIL ACTION |
| | : | |
|     v. | : | No. 06-242 |
| | : | |
| TOYS "R" US - DELAWARE, INC., d/b/a | : | |
| Babies "R" Us, and BABIES "R" US, INC. | : | |
| et al., | : | |
|     Defendants. | : | |

## EXPLANATION AND ORDER

### I.      Background

Babies 'R' Us ("BRU") is a large retailer of baby and juvenile products including strollers, high chairs, breast pumps, bedding, car seats, and infant carriers. It carries products manufactured by Britax, Peg Perego, Medela, Maclaren, Kids Line, Regal Lager, and Baby Bjorn (the "manufactuers"), among others. Smaller retailers like Baby Age and Baby Club (the "retailers") competed with BRU by undercutting BRU's prices in order to increase their sales volume. This undercutting ceased when the manufacturers began to require the retailers to sell their goods at or

1

above a certain price. The retailers, and various consumers (the "consumers") who allegedly paid

more for baby products than they would have absent these pricing policies, complain that BRU

orchestrated these arrangements in order to ward off competition.[1]

The retailers and the consumers brought an action against BRU and the manufacturers,

alleging that this scheme violates federal antitrust law. They allege that it constitutes a combination

in restraint of trade under § 1 of the Sherman Act; monopolization under § 2 of the Sherman Act;

attempted monopolization under § 2 of the Sherman Act; and a conspiracy to monopolize under §§

1 and 2 of the Sherman Act.[2] The consumers further allege that BRU's actions violate the

Pennsylvania common law of tortious interference with contractual relations, and unjust enrichment.

BRU and the manufacturers have moved to dismiss the complaints pursuant to Federal Rule

of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

---

[1] The retailers' complaint will be referenced with "BA," for Baby Age, the first named retailer. The consumers' complaint will be referenced with "McD," for McDonough, the first named consumer.

[2] Generally, a consumer who purchases from a retailer — and not directly from a manufacturer — lacks standing to bring an antitrust action against that manufacturer. <u>Illinois Brick v. Illinois</u>, 431 U.S. 720, 746 (1977). But, such a consumer does have standing when the manufacturer was involved in an antitrust conspiracy with the retailer from whom the consumer directly purchased. <u>Howard Hess Dental v. Dentsply</u>, 424 F.3d 363, 379 (3d Cir. 2005).

Here, consumer plaintiffs allege that retailer BRU has illegally conspired with each manufacturer, and that the consumer plaintiffs all purchased goods from retailer BRU. <u>See, e.g.</u>, McD ¶¶ 213, 229-238, 255-261. Further, Defendants at oral argument conceded that the consumer plaintiffs have standing if they successfully allege that BRU and each manufacturer participated in a combination in restraint of trade under § 1 of the Sherman Act. Oral Arg. Tr. 4-5. Consumer plaintiffs have successfully pleaded this claim. <u>See</u> Part III, <u>infra</u>. Therefore, the consumer plaintiffs have standing.

## II.      Federal Rule of Civil Procedure 12(b)(6) — Legal standard

To survive a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a plaintiff must make a "short and plain statement" providing the "grounds" of his "entitlement to relief." Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1965 (2007) (quoting Rule 8(a)(2)). This requires more than a statement that is merely consistent with a valid theory of recovery. Id. The statement must include "enough factual matter (taken as true) to suggest" a right to relief. Id. (parentheses in original) (emphasis added). That is, the statement must have "enough heft to show that the pleader is entitled to relif." Id. at 1966 (internal quotation marks omitted). It must "raise a right to relief above a speculative level." Id. at 1964. I will now apply this standard to each of the claims made by the plaintiffs in this case.

## III.      Combination in restraint of trade (Sherman § 1)

Plaintiffs must allege enough facts — that is, they must state their claim with enough "heft" — to suggest (1) a market or markets in which competition has been harmed, (2) concerted action involving (a) BRU and each manufacturer, and (b) each manufacturer and various retailers; (3) the anticompetitive nature of the concerted action, and (4) a causal nexus between the concerted action and Plaintiffs' particular injuries. Gordon v. Lewiston Hosp., 423 F.3d 184, 207 (3d Cir. 2005); Twombly, 127 S.Ct. at 1965; Phillips v. Cty. of Allegheny, 515 F.3d 224, 233-234 (3d Cir. 2007).

## 1.      Relevant market

Plaintiffs must define their markets with reference to "reasonable interchangeability" and "cross-elasticity of demand." Queen City Pizza v. Domino's Pizza, 124 F.3d 430, 436 (3d Cir.

1997).[3]  And they must not allege a market that "clearly" fails to encompass all "interchangeable substitute products" even when granting Plaintiffs the benefit of "all factual inferences." Id. Plaintiffs allege separate markets of retail sales of "high-end baby and juvenile strollers," "high-end high chairs," "high-end breast pumps," "high-end baby bedding," "high-end car seats," and "high-end infant carriers." BA ¶ 69; McD ¶ 206.[4]

### a.      Reasonable interchangeability and cross-elasticity of demand

The definition of relevant market given by § 1.11 of the well-known and influential 1992 Department of Justice Guidelines ("Guidelines") incorporates both of these concepts. That definition proceeds inductively: Start with a particular product. The market containing that product is the smallest set of products (including that very product, of course) such that a hypothetical firm selling all of those products with no competition could profitably impose a "small but significant and nontransitory increase in price."

This formulation incorporates reasonable interchangeability. See Philip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their Applications ("Areeda") ¶ 530a. If the hypothetical market-wide monopolist could profitably impose a small price increase

---

[3] Two products are "reasonably interchangeable" if consumers can use each for the same purpose. "Cross-elasticity of demand" refers to the relationship between the price of one product and the demand of another. The cross-elasticity of demand between two products is high if an increase in one's price causes an increase in the other's demand. See Philip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their Applications ("Areeda")  ¶ 562.

[4] Plaintiffs also alleged a market consisting of all of these individual markets taken together. BA ¶ 69; McD ¶ 206. They have chosen not to defend that combination market against the motions to dismiss. Pls.' Resp. 47 n.46.

on all the in-market products simultaneously, it must be because consumers are captive; they are not venturing outside the market to make purchases when prices in the market go up. This in turn means that those out-of-market products are not reasonably interchangeable with the in-market products; otherwise consumers would be buying them instead of the in-market products to take advantage of the lower price.

It also incorporates cross-elasticity of demand between in-market products. Areeda ¶ 530a. Suppose the hypothetical market-wide monopolist increased the price on only one of the in-market products. Thent he demand for the rest of the in-market products would increase. After all, they are interchangeable with the now-higher-priced product, and they are now cheaper than that product. This shows that in-market products have high cross-elasticity of demand.

Here, Plaintiffs have invoked precisely this formulation with respect to each proffered market. They allege that the manufacturers "would not, by raising prices for their respective relevant high-end baby and juvenile products a small but significant nontransitory amount, lose sufficient sales to make such a price increase unprofitable." BA ¶ 72(e); McD ¶ 209(e).[5]

**b.      No clear failure to include economic substitutes**

As explained above, Plaintiffs have not "clearly" failed to account for all reasonably interchangeable economically substitutable products. Indeed, by invoking the Guidelines market

---

[5] Defendants contend that this language refers to the price at which manufacturers sell to retailers, rather than the price at which retailers sell to consumers. Oral. Arg. Tr. 50, 54. Because the gravamen of this action is a scheme to implement minimum resale price maintenance ("RPM") at the retail level, the most natural reading of this language is the one that refers to the price to consumers.

definition, they clearly have accounted for all such substitutes. This is true because the only products falling outside the market under the Guidelines definition are not interchangeable with in-market products and are not economically substitutable for in-market products (because they do not have a high cross-elasticity of demand with in-market products).[6]

Therefore, Plaintiffs have stated enough facts to suggest the existence of several relevant markets in which competition has been harmed. Plaintiffs' allegations are not only consistent with the existence of "high-end baby and juvenile strollers," "high-end high chairs," "high-end breast pumps," "high-end baby bedding," "high-end car seats," and "high-end infant carriers" markets, but they suggest the existence of those markets. They do this by asserting facts about interchangeability and cross-elasticity of demand that explain why the proffered markets are not larger than Plaintiffs allege them to be. Put another way, their allegation that, for each market, a hypothetical monopolist could profitably raise prices on all in-product markets for a short time, constitute enough heft to raise the satisfaction of the relevant-market element beyond a speculative level.

## 2.      Concerted action

_____Plaintiffs claim that BRU conspired with each manufacturer to cause each manufacturer to form minimum RPM agreements with the manufactuer's retail dealers. To link BRU's actions, on the front end, with the RPM policies, on the back end, Plaintiffs must allege two interrelated types of concerted action. First, they must allege concerted action between BRU and each manufacturer.

---

[6] Defendants argue that Plaintiffs' market definitions are implausible because they do not specify "what the price points are, which manufacturers do and do not make high-end products, and which retailers do and do not sell them." Defs.' Mot. 17. But these evidentiary details are not required at the motion-to-dismiss stage. Broadcom v. Qualcomm, 501 F.3d 297, 317 (3d Cir. 2007).

Second, they must allege concerted action between each manufacturer and that manufactuer's retailer dealers.

### a.    Between BRU and each manufacturer

Plaintiffs may allege concerted action by claiming parallel conduct coupled with circumstances that tend to negate the possibility that BRU and each manufacturer acted independently. Phillips, 515 F.3d at 233-234. Accepted "plus factors" include (a) that the parallel conduct at issue was against each manufacturer's independent economic self-interest, Lum v. Bank of Amer., 361 F.3d 217, 230 (3d Cir. 2004); (b) that BRU wielded sufficient influence over each manufacturer to create a duress situation, Monsanto v. Spray-Rite, 465 U.S. 752, 767-768 (1984); and (c) that BRU threatened to retaliate against each manufacturer if each manufacturer did not implement minimum resale price maintenance ("RPM") agreement with its retailers, and the manufacturers in turn acquiesced, Albrecht v. Herald, 390 U.S. 145, 149 (1968).

Plaintiffs have alleged parallel conduct in the form of imposition of minimum RPM policies. See, e.g., BA ¶¶ 40(a) (Peg Perego); 41(a), (g) (Medela); 42(a) (Britax); 43(a) (Maclaren); 44(a) (Kids Line); 45(q) (Regal Lager & Baby Bjorn)[7]; McD ¶¶ 68 (Peg Perego); 104, 109 (Medela); 135 (Britax); 166-167 (Maclaren); 175 (Kids Line); 190, 196 (Regal Lager & Baby Bjorn). And Plaintiffs have alleged that the minimum RPM policies are contrary to each manufacturer's economic self-interest, because each manufacturer's goal was to increase sales volume, and the RPM agreements limited this volume because they resulted in the termination of certain retail outlets. See, e.g., BA

---

[7] Plaintiffs allege that Regal Lager acted as Baby Bjorn's agent. BA ¶ 45(a); McD ¶ 188.

¶¶ 40(dd)-(ff) (Peg Perego); 41(vv) (Medela); 42(ee) (Britax), 43(p)-(q) (Maclaren); 44(d) (Kids Line); 60 (all manufacturers); McD ¶¶ 87 (Peg Perego); 132 (Medela); 159 (Britax); 170 (Maclaren); 175 (Kids Line); 202 (all manufacturers). Plaintiffs have also alleged that BRU wields significant power over each manufacturer such that each manufacturer depends upon BRU's orders to remain economically viable. See, e.g., BA ¶¶ 40(c) (Peg Perego), 41(t) (Medela), 42(b) (Britax); 43(i) (Maclaren), 44(b) (Kids Line); McD ¶¶ 68 (Peg Perego), 106 (Medela), 136-137 (Britax); 165 (Maclaren); 173 (Kids Line). And Plaintiffs have also alleged that BRU threatened each manufacturer with severe repercussions in order to induce each manufacturer to impose minimum RPM policies on its retailers. See, e.g., BA ¶¶ 41(m) (Medela); 45(j) (Regal Lager & Baby Bjorn); 67 (all manufacturers); McD ¶¶ 77 (Peg Perego); 110 (Medela); 148 (Britax); 177 (Kids Line); 201 (Regal Lager & Baby Bjorn); 205(d) (all manufacturers).

        Therefore, Plaintiffs have stated enough facts to suggest the existence of concerted action between BRU and each manufacturer. By pleading widely recognized plus factors, Plaintiffs have alleged  grounds suggesting a finding of concerted action between BRU and each manufacturer. Plaintiffs have alleged that implementing RPM agreements was against each manufacturer's independent self interest. This tends to suggest — and is more than merely "consistent with" — the absence of unilateral action. Further, Plaintiffs have alleged that BRU threatened each manufacturer with termination and had the retail power to make that threat meaningful. This also tends to suggest the absence of unilateral manufacturer conduct. Simply put, these assertions takes the concerted-action allegations beyond mere parallel conduct — which, under Twombly, is insufficient because it is merely "consistent with" concerted action — and tend to negate other potential explanations for the striking parallelism. Plaintiffs' overwhelming allegations of facts tending to negate the potential

8

of unilateral conduct constitute enough "heft" to raise the satisfaction of the concerted-action element of the claim above the speculative level.

### b.    Between each manufacturer and various retailers

In addition to concerted action between BRU and each manufactuer, Plaintiffs must allege concerted action between each manufacturer and various retailers. Here, this has been adequately pleaded. Plaintiffs have alleged concerted action between each manufacturer and its retailers in the form of minimum RPM agreements. BA ¶¶ 1 (all manufacturers); 54 (Peg Perego); 58 (Medela); 53 (Britax); 57 (Maclaren); 55 (Kids Line); 56 (Regal Lager & Baby Bjorn); McD ¶¶ 1 (all manufacturers); 79, 84 (Peg Perego); 113, 119 (Medela); 150 (Britax); 167(b) (Maclaren); 181(e) (Kids Line); 200 (Regal Lager & Baby Bjorn).

### 3.    Anticompetitive nature

The third element of a Sherman § 1 claim is that the concerted action at issue was anticompetitive. That is, the concerted action at issue must have harmed the entire relevant market as a whole. Plaintiffs may allege the anticompetitive nature of the concerted action by alleging actual harm to competition. <u>FTC v. Indiana Fed'n of Dentists</u>, 476 U.S. 447, 460 (1986). Hallmarks of such actual harm include an increase in retail prices above and beyond what they would be under competitive conditions, a reduction in output below what it would be under competitive conditions, and a deterioration in quality and service. <u>Angelico v. Lehigh Valley Hosp.</u>, 184 F.3d 268, 276 (3d Cir. 1999). Further, binding precedent gives no indication that harm only to interbrand — as opposed to intrabrand — competition may suffice. Indeed, the U.S. Supreme Court and the leading treatise

9

in the field expressly recognize that harm to intrabrand competition is cognizable when brought about by the demands of a "dominant" retailer, one that has market power in the retail sales market and one upon whom each manufacturer depends for a large portion of its sales. Leegin v. PSKS, 127 S. Ct. 2705, 2717, 2719-2720 (2007); Areeda ¶¶ 1601(107), 1604.

Plaintiffs have alleged that the minimum RPM scheme caused prices for the manufacturers' goods to increase beyond competitive levels. See, e.g., BA ¶¶ 6, 74 (all manufacturers); 41(l) (Medela); 42(dd) (Britax); 43(n)-(o) (Maclaren); McD ¶¶ 5, 7 (all manufacturers); 158 (Britax). Also, Plaintiffs have alleged that those RPM policies blocked certain sales that otherwise would have been made, and in some cases caused sales to be made less rapidly than they otherwise would have, resulting in reduced overall output. See, e.g., BA ¶¶ 41(h) (Medela); 42(l) (Britax); 43(e) (Maclaren); 44(m) (Kids Line); 45(t) (Regal Lager & Baby Bjorn); McD ¶¶ 82 (Peg Perego); 127 (Medela); 183 (Kids Line); 199 (Regal Lager & Baby Bjorn). Further, there is at least one allegation that quality has decreased in the form of a decrease in customer service. BRU's already-poor customer service was magnified because it now accounted for a higher percentage of sales than it did before the RPM policies took effect. BA ¶ 41(rr); McD ¶ 129.

And Plaintiffs have alleged that BRU is precisely the dominant retailer that antitrust law condemns. They allege BRU's control of a dominant — indeed, monopolistic — share of the relevant markets. BA ¶¶ 71, 82, 87; McD ¶ 244. And they claim that each manufacturer depended upon BRU for a large portion of its retail sales. BA ¶¶ 34-35, 37, 38(h) (all manufactuers); 40(h) (Peg Perego); 42(c) (Britax); 43(i) (Maclaren), 44(b); McD ¶¶ 39-42 (all manufacturers); 68 (Peg Perego); 106 (Medela); 136 (Britax); 173 (Kids Line).

_____Therefore, Plaintiffs have stated enough facts to suggest that the concerted action here was

10

anticompetitive. They have alleged that prices were higher than competitive prices, output was lower than competitive output, and quality was worse than competitive quality. These allegations far exceed a conclusory accusation of anticompetitive effect. They are the hallmarks of anticompetition, and they therefore suggest — and are not merely consistent with — the anticompetitive nature of the concerted action at issue here. That is, these allegations constitute the heft required by Twombly to raise the satisfaction of this element beyond mere speculation.

### 4.      Causal nexus

Finally, Plaintiffs must allege that the anticompetitive agreements involving BRU, the manufacturers, and the retailers, were the source of their harm. That is, a Sherman § 1 violation will not exist if the harm incurred by Plaintiffs came about as the result of conduct that does not implicate the antitrust laws. Here, Plaintiffs have alleged that their injuries — for the consumer plaintiffs, paying a higher price, and for the retailer plaintiffs, losing sales volume — were caused by BRU's minimum RPM scheme rather than by ambient market conditions or other natural forces. See, e.g., BA ¶ 8; McD ¶ 211.

### IV.      Monopolization (Sherman § 2)

Plaintiffs must allege enough facts — that is, they must state their claim with enough "heft" — to suggest (1) a market or markets in which competition has been harmed, (2) BRU's maintenance of monopoly power in that market, (3) that BRU maintained that power by means other than superior competitive business strategy, and (4) a causal nexus between the monopolization and Plaintiffs' particular injuries. Aspen Skiing v. Aspen Highlands, 472 U.S. 585, 596 n.19 (1985);

11

<u>Twombly</u>, 127 S.Ct. at 1965; <u>Phillips</u>, 515 F.3d at 233-234; <u>Rossi v. Standard Roofing</u>, 156 F.3d 452, 483 (3d Cir. 1998).

### 1.        Relevant market

Plaintiffs have adequately alleged multiple relevant markets. <u>See</u> Part III.1, <u>supra</u>.

### 2.        BRU's monopoly power

Monopoly power is the "power to control prices and exclude competition," so "[i]f a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power." <u>Broadcom v. Qualcomm</u>, 501 F.3d 297, 307 (3d Cir. 2007). Further, a market may be unusually susceptible to monopolization — and therefore an allegation of monopoly power may be particularly compelling — where significant barriers to new-firm entry such as stringent industry regulation and high start-up cost are present. <u>Id.</u>

Plaintiffs have alleged that BRU has the requisite power over price and competition. BA ¶¶ 71-72, 87; McD ¶¶ 208-209, 241. Further, Plaintiffs have alleged that the relevant markets have significant barriers to entry in the form of stringent industry regulation and high start-up cost. BA ¶¶ 6, 33, 35, 72, 91; McD ¶¶ 46, 211.

Therefore, Plaintiffs have stated enough facts to suggest the existence of BRU's monopoly power in the relevant markets. Their complaints include enough heft to raise the satisfaction of this element beyond a speculative level. Further, by alleging facts supporting readily manipulable relevant markets, Plaintiffs have alleged grounds suggesting — not merely consistent with — a finding of monopoly power.

### 3.      Maintenance by improper means

_____That BRU maintained its monopoly power by improper means rather than by superior business intellect can be shown by BRU's exclusion of competition and refusal to compete on the merits (for example, on price and service). Broadcom, 501 F.3d at 315. Plaintiffs allege throughout the complaints that BRU was able to thwart the efforts of other, efficient retailers and maintain its monopoly power by procuring anticompetitive RPM agreements rather than by superior business acumen. BA ¶¶ 38(f), 89; McD ¶ 242. In particular, Plaintiffs allege that BRU excluded competitors by instructive manufacturers to terminate retailers who would not comply with minimum RPM. See, e.g., BA ¶ 41(cc) ("purge of competing retailers"), (gg); McD ¶ 115. Further, Plaintiffs allege that BRU, while obviously not wanting to compete on price as evidenced from the minimum-RPM demands, also had no intention of competing on customer service or quality. See, e.g., BA ¶ 41(j); McD ¶ 98.

_____Therefore, Plaintiffs have stated enough facts to suggest the existence of maintenance by improper means. Their complaints include enough heft to raise the satisfaction of this element beyond a speculative level.

### 4.      Causal nexus

Plaintiffs have alleged that their injuries — for the consumer plaintiffs, paying a higher price, and for the retailer plaintiffs, losing sales volume — were caused by BRU's monopolization rather than by ambient market conditions or other natural forces. See, e.g., BA ¶ 8; McD ¶ 211. Therefore, because Plaintiffs have alleged facts possessing enough heft to raise their right to relief on the

13

monopolization claim beyond a speculative level, the monopolization claim shall stand.

## V.   Attempted monopolization (Sherman § 2)[8]

Plaintiffs must allege enough facts — that is, they must state their claim with enough "heft" — to suggest (1) a market or markets in which competition may be harmed, (2) that BRU engaged in anticompetitive conduct, (3) that BRU had a specific intent to acquire monopoly power in those markets; (4) that BRU had a "dangerous probability" of actually acquiring that power, and (5) a causal nexus between the attempted monopolization and Plaintiffs' particular injuries. Spectrum Sports v. McQuillan, 506 U.S. 447, 456 (1993); Twombly, 127 S.Ct. at 1965; Phillips, 515 F.3d at 233-234; Rossi, 156 F.3d at 483.

## 1.   Relevant market

Plaintiffs have adequately alleged multiple relevant markets. See Part III.1, supra.

## 2.   Anticompetitive conduct

Plaintiffs have adequately alleged that BRU engaged in anticompetitive conduct. See Part III.3, surpa.

---

[8] It is apparently an open question whether a plaintiff can ultimately obtain a favorable jury verdict on both monopolization and attempted monopolization. LePage's v. 3M, 324 F.3d 141, 169 (3d Cir. 1999). However, there is no authority suggesting that both claims cannot simultaneously survive a motion to dismiss.

### 3.      Specific intent to monopolize

Plaintiffs have alleged that BRU's goal in procuring the minimum RPM agreements from each manufacturer was to acquire a monopoly share of the relevant markets. BA ¶ 101; McD ¶ 250.

### 4.      "Dangerous probability" of monopolization

Plaintiffs have alleged that BRU had a "dangerous probability" of acquiring monopoly power in the relevant markets. BA ¶ 103; McD ¶ 252. Further, Plaintiffs have alleged that the markets have certain characteristics that tend to make the relevant markets more susceptible to monopolization, and therefore tend to make the "dangerous probability" allegation more likely. In particular, Plaintiffs have alleged that the relevant markets have significant barriers to entry in the form of stringent industry regulation and high start-up cost, and that the market was already highly concentrated. BA ¶¶ 6, 33, 35, 72, 91; McD ¶¶ 46, 211; see also Part IV.2, supra.

### 5.      Causal nexus

Plaintiffs have alleged that their injuries — for the consumer plaintiffs, paying a higher price, and for the retailer plaintiffs, losing sales volume — were caused by BRU's attempted monopolization rather than by ambient market conditions or other natural forces. See, e.g., BA ¶ 8; McD ¶ 211.

## VI.    Conspiracy to monopolize (Sherman §§ 1 and 2)[9]

Plaintiffs must allege enough facts — that is, they must state their claim with enough "heft" — to suggest (1) a market or markets in which competition may be harmed, (2) an agreement between BRU and each manufacturer, (3) BRU's and each manufacturer's specific intent for BRU to maintain its monopoly power in those markets; (4) at least one overt act committed in furtherance of this objective by a member of each alleged conspiracy; and (5) a causal nexus between the conspiracy and Plaintiffs' particular injuries. Friedman v. Del. Cty. Mem. Hosp., 672 F. Supp. 171, 196 (E.D. Pa. 1987); Pontius v. Children's Hosp., 552 F. Supp. 1352, 1377 (E.D. Pa. 1982); Twombly, 127 S.Ct. at 1965; Phillips, 515 F.3d at 233-234; Rossi, 156 F.3d at 483.


### 1.    Relevant market

Plaintiffs have adequately alleged multiple relevant markets. See Part III.1, supra.


### 2.    Agreement between BRU and each manufacturer

Plaintiffs have adequately alleged that BRU agreed with each manufacturer. See Part III.2, surpa.

---

[9] The Baby Age complaint styles this claim as a Sherman § 1 and Sherman § 2 claim. However, to the extent it is grounded in § 1, it is functionally identical to the § 1 claim already pleaded in Count I. See, e.g., ID Sec. Sys. Can. v. Checkpoint, 249 F. Supp. 2d 622, 658 (E.D. Pa. 2003) (discussing analysis of conspiracy claim pleaded under both §§ 1 and 2).

### 3.      Specific intent for BRU to maintain monopoly power

Plaintiffs have alleged that BRU and each manufacturer specifically intended for BRU to maintain its monopoly share. They allege that BRU's goal in conspiring with each manufacturer to impose RPM on other retailers was to maintain its monopoly share. BA ¶ 96; McD ¶ 259. Further, Plaintiffs allege that each manufacturer, in agreeing to impose minimum RPM, intended to help BRU maintain that dominant position. Id.[10]

Therefore, Plaintiff have stated enough facts to suggest the existence of each co-conspirator's specific intent. Their complaints include enough heft to raise the satisfaction of this element beyond a speculative level.

### 4.      Overt act

Plaintiffs have alleged that, for each BRU-manufacturer conspiracy, one member of the conspiracy committed an overt act in furtherance of the conspiracy. Indeed, Plaintiffs allege numerous overt acts, including meetings, threats from BRU, and actual imposition of the RPM policies by manufacturers. See, e.g., BA ¶¶ 40(u), (y) (Peg Perego); 41(u) (Medela); 42(h) (Britax); 43(l) (Maclaren); 44(k) (Kids Line); 45(r)-(s) (Regal Lager & Baby Bjorn); McD ¶ 78 (Peg Perego); 108 (Medela); 148 (Britax); 167 (Maclaren); 180 (Kids Line); 199(e) (Regal Lager & Baby Bjorn).

---

[10] Of course, each manufacturer had its own economic stability to look after, and surely did not actively desire in the first instance to help BRU maintain its monopoly power. But this bears upon motive rather than intent, and does not undermine the sufficiency of Plaintiffs' specific-intent allegations.

## 5. Causal nexus

Plaintiffs have alleged that their injuries — for the consumer plaintiffs, paying a higher price, and for the retailer plaintiffs, losing sales volume — were caused by the antitrust conspiracy rather than by ambient market conditions or other natural forces. See, e.g., BA ¶ 8; McD ¶ 211.

## VII. Tortious interference with contractual relations (Pennsylvania common law)[11]

Retailer Plaintiffs must allege enough facts — that is, they must state their claim with enough "heft" — to suggest (1) the existence of contracts between the retailer plaintiffs and certain manufacturers; (2) that BRU interfered with the retailer plaintiffs' performance under these contracts; (3) that BRU did so intentionally; and (4) that BRU did so improperly. Schulman v. J.P. Morgan, 35 F.3d 799, 809 (3d Cir. 1994) (citing Pennsylvania Supreme Court cases and Rest. 2d Torts § 766, adopted by Pennsylvania courts); Twombly, 127 S. Ct. at 1965; Phillips, 515 F.3d at 233-234.

## 1. Contracts between retailer plaintiffs and the manufacturers

Retailer plaintiffs have alleged that Peg Perego had a supply contract with retailer plaintiff Baby Age and that Medela had a supply contract with retailer plaintiff Baby Club. BA ¶ 64(a)-(d).

---

[11] This claim is pleaded only in the retailers' complaint. Thus, the only relevant citations are paragraphs from that complaint.

**2.      BRU interfered with these contracts**

Retailer plaintiffs have alleged that BRU caused the Peg Perego-Baby Age contract to terminate. BA ¶ 64(a). They also have alleged that BRU caused the Medela-Baby Club contract to terminate. BA ¶¶ 64(c), 65.

**3.      Interference was intentional**

Retailer plaintiffs have directly alleged that BRU had the specific intent to interfere with the contracts at issue. BA ¶ 107. Further, they have allege other facts from which such intent can be inferred. With respect to the Peg Perego-Baby Age contract, retailer plaintiffs allege that BRU had knowledge of the supply contract because BRU gradually assumed comprehensive control of all of Peg Perego's pricing agreements. BA ¶ 40(e)-(f). Also, retailer plaintiffs allege a litany of facts suggesting that interference with this contract was in BRU's economic self-interest. See, e.g., BA ¶ 40(f). With respect to the Medela-Baby Club contract, retailer plaintiffs make the same allegations: BRU assumed control of Medela's pricing decisions, and interference with the existing contract was in BRU's best interest. BA ¶ 41(f), (l).

**4.      Interference was improper**

Retailer plaintiffs allege that BRU did not have any contractual privilege allowing it to lawfully interference with the performance of the Peg Perego-Baby Age contract or the Medela-Baby Club contract. BA ¶ 108.[12]

_____

[12] Further, the alleged history of dealing between retailer plaintiffs and certain manufacturers suffices to plead a claim of intentional interference with prospective contractual relations. The

**VIII.   Unjust enrichment (Pennsylvania common law)[13]**

Retailer Plaintiffs must allege enough facts — that is, they must state their claim with enough

"heft" — to suggest (1) they conferred a benefit on BRU; (2) BRU had knowledge of the benefit;

and (3) the circumstances are such that BRU's retention of that benefit would be unjust. Allegheny

Gen. Hosp. v. Phillip Morris, 228 F.3d 429, 447 (3d Cir. 2000) (interpreting Pennsylvania law);

Twombly, 127 S. Ct. at 1965; Phillips, 515 F.3d at 233-234.

**1.       Retailer plaintiffs conferred benefit on BRU**

Retailer plaintiffs allege that, by entering into minimum RPM agreements with the

manufacturers, they allowed BRU to undercut their prices and win sales that, in a competitive

market, would have gone to the retailer plaintiffs. See, e.g., BA ¶¶ 41(h), 42(l), 43(e), 44(m), 45(t).

**2.       BRU knew about this benefit**

Retailer plaintiffs allege that BRU knew about the sales it diverted from the retailer plaintiffs,

because BRU specifically intended the minimum RPM agreements to bring about this result. See,

e.g., BA ¶¶ 38(f), 89, 96, 112.

---

retailers' complaint is packed cheek-to-jowl with factual allegations that suggest that more supply
contracts would have been made but for BRU's imposition of minimum RPM. See, e.g., BA ¶¶ 40(y)
(Baby Age had been a "dealer of Peg Perego products"); 41(hh) (Baby Club had been selling
Medela's products for "eight years"); 107.

[13] This claim is pleaded only in the retailers' complaint. Thus, the only relevant citations are
paragraphs from that complaint.

### 3.      Retention would be inequitable

_____Retailer plaintiffs allege that retention would be inequitable, because the minimum RPM scheme that diverted sales from the retailer plaintiffs was illegal (in that it violated federal antitrust law). <u>See, e.g.</u>, BA ¶¶ 8; <u>see also</u> Parts III-VI, <u>supra</u>.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BABYAGE.COM, INC. and | : | |
| THE BABY CLUB OF AMERICA, INC., | : | |
|     Plaintiffs, | : | CIVIL ACTION |
| | : | |
|     v. | : | No. 05-6792 |
| | : | |
| TOYS "R" US, INC., d/b/a Babies "R" Us, | : | |
| and BABIES "R" US, INC., | : | |
|     Defendants. | : | |

| | | |
|---|---|---|
| JAMES L. MCDONOUGH et al., | : | |
| individually and on behalf of all others | : | |
| similarly situated, | : | |
|     Plaintiffs, | : | CIVIL ACTION |
| | : | |
|     v. | : | No. 06-242 |
| | : | |
| TOYS "R" US - DELAWARE, INC., d/b/a | : | |
| Babies "R" Us, and BABIES "R" US, INC. | : | |
| et al., | : | |
|     Defendants. | : | |

## <u>ORDER</u>

    **AND NOW**, this _19th ___ day of May, 2008, it is **ORDERED** that Defendants motions to dismiss (05-6792 docs. # 300, 301, 302, 303, 304, 307, 308; and 06-242 docs. # 344, 345, 346, 347, 348, 351, 352) are **DENIED**.


_____    s/Anita B. Brody

_____                                 _____
                                          ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:        Copies **MAILED** on _____ to: