**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BABYAGE.COM, INC. and | : | |
| THE BABY CLUB OF AMERICA, INC., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 05-6792 |
| | : | |
| TOYS "R" US, INC., d/b/a Babies "R" Us, | : | |
| and BABIES "R" US, INC., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| JAMES L. MCDONOUGH et al., | : | |
| individually and on behalf of all others | : | |
| similarly situated, | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 06-242 |
| | : | |
| TOYS "R" US - DELAWARE, INC., d/b/a | : | |
| Babies "R" Us, and BABIES "R" US, INC. | : | |
| et al., | : | |
| Defendants. | : | |

## EXPLANATION AND ORDER

### I.      Background

_____Babies 'R' Us ("BRU") is a large retailer of baby and juvenile products including strollers, high chairs, breast pumps, bedding, car seats, and infant carriers. It carries products manufactured by Britax, Peg Perego, Medela, Maclaren, Kids Line, Regal Lager, and Baby Bjorn (the "manufactuers"), among others. Smaller retailers like Baby Age and Baby Club (the "retailers") competed with BRU by undercutting BRU's prices in order to increase their sales volume. This

undercutting ceased when the manufacturers began to require the retailers to sell their goods at or above a certain price. The retailers, and various consumers (the "consumers") who allegedly paid more for baby products than they would have absent these pricing policies, complain that BRU orchestrated these arrangements in order to ward off competition.[1]

The retailers and the consumers brought an action against BRU and the manufacturers, alleging that this scheme violates federal antitrust law and Pennsylvania common law. BRU and the manufacturers moved to dismiss the complaints in their entirety. On May 20, 2008, I issued an opinion denying the motion. Now, defendant Kids Line moves for reconsideration of that opinion as to the issue of concerted action between BRU and Kids Line, an element of several of the antitrust claims.

## II.      Motion-for-reconsideration legal standard

A litigant is not permitted to use a motion for reconsideration as a vehicle to make arguments that it failed to make earlier or to re-litigate earlier arguments once again. Rather, a party moving for reconsideration of a district court's ruling must base its motion on one of three narrow grounds: (1) the availability of newly-discovered evidence; (2) an intervening change in governing law; or (3) a "clear" error of law made by the district court in its ruling. North River Ins. v. CIGNA, 52 F.3d 1194, 1218 (3d Cir. 1995) (stating proper grounds for motion for reconsideration). Here, Kids Line relies on the third ground, arguing that I committed a clear error of law.

---

[1] The retailers' complaint will be referenced with "BA," for Baby Age, the first named retailer. The consumers' complaint will be referenced with "McD," for McDonough, the first named consumer.

**III.    Discussion**

In the May 20, 2008 opinion, I held, in relevant part:

Plaintiffs may allege concerted action by claiming parallel conduct coupled with circumstances that tend to negate the possibility that BRU and each manufacturer acted independently. Phillips, 515 F.3d at 233-234. Accepted "plus factors" include (a) that the parallel conduct at issue was against each manufacturer's independent economic self-interest, Lum v. Bank of Amer., 361 F.3d 217, 230 (3d Cir. 2004); (b) that BRU wielded sufficient influence over each manufacturer to create a duress situation, Monsanto v. Spray-Rite, 465 U.S. 752, 767-768 (1984); and (c) that BRU threatened to retaliate against each manufacturer if each manufacturer did not implement minimum resale price maintenance ("RPM") agreement with its retailers, and the manufacturers in turn acquiesced, Albrecht v. Herald, 390 U.S. 145, 149 (1968).

Plaintiffs have alleged parallel conduct in the form of imposition of minimum RPM policies. See, e.g., BA ¶¶ 40(a) (Peg Perego); 41(a), (g) (Medela); 42(a) (Britax); 43(a) (Maclaren); 44(a) (Kids Line); 45(q) (Regal Lager & Baby Bjorn); McD ¶¶ 68 (Peg Perego); 104, 109 (Medela); 135 (Britax); 166-167 (Maclaren); 175 (Kids Line); 190, 196 (Regal Lager & Baby Bjorn). And Plaintiffs have alleged that the minimum RPM policies are contrary to each manufacturer's economic self-interest, because each manufacturer's goal was to increase sales volume, and the RPM agreements limited this volume because they resulted in the termination of certain retail outlets. See, e.g., BA ¶¶ 40(dd)-(ff) (Peg Perego); 41(vv) (Medela); 42(ee) (Britax), 43(p)-(q) (Maclaren); 44(d) (Kids Line); 60 (all manufacturers); McD ¶¶ 87 (Peg Perego); 132 (Medela); 159 (Britax); 170 (Maclaren); 175 (Kids Line); 202 (all manufacturers). Plaintiffs have also alleged that BRU wields significant power over each manufacturer such that each manufacturer depends upon BRU's orders to remain economically viable. See, e.g., BA ¶¶ 40(c) (Peg Perego), 41(t) (Medela), 42(b) (Britax); 43(i) (Maclaren), 44(b) (Kids Line); McD ¶¶ 68 (Peg Perego), 106 (Medela), 136-137 (Britax); 165 (Maclaren); 173 (Kids Line). And Plaintiffs have also alleged that BRU threatened each manufacturer with severe repercussions in order to induce each manufacturer to impose minimum RPM policies on its retailers. See, e.g., BA ¶¶ 41(m) (Medela); 45(j) (Regal Lager & Baby Bjorn); 67 (all manufacturers); McD ¶¶ 77 (Peg Perego); 110 (Medela); 148 (Britax); 177 (Kids Line); 201 (Regal Lager & Baby Bjorn); 205(d) (all manufacturers).

Therefore, Plaintiffs have stated enough facts to suggest the existence of concerted action between BRU and each manufacturer. By pleading widely recognized plus factors, Plaintiffs have alleged  grounds suggesting a finding of concerted action between BRU and each manufacturer. Plaintiffs have alleged that implementing RPM agreements was against each manufacturer's independent self interest. This tends to suggest — and is more than merely "consistent with" — the absence of unilateral action. Further, Plaintiffs have alleged that BRU threatened each manufacturer with termination and had the retail power to make

that threat meaningful. This also tends to suggest the absence of unilateral manufacturer conduct. Simply put, these assertions takes the concerted-action allegations beyond mere parallel conduct — which, under <u>Twombly</u>, is insufficient because it is merely "consistent with" concerted action — and tend to negate other potential explanations for the striking parallelism. Plaintiffs' overwhelming allegations of facts tending to negate the potential of unilateral conduct constitute enough "heft" to raise the satisfaction of the concerted-action element of the claim above the speculative level.

May 20, 2008 Opinion, at 7-8 (footnote omitted). Kids Line does not allege that I misstated the law on concerted action or the relevant pleading standard. Rather, Kids Line alleges that I clearly erred in applying that law, inappropriately finding that Plaintiffs plus-factor allegations survive the motion-to-dismiss stage. KL Mot., at 4.

As to economic self-interest, Kids Line argues that it was error to find that paragraphs BA ¶ 44(d) and McD ¶ 175 support the conclusion that minimum RPM hurt Kids Line's bottom line. KL Mot., at 4-7. Kids Line is mistaken. These paragraphs allege, among other facts, that "Kids Line acknowledged internally that denying additional sales outlets on the internet was against Kids Line's own economic interests." And, by definition, minimum RPM denies these very sales outlets, because it prevents Kids Line from allowing a retailer to discount its products below the declared minimum. When coupled with the allegations that Kids Line did in fact implement minimum RPM, the allegation in BA ¶ 44(d) and McD ¶ 175 that Kids Line is a volume seller leads inescapably to the conclusion that minimum RPM was contrary to Kids Line's independent profit motive.

As to creation of a duress situation, Kids Line argues that it was error to find BRU forced Kids Line into such a predicament based solely upon paragraphs BA ¶ 44(b) and McD ¶ 173. KL Mot., at 4, 9-10. Kids Line appears to be laboring under the misimpression that I relied exclusively upon these allegations to find duress. These paragraphs allege that, "[b]y 2001, BRU accounted for

4

50.1% of Kids Line's sales."[2] Kids Line contends that, in addition to BRU's power demonstrated by percentage of Kids Line sales, Plaintiffs must allege some affirmative conduct showing that BRU actually wielded this power. KL Mot., at 9-10. But Plaintiffs have alleged such conduct. For example, Plaintiffs alleged that BRU used its dominance to "dictate[]" the terms on which Kids Line could do business with other retailers. BA ¶ 44(c); McD ¶ 174. In particular, Plaintiffs alleged that BRU blocked Kids Line's request to allow retailer Baby Age to depart from minimum RPM and discount its prices to match BRU's. BA ¶ 44(h)-(i); McD ¶¶ 179-180. Plaintiffs also alleged that BRU took action in the form of refusing to accept Kids Line's supply shipments until Kids Line implemented minimum RPM with its retailers. McD ¶ 48. Additionally, Plaintiffs alleged that once the minimum RPM agreements were in place, BRU actively surveilled retail prices in order to enforce compliance with those agreements. BA ¶ 38(e).

As to retaliation, Kids Line argues that it was error to find that paragraphs BA ¶ 44(f) and McD ¶ 177 support the conclusion that BRU threatened to retaliate against Kids Line if Kids Line did not comply with minimum RPM. KL Mot., at 4, 8-9. Those paragraphs allege that, once BRU found out that Kids Line was discounting the total price of its products by cutting shipping costs to retailers, BRU demanded that Kids Line reimburse it for those costs. Giving Plaintiffs the benefit of all reasonable inferences, as I must on a motion to dismiss, this is a textbook allegation of retaliation. But this is not the only example. Again giving Plaintiffs the benefit of all reasonable inferences, the allegation that BRU "engaged in extensive retail price surveillance to ensure that

---

[2] McD ¶ 173 replaces the "50.1%" figure with the phrase "a significant portion."

5

[Kids Line was] not in breach of the BRU-[Kids Line] Agreement[]" can be construed as a threat of reprisal if the results of that surveillance are not to BRU's liking. BA ¶ 38(e).

## IV.  Conclusion

Both complaints contain the factual heft required by <u>Twombly</u> to support allegations of the three plus factors identified in the May 20, 2008 opinion: (1) that the minimum RPM policies were against Kids Line's independent economic self-interest; (2) that BRU wielded sufficient influence over Kids Line to create a duress situation; and (3) that BRU threatened to retaliate against Kids Line if Kids Line did not implement minimum RPM with its retailers, and Kids Line in turn acquiesced.[3] Therefore, both complaints contain sufficient factual heft to support allegations of concerted action between BRU and Kids Line.[4]

Judging the sufficiency of plus-factor allegations under the <u>Twombly</u> pleading standard is not an easy task. Because <u>Twombly</u> was handed down only recently, district courts operate by-and-large without a great deal of guidance from the regional circuit courts of appeal on how to apply it. And because that case does not establish (because it would be virtually impossible for <u>any</u> case to

---

[3] Also, my opinion noted that these plus factors represent a non-exhaustive list of indicia of concerted action.

[4] Kids Line cites <u>Kendall v. Visa</u>, 518 F.3d 1042 (9th Cir. 2008) for the (unremarkable) proposition that allegations of parallel conduct — without more — cannot survive a motion to dismiss for failure to state a Sherman § 1 claim. KL Mot., at 6. However, Plaintiffs here have alleged more. Namely, they have alleged the presence of three plus factors recognized by the Third Circuit as tending to negate the possibility of independent action. It is also worth noting that the Sherman § 1 conspiracy allegations in <u>Kendall</u> were, by and large, direct allegations of conspiracy, rather than indirect allegations of conspiracy made via parallel conduct and plus factors. In contrast, in my May 20, 2008 opinion, I relied primarily on indirect allegations.

establish) a bright-line division between what allegations count as credible factual assertions and what allegations count as legal conclusions, the governing standard is necessarily somewhat amorphous. All of this is to say that errors in applying the <u>Twombly</u> pleading standard are unlikely to be the "clear errors" required in the motion-for-reconsideration context.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BABYAGE.COM, INC. and                      :
THE BABY CLUB OF AMERICA, INC.,            :
     Plaintiffs,                          :        CIVIL ACTION
                                          :
     v.                                   :        No. 05-6792
                                          :
TOYS "R" US, INC., d/b/a Babies "R" Us,     :
and BABIES "R" US, INC.,                    :
     Defendants.                          :

---

JAMES L. MCDONOUGH et al.,                 :
individually and on behalf of all others   :
similarly situated,                        :
     Plaintiffs,                          :        CIVIL ACTION
                                          :
     v.                                   :        No. 06-242
                                          :
TOYS "R" US - DELAWARE, INC., d/b/a         :
Babies "R" Us, and BABIES "R" US, INC.     :
et al.,                                    :
     Defendants.                          :

## <u>ORDER</u>

    **AND NOW**, this __2nd___ day of July, 2008, it is **ORDERED** that Kids Line's Motion

for Reconsideration (05-6792 doc. # 338; and 06-242 doc. # 381) is **DENIED**.

 

---

 

_____s/Anita B. Brody

_____

                                                     ANITA B. BRODY, J.

8

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to: