## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

CAROL McDONOUGH, et al.,          :
    Plaintiffs                        :
                             :          CIVIL ACTION
             v.                     :
                             :          NO. 06-0242
TOYS "R" US, INC., et al.,         :
    Defendants                        :

**July 15, 2009**                                                          **Anita B. Brody, J.**

## MEMORANDUM

Over the past decade, the retail chain Babies "R" Us, Inc. ("BRU"), has become a fixture in the lives of new parents across the United States.  Although it dominates the retail market for baby products, recently BRU began facing stiff competition from internet retailers offering steep discounts.  This case concerns whether BRU responded by conspiring with baby-product manufacturers to restrict competition in violation of federal antitrust law.[1]  BRU allegedly coerced manufacturers into adopting vertical price restraints—policies designed to prevent retail discounting—that would insulate BRU from price competition.  The plaintiffs are consumers who paid allegedly inflated prices at BRU for certain baby products.[2]  They moved for class certification under Federal Rule of Civil Procedure 23(b)(3).

---

[1] Jurisdiction is exercised under 28 U.S.C. § 1331 because the claims arise under federal law.

[2] Several internet retailers sued in Babyage.com, et al. v. Toys "R" Us, Inc., et al., No. 05-6792 (E.D. Pa. filed Dec. 29, 2005).  The cases were consolidated for discovery in March 2006.

Two watershed decisions issued after this case was filed are important here.  The first was

Leegin Creative Leather Products, Inc. v. PSKS, Inc., 127 S.Ct. 2705 (2007), where the Supreme

Court declared that vertical price restraints are not *per se* illegal anymore but instead are

evaluated under the rule of reason, overruling Dr. Miles Medical Co. v. John D. Park & Sons

Co., 220 U.S. 373 (1911).  Although finding that "vertical agreements setting minimum resale

prices can have procompetitive justifications," Leegin, 127 S.Ct. at 2716, the Court stated that

lower courts must "be diligent in eliminating their anticompetitive uses from the market," id. at

2719.  Relevant to the case before me, the Supreme Court warned:

> A dominant retailer, for example, might request resale price maintenance to
> forestall innovation in distribution that decreases costs.  A manufacturer might
> consider it has little choice but to accommodate the retailer's demands for vertical
> price restraints if the manufacturer believes it needs access to the retailer's
> distribution network.

Id. at 2717.  When thus coerced, the Court explained, "the manufacturer does not establish the

practice to stimulate services or to promote its brand," id., but instead "supports a dominant,

inefficient retailer," id. at 2719.  The Court then cited Toys "R" Us, Inc. v. FTC, where the

Seventh Circuit upheld findings that Toys "R" Us, Inc.—the parent company of BRU—coerced

toy manufacturers into implementing vertical restraints to hinder competition from warehouse

clubs like Costco, BJ's, and Sam's Club.  221 F.3d at 930-33.

The second decision was In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir.

2008), where the Third Circuit clarified the legal standard for class certification.  In that case, the

district court failed to resolve significant disputes between expert witnesses and granted

certification based on only threshold showings under Rule 23.  Although this was common

practice at the time, the Third Circuit declared that Rule 23 requires much more rigorous

analysis.  Now courts must "consider carefully all relevant evidence and make a definitive

determination that the requirements of Rule 23 have been met before certifying a class," id. at

320, and "resolve all factual or legal disputes relevant to class certification, even if they overlap

with the merits," id. at 307.

In re Hydrogen Peroxide was a private antitrust action similar to this case.  The Third

Circuit found that class certification may have been improper because the defendants had offered

expert testimony and empirical evidence poking holes in the plaintiffs' argument under the

predominance requirement of Rule 23(b)(3).  The court then remanded the case for another

certification decision.  In re Hydrogen Peroxide thus teaches that a defendant may successfully

challenge class certification by using evidence to undermine the plaintiffs' case under Rule 23,

and a district court must consider this when deciding class certification.  In the case before me,

both sides offered expert testimony and other evidence related mostly to the predominance

requirement.  Following over two days of hearings and having resolved their disputes and

analyzed all relevant evidence, I conclude that the plaintiffs have carried their burden under Rule

23.  Therefore, I will grant the motion for class certification.


I. BACKGROUND[3]

During the early 1990s, small specialty stores dominated the U.S. retail market for baby

products.  Hoping to capture this market, retail giant Toys "R" Us, Inc., created BRU and opened

---

[3] The facts are stated based on evidence offered to support the Fourth Amended Consolidated
Class Action Complaint ("Complaint").

several stores in 1996.[4]  Unlike small specialty stores, BRU carries many brands and all types of

baby products at one location.  BRU gained 76 more stores when it purchased Baby Super Stores

in 1997.  It opened an online shop in 1998.  And from 1998 to 2007, BRU opened about 18 new

stores per year.  Now BRU has over 260 stores across the country.  By contrast, between 1996

and 2002, small specialty stores dwindled from 2,700 to 600.  BRU thus became the dominant

retailer of baby products.

 BRU soon faced stiff competition, however, from a new form of product distribution.

"E-commerce," whereby commercial transactions are conducted electronically over the internet,

became widespread during the late 1990s and transformed the baby-products industry.  Without

the operating costs associated with brick-and-mortar stores, internet retailers can offer huge

discounts that other retailers cannot match.  By consequence, BRU began facing tough price

competition from internet retailers.

 This case concerns how BRU responded to this competition.  The plaintiffs offered

evidence that BRU coerced manufacturers of baby products into preventing internet retailers

from offering discounts.  Specifically, BRU would threaten not to carry products unless their

manufacturer agreed to prevent internet retailers from discounting them.  Manufacturers were

forced to acquiesce because industry-dominant BRU had become their most prized customer.

 Manufacturers used various methods to prevent internet discounting.  These include

implementing various "distribution policies," which are policies governing how retailers may

distribute products.  One was resale price maintenance, i.e., vertical price restraint.  This type of

---

[4] The three defendants Toys "R" Us - Delaware, Inc.; Toys "R" Us, Inc., doing business as
Babies "R" Us; and BRU are collectively called "BRU" in this opinion.

policy specifies a manufacturer-suggested retail price ("MSRP") for a product and prohibits retailers from discounting too far below that price.  Another type of policy used was to regulate who could carry a product, e.g., banning internet-only retailers.  Whatever method manufacturers used, the result benefitted BRU (with protected high margins) but harmed internet retailers (without ability to discount), manufacturers (with fewer total sales), and consumers (with higher prices).

BRU conspired with numerous manufacturers, including the defendants Britax Child Safety, Inc. ("Britax"); Kids Line, LLC. ("Kidsline"); Maclaren USA, Inc. ("Maclaren"); Medela, Inc. ("Medela"); Peg Perego USA, Inc. ("Peg-Perego"); and BabyBjörn, AB ("BabyBjörn"), which supplied U.S. retailers through the defendant Regal Lager, Inc. ("Regal Lager").  They make assorted products—including baby carriers, car seats, bedding, strollers, and breast pumps—and are considered market leaders.  The thirteen consumers who brought this action are Stephanie Bozzo, Amy Grogan, Erin Hall, Julie Lindemann, Carol McDonough, Lawrence McNally, Melissa Nuttall, Sarah Otazo, Evelia Ragsdale, Sara Shuck, Jennifer Sullivan, Darcy Trzupek, and Yossi Zarfati.  They complain that BRU conspired with other defendants to restrict competition from internet discounting and then charged consumers higher prices.  These conspiracies are examined one by one below.


## A.  BabyBjörn and Regal Lager

Founded in Sweden in 1961, BabyBjörn has become famous for making baby carriers—devices to carry a child in a pouch secured on one's chest.  Various models are available, including the BabyBjörn Baby Carrier, BabyBjörn Carrier XL, BabyBjörn Carrier

Brown Leather, and BabyBjörn Carrier Active.  From 1991 to 2005, Regal Lager was responsible

for supplying BabyBjörn carriers to the U.S. market.  It also became BabyBjörn's agent in early

1999.  BabyBjörn replaced Regal Lager with another supplier Baby Swede LLC ("BabySwede")

in April 2005.

From 1991 to 2000, BabyBjörn carriers were sold mainly by small specialty stores.  Regal

Lager and BabyBjörn began negotiating with BRU in March 1999.  During the negotiations,

BRU demanded protection from internet discounting and proposed a distribution policy to

accomplish this.[5]  Regal Lager and BabyBjörn agreed to BRU's demand.  Accordingly, Regal

Lager implemented the mentioned policy effective February 1, 2000.  BRU's first order was

placed the very next day.  Pursuant to the conspiracy, Regal Lager and BabyBjörn vigorously

enforced resale price maintenance against internet retailers, gave BRU preferential treatment, and

stopped opening internet accounts.  During this period, BRU accounted for most of Regal

Lager's business.  Its founder Bengt Lager said about BRU: "It's hard to say no when they have

over 50% of our business!"  (Pl.'s Ex. 20.)

Lindemann, Ragsdale, Hall, Nuttall, Shuck, McNally, Grogan, and Bozzo purchased

BabyBjörn carriers from BRU and complain of paying higher prices because competition was

unlawfully restricted.  In the motion before me, they request certification for a subclass defined to

include: "All persons who purchased any baby carrier manufactured by BabyBjörn and

distributed by Regal Lager from Babies 'R' Us for the period February 2, 2000 to April 30,

2005."  (Pl.'s Statement of Proposed Class Definitions 1 [hereinafter Pl.'s Definitions].)

---

[5] BRU proposed almost identical policies to other defendants.

**B.  Britax**

Britax has become famous for making car seats that are extremely safe and highly rated by Consumer Reports.  Nine models are available in various fabrics.  The most popular ones are the Marathon and the Roundabout.  Britax also makes two models of strollers.

Britax originally had a distribution policy unrelated to retail discounting.  Britax then began selling to BRU in October 1998.  Although initially retail pricing remained unregulated, matters changed in 1999 when BRU became concerned about internet discounting.  BRU demanded that Britax stop internet retailers from discounting its products.  Britax agreed and created a new distribution policy after consultation with BRU.  Effective July 2000, this policy regulated pricing and prohibited internet-only retailers from selling the Roundabout.  Pursuant to the conspiracy, Britax enforced resale price maintenance against internet retailers and assured BRU: "We … are doing what we 'legally' can do to ensure MSRP harmony in the marketplace." (Pl.'s Ex. 32.)

Britax later created another distribution policy to further protect BRU.  Effective July 2005, this policy barred internet retailers from discounting any Britax product.  Britax admitted that the new policy "has had a positive influence on sales to BRU and will continue to do so if we are able to maintain the policy" because it "allows BRU to directly benefit from consumers no longer finding discounted Britax products on the Internet."  (Pl.'s Ex. 120.)

Nuttall bought a Britax car seat from BRU in 2002 and complains of paying a higher price because competition was unlawfully restricted.  She requests certification for a subclass

7

defined to include: "All persons who purchased any car seat or stroller manufactured by Britax from Babies 'R' Us for the period January 1, 1999 to the present."  (Pl.'s Definitions 1.)


## C.  Kidsline

Founded in 1987, Kidsline has become a leading manufacturer of baby bedding and accessories.  This includes quilts, mobiles, hanging decorations, laundry hampers, and other items for children's bedrooms.  Kidsline's most popular products are four- and six-piece bedding sets.  Each includes a quilt, crib bumper, fitted sheet, and dust ruffle.  Six-piece sets also include a window decoration and diaper stacker.

Kidsline began selling to BRU's predecessor Baby Super Stores in 1992 and continued when BRU acquired Baby Super Stores in 1997.  BRU became concerned about internet discounting in 1999 and demanded that Kidsline protect BRU.  When Kidsline complied, BRU began dictating how Kidsline treated retailers.  Pursuant to the conspiracy, Kidsline enforced resale price maintenance against internet retailers, gave BRU preferential treatment, compensated BRU for others' discounting, and stopped opening internet accounts starting in 2001.  Furthermore, BRU suggested a distribution policy that Kidsline implemented in October 2004.  Kidsline revised the policy in February 2005 after consultation with BRU.  Around this time, Kidsline's chief financial officer Charles Ginn told an internet retailer that discounting was prohibited because of BRU and commented: "[D]o you actually think that I'm going to make a decision between a very important customer and an important customer?  The very important customer wins every time."  (Kiefer Dep. 248:18-22, Nov. 21, 2008.)

Sullivan bought Kidsline sheets from BRU and complains of paying a higher price because competition was unlawfully restricted.  She requests certification for a subclass defined to include: "All persons who purchased any four or six-piece bedding sets manufactured by Kids Line from Babies 'R' Us for the period January 1, 1999 to the present."  (Pl.'s Definitions 1.)

### D.  Maclaren

Owen Maclaren, a retired aeronautical engineer, invented a stroller called the "B-1 buggy" in 1965.  He enjoyed quick success because, unlike cumbersome prams then available, his buggy conveniently folded like an umbrella.  Since then, his company Maclaren has become famous for making compact, lightweight "umbrella" strollers like the original B-1 buggy.  Eleven stroller models are now available, but the best-selling are the Quest and Triumph.  Maclaren also makes baby carriers, rockers, and other related products.

BRU began selling Maclaren strollers at four stores in October 1999.  At that time, BRU demanded that Maclaren stop internet discounting and refused to carry Maclaren strollers nationwide unless retail pricing was regulated.  Maclaren complied with BRU's demand.  Pursuant to the conspiracy, BRU proposed a distribution policy that Maclaren implemented in March 2000.  Maclaren also vigorously enforced resale price maintenance against internet retailers and gave BRU preferential treatment.  Around this time, Maclaren admitted losing business to "meet BRU margin requirements" (Pl.'s Ex. 19) and said that Maclaren had "made BRU the most competitive Retailer in the country" (Pl.'s Ex. 84).

Zarfati bought a Maclaren stroller from BRU and complains of paying a higher price because competition was unlawfully restricted.  He requests certification for a subclass defined to

include: "All persons who purchased any stroller manufactured by Maclaren from Babies 'R' Us for the period October 1, 1999 to the present."  (Pl.'s Definitions 2.)

### E.  Medela

Medela has become famous for making breast pumps and accessories.  There are three categories: hospital-grade electric pumps, consumer-grade electronic pumps (intended for one person), and manual pumps.  Medela's business initially focused on renting hospital-grade electric pumps.  But in 1996, Medela launched a consumer-grade electronic breast pump called the Pump In Style ("PNS") that soon became a major success.  Now various models are available—the Original, Traveler, Companion, and Advanced.

Beginning in 1996, Medela had a distribution policy for the PNS Original.  But this policy was rarely enforced until October 1999, when Medela began negotiating with BRU.  At that time, BRU's president made a suprise visit to Medela's office.  During this meeting, Medela agreed to protect BRU from internet discounting, committed to begin enforcing resale price maintenance, and gave BRU the names of internet retailers to monitor.  BRU thereafter controlled Medela's decisions about internet accounts and retail pricing.

BRU began selling the PNS Original in July 2000 and quickly became Medela's biggest account.  That same year, Medela launched the PNS Traveler and PNS Companion along with distribution policies covering them.  But in 2002, growing concerned about BRU's dominance, Medela relaxed these policies and suspended the distribution policy for the PNS Original.  Soon after, BRU warned Medela that internet retailers were discounting again.  To send a message,

BRU canceled all orders on May 6, 2002.  In response, Medela called a meeting where BRU withdrew its cancellation and Medela agreed once again to stop internet discounting.

Pursuant to this meeting, Medela terminated 17 internet accounts in July 2002 and admitted: "We discontinued internet sellers to protect BRU's business and margin and therefore accepted considerable legal risk."  (Pl.'s Ex. 80.)  Furthermore, Medela developed new distribution policies for the PNS Original and PNS Traveler.  Effective July 2003, these policies barred retailers unless they conducted more than 50% of their business through brick-and-mortar stores.  Medela explained to BRU: "This plan will not effect [*sic*], but instead benefit BRU.com." (Pl.'s Ex. 42.)  Medela launched the PNS Advanced in late 2003 under the same policy.

Bozzo and Trzupek bought PNS breast pumps from BRU and complain of paying higher prices because competition was unlawfully restricted.  They request certification for a subclass defined to include: "All persons who purchased any Pump In Style breast pump manufactured by Medela from Babies 'R' Us for the period July 1, 1999 to the present."  (Pl.'s Definitions 2.)

### F.  Peg-Perego

Peg-Perego distinguishes itself by making designer baby products that reflect Italian fashion.  Several stroller models are available, including the Olympic, Milano, Aria, Pliko, and Skate.  Other significant products are the Prima Pappa high chair and Primo Viaggio car seat.

Peg-Perego began selling to BRU in 1996 and also sold to Baby Super Stores.  BRU then became Peg-Perego's biggest account upon acquiring Baby Super Stores in 1997.  In 1999, BRU became concerned about internet retailers and demanded that Peg-Perego prevent them from discounting.  Peg-Perego agreed and in May 1999 implemented a distribution policy that BRU

11

requested.  Later, this policy was revised to require internet retailers to prove that they were not

discounting.  From that time on, Peg-Perego enforced resale price maintenance against internet

retailers to protect BRU.

Bozzo, McDonough, McNally, Otazo, and Shuck bought Peg-Perego strollers and other

products from BRU and complain of paying higher prices because competition was unlawfully

restricted.  They request certification for a subclass defined to include: "All persons who

purchased any car seat, high chair, or stroller manufactured by Peg Perego from Babies 'R' Us

for the period July 1, 1999 to the present."  (Pl.'s Definitions 2.)


## II. Legal Standard

Subsection (a) of Fed. R. Civ. Pro. 23 specifies four prerequisites for a class action.  They

are called numerosity, commonality, typicality, and adequacy.  Subsection (b) specifies additional

requirements for each type of class action.  For certification under (b)(3), the moving party must

show "that the questions of law or fact common to class members predominate over any

questions affecting only individual members," and "that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Pro.

23(b)(3).  These requirements are called predominance and superiority.

In the recent case In re Hydrogen Peroxide, the Third Circuit clarified the standard of

review for assessing motions for class certification.  The court said that deciding class

certification "requires rigorous consideration of all the evidence and arguments offered by the

parties."  553 F.3d at 321.  A district court must "consider carefully all relevant evidence and

make a definitive determination that the requirements of Rule 23 have been met before certifying

a class." Id. at 320.  "A party's assurance to the court that it intends or plans to meet the

requirements is insufficient." Id. at 318.  Furthermore, "the court must resolve all factual or legal

disputes relevant to class certification, even if they overlap with the merits." Id. at 307.  And

"[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance

of the evidence." Id. at 320.  Finally, "[w]eighing conflicting expert testimony at the certification

stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." Id. at

323.  "[A] district court may find it unnecessary to consider certain expert opinion with respect to

a certification requirement, but it may not decline to resolve a genuine legal or factual dispute"

relevant to class certification. Id. at 324.


## III. DISCUSSION

Below I consider "all the evidence and arguments offered by the parties" relevant to class

certification.  In re Hydrogen Peroxide, 553 F.3d at 321.  Before I may address the Rule 23

requirements, however, certain preliminary matters must be resolved.  The first concerns whether

the plaintiffs have standing.  The second relates to class definition.


### A.  Standing

"Article III of the Constitution limits federal 'judicial Power' to the adjudication of

'Cases' or 'Controversies.'" Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 137 (3d Cir.

2009) (quoting U.S. Const. art. III, § 2).  "Courts enforce the case-or-controversy requirement

through the several justiciability doctrines that cluster about Article III." Id. (internal quotation

marks omitted).  "Perhaps the most important of these doctrines is standing." Id. (internal

quotation marks omitted).  "The doctrine of standing … requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction."  Summers v. Earth Island Inst., 129 S.Ct. 1142, 1149 (2009).  In a class action, this means that "[a] litigant must be a member of the class which he or she seeks to represent."  Sosna v. Iowa, 419 U.S. 393, 403 (1975).  See Bailey v. Patterson, 369 U.S. 31, 32-33 (1962) (noting related to standing that the appellants "cannot represent a class of whom they are not a part"); 1 Alba Conte & Herbert Newberg, Newberg on Class Actions § 2:10 (4th ed. 2002) (stating that in class actions standing requires membership in the proposed class).

The proposed Kidsline subclass definition includes: "All persons who purchased any four or six-piece bedding sets manufactured by Kids Line from Babies 'R' Us for the period January 1, 1999 to the present."  (Pl.'s Definitions 1.)  Counsel for the plaintiffs admitted that none of the plaintiffs bought a bedding set from BRU.  (Hr'g Tr. 110, May 27, 2009 ["5/27 Hr'g Tr."].)  For this reason, the plaintiffs lack standing for their claim against Kidsline.  Therefore, I will dismiss that claim without prejudice.  See Bd. of Sch. Comm'rs of Indianapolis v. Jacobs, 420 U.S. 128, 129-30 (1975) (holding that when a class has not yet been certified and the named plaintiffs cannot meet the case or controversy requirement, the complaint must be dismissed).

Furthermore, Britax argues that Nuttall has not proven membership in the Britax subclass because she cannot remember details about her purchase.  During her deposition, Nuttall credibly testified to buying a Britax car seat from BRU in 2002.  (Nuttall Dep. 23:7-28:6.)  For this reason, I find that her subclass membership has been proven.  Similarly, Regal Lager argues that Grogan has not proven membership in the BabyBjörn subclass because she made her purchase

before the subclass period began.  Grogan testified to buying only a BabyBjörn carrier from BRU

in August 1999 (Grogan Dep. 17:3-8), whereas the subclass period begins February 2, 2000.  She

thus falls outside this subclass and must be dismissed.  Sullivan likewise does not fall within any

proposed subclass, having bought only Kidsline sheets, and must be dismissed.


**B.  Class Definition**

Issues related to class definition are considered next.  Initially, the plaintiffs proposed a

single class consisting of any person who bought a BabyBjörn, Britax, Kidsline, Maclaren,

Medela, or Peg-Perego product from BRU between 1999 and the present.  (Pl.'s Mot. for Class

Cert'n 1.)  Reasoning that this case involved separate conspiracies, I decided that subclasses

should be used instead.  See Fed. R. Civ. Pro. 23(c)(5) ("When appropriate, a class may be

divided into subclasses.")  Therefore, I made the plaintiffs propose subclasses that would include

"Babies 'R' Us customers who bought a certain brand and type of baby product during a certain

period of time" (Doc. #565).

Although the plaintiffs complied for the most part, their Britax subclass definition

mentions "car seat or stroller" and their Peg-Perego subclass definition mentions "car seat, high

chair, or stroller."  (Pl.'s Definitions 1-2.)  Both definitions impede certification and should be

revised.[6]  Because the plaintiffs focused mostly on Britax car seats and Peg-Perego strollers, I

will revise their definitions to mention only these products.  By consequence, Otazo must be

---

[6] For example, because the parties agree that strollers, car seats, and high chairs have separate
markets, many questions related to antitrust economics (e.g., whether a conspiracy harmed
competition) would require different evidence for different subclass members, precluding
certification under Rule 23(b)(3).

dismissed because she bought only a Peg-Perego high chair.  Furthermore, I stated that I would not allow subclass periods beyond the date when this case was filed and will revise the proposed definitions accordingly.

The defendants argue that determining subclass membership will require defining the imprecise term "high-end" because the plaintiffs say this case involves high-end products. (Def.'s Sur-Sur-Surreply 18.)  See Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 187 (3d Cir. 2006) (requiring "a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified").  The proposed definitions, however, do not mention "high-end" or otherwise implicate the term.

Finally, Regal Lager objects that the proposed BabyBjörn subclass definition reaches consumers who bought BabyBjörn carriers (1) outside the country, (2) indirectly from BRU, (3) not supplied by Regal Lager, and (4) not subject to Regal Lager's official distribution policy. The first two objections are easily resolved with minor revisions to the definitions, namely, writing "All persons who directly purchased … within the U.S."  The second two are unpersuasive.  The subclass clearly includes only consumers of BabyBjörn carriers "distributed by Regal Lager."  (Pl.'s Definitions 1.)  And the Complaint alleges that Regal Lager restricted competition even outside the official distribution policy.

## C.  Rule 23(a)

Next I consider the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).  These prerequisites must be satisfied to bring any class action.  In this case, they

must be satisfied regarding each subclass.  See Fed. R. Civ. Pro. 23(c)(5) ("[S]ubclasses … are each treated as a class under this rule.").

### 1.  Numerosity

The first prerequisite in Rule 23(a) requires that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. Pro. 23(a)(1).  In general, sufficient numerosity exists "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).  But "[n]o minimum number of plaintiffs is required to maintain a suit as a class action."  Id. at 226.

Numerosity was conceded by all but one defendant.  Regal Lager argues that the plaintiffs have not produced sufficient evidence to prove numerosity for the BabyBjörn subclass.  (Regal Lager's Sep. Surreply 6; Regal Lager's Sep. Sur-Sur-Surreply 6-8.)  The plaintiffs respond by pointing to BRU sales data.  BRU's gross income from BabyBjörn-carrier sales ranged from about $6.4 million to about $12.4 million per year from 2001 to 2005.  (Mys.'s Rep. ¶ 64.)  This indicates that BRU sold many thousands of BabyBjörn carriers during the relevant period, meaning that potential subclass members are quite numerous indeed.  Joining them in one action would be impossible.  Therefore, I find that numerosity has been established.

### 2.  Commonality

The second prerequisite in Rule 23(a) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. Pro. 23(a)(2).  "However, where an action is to proceed under Rule 23(b)(3), the commonality requirement is subsumed by the predominance

requirement" because "it is far more demanding than the Rule 23(a)(2) commonality

requirement."  Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 148 (3d Cir. 2008)

(internal quotation marks omitted).  Commonality thus does not require discussion here because

the plaintiffs request class certification under Rule 23(b)(3).


### 3.  Typicality

The third prerequisite in Rule 23(a) requires that "the claims or defenses of the

representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. Pro.

23(a)(3).  Lindemann, Ragsdale, Hall, Nuttall, Shuck, McNally, and Bozzo want to represent the

BabyBjörn subclass because they purchased BabyBjörn carriers from BRU.  (Lindemann Dep.

32:19-33:2, Nov. 14, 2006; Ragsdale Dep. 71:18-21, Oct. 4, 2006; Hall Dep. 30:11-20, Nov. 6,

2006; Nuttall Dep. 50:7-22, Nov. 6, 2006; Shuck Dep. 35:14-36:4, Nov. 8, 2006; McNally Dep.

103:21-104:11, Nov. 7, 2006; Bozzo Dep. 95:5-14, March 6, 2007.)  Nuttall wants also to

represent the Britax subclass because she purchased a Britax car seat from BRU.  (Nuttall Dep.

24:19-25:22.)  Zarfati wants to represent the Maclaren subclass because he purchased a Maclaren

stroller from BRU.  (Zarfati Dep. 33:13-16, Dec. 10, 2008.)  Bozzo and Trzupek want to

represent the Medela subclass because they purchased Medela PNS breast pumps from BRU.

(Bozzo Dep. 43:5-45:19; Trzupek Dep. 54:21-55:21, March 14, 2007.)  McNally, Bozzo, and

McDonough want to represent the Peg-Perego subclass because they purchased Peg-Perego

strollers from BRU.  (McNally 76:4-78:2; Bozzo Dep. 83:13-84:16; McDonough Dep. 38:24-

39:12, Nov. 7, 2006.)  Their purchases were all made during the relevant subclass period.

*a. Claims*

The typicality inquiry asks "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." Beck v. Maximus, Inc., 457 F.3d 291, 295-96 (3d Cir. 2006) (internal quotation marks omitted). "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." Georgine v. Amchem Products, Inc., 83 F.3d 610, 631 (3d Cir. 1996). "The inquiry assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." Id.

In this case, the plaintiffs complain of paying higher prices because BRU conspired with manufacturers to restrict competition in violation of federal antitrust law. Subclass members' claims arise from identical allegations and legal theories. Regardless, the defendants contend that factual differences between plaintiffs and subclass members defeat typicality. First, they argue that the plaintiffs cannot fairly represent subclass members who bought different models within the same product line. Second, the defendants argue that the plaintiffs cannot fairly represent subclass members who made their purchases at different times because some manufacturers amended their official distribution policies during the subclass period.

Both arguments are unpersuasive. Conspiracies to implement specific distribution policies on specific models are not alleged. Rather, the plaintiffs showed evidence that BRU conspired with each manufacturer generally to prevent internet discounting—irrespective of how—and thereby to insulate BRU from price competition on its products—irrespective of model and color. Although one manufacturer might have used many methods to insulate BRU

19

from competition, subclass members and plaintiffs who bought different models at different

times nonetheless complain of identical misconduct based on the same legal theory.  See Danvers

Motor, 543 F.3d at 150 ("Factual differences will not defeat typicality if the named plaintiffs'

claims arise from the same event or course of conduct that gives rise to the claims of the class

members and are based on the same legal theory.") (emphasis omitted); In re Playmobil Antitrust

Litig., 35 F.Supp. 2d 231, 242 (E.D.N.Y. 1998) ("Typicality refers to the nature of the claims of

the representative, not the individual characteristics of the plaintiff.").


   *b.  Defenses*

   Furthermore, the defendants maintain that certain plaintiffs are subject to unique defenses

that preclude typicality.  "A proposed class representative is neither typical nor adequate if the

representative is subject to a unique defense that is likely to become a major focus of the

litigation."  Beck, 457 F.3d at 301.  "To defeat class certification, a defendant must show some

degree of likelihood a unique defense will play a significant role at trial."  Id. at 300.  A court

assessing this argument must determine "whether it is predictable that the unique defense will

play a major role in the litigation."  Id.  "[T]his standard strikes the proper balance between

protecting class members from a representative who is not focused on common concerns of the

class, and protecting a class representative from a defendant seeking to disqualify the

representative based on a speculative defense."  Id. at 301.

   First, the defendants argue that the statute of limitations may prevent Bozzo, Grogan, and

Nutall from asserting claims.  This defense would unlikely become significant during trial and

should not prevent class certification.  "While the statute of limitations defense may ultimately

affect an individual's right to recover, it does not affect the presentation of the liability issues" and "[t]here is no reason to believe that any of the named plaintiffs will be distracted by [this] relatively unique personal defense." In re Linerboard Antitrust Litig., 203 F.R.D. 197, 211-12 (E.D. Pa. 2001) (internal quotation marks omitted), aff'd, 305 F.3d 145 (3d Cir. 2002).

Second, the defendants contend that Lindemann, Trzupek, and Zarfati cannot prove injury because they made their purchases using coupons. Likewise, the defendants contend that Bozzo, McDonough, McNally, Nuttall, Shuck, and Trzupek cannot prove injury because they valued non-price factors when they shopped at BRU—e.g., the ability to touch products before buying. Below in section D.2, however, I determine that neither using coupons nor valuing non-price factors affects whether subclass members were injured by the conspiracies. See Beck, 457 F.3d at 300 ("If a court determines an asserted unique defense has no merit, the defense will not preclude class certification.").

Finally, the defendants maintain that Bozzo, Grogan, Hall, McNally, Nuttall, and Shuck might not recover because they cannot remember how much they paid. This issue would unlikely become significant during trial because I conclude that injury and damages can be proved with evidence common to the subclass and thus irrespective of whether plaintiffs can remember how much they paid.

In summary, I found that the plaintiffs and subclass members would complain of identical misconduct based on the same legal theory. Furthermore, I found that the named plaintiffs are not subject to unique defenses that preclude typicality. Therefore, I conclude that typicality has been satisfied for each subclass.

### 4. Adequacy

The fourth prerequisite in Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. Pro. 23(a)(4). Whether adequacy has been satisfied "depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." New Directions Treatment Services v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007). The second factor "seeks to uncover conflicts of interest between named parties and the class they seek to represent." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004) (internal quotation marks omitted). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625-26 (1997) (internal quotation marks omitted).

The defendants do not contest the first factor but make several arguments concerning the second one.[7] First, they argue that subclass members who bought different models or made purchases at different times have mutually antagonistic interests. I found that subclass members would complain of identical misconduct based on the same legal theory. For this reason, they do not have antagonistic interests. See Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 929 (3d Cir. 1986) (noting that where consumers allege that a manufacturer and car dealers conspired to raise prices of non-warranty repairs, "[t]he fact that class members obtained repairs at different

---

[7] They also allege the unique defenses considered above, but my conclusions are the same. See Beck, 457 F.3d 291 at 296 ("[U]nique defenses bear on both the typicality and adequacy of a class representative.").

dealerships does not, without more, create the kind of antagonistic interests that would make the named plaintiffs inadequate class representatives"); In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 380-81 (S.D.N.Y. 1996) ("Where the plaintiffs have alleged a single conspiracy to artificially inflate prices, a representative plaintiff may satisfy the adequacy requirement without … having bought all of the affected products or having made purchases throughout the entire class period.").

Second, Regal Lager argues that Shuck cannot adequately represent the BabyBjörn subclass because she knows little about the case.  Adequacy does not require a plaintiff to master facts and legal theories.  See Lewis v. Curtis, 671 F.2d 779, 789 (3d Cir. 1982) ("The adequacy-of-representation test is not concerned whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel."), abrogated on other grounds, Garber v. Lego, 11 F.3d 1197, 1203 (3d Cir. 1993). Nonetheless, Shuck has shown knowledge of the conspiracies and testified to reviewing the Complaint.  (Shuck Dep. 93:8-94:1.)

Finally, the defendants argue that various named plaintiffs are inadequate based on their relationship to class counsel.  Hall and proposed counsel Elizabeth Fegan are sisters.  Other named plaintiffs are friendly with various proposed counsel.  Courts sometimes express concern about close relationships between class representatives and counsel because it might create the appearance of impropriety or the plaintiff might want to maximize the counsel's fee award to the detriment of class members.  See London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1255 (11th Cir. 2003) (finding a representative inadequate for having close social and financial ties to the class attorney); Susman v. Lincoln Am. Corp., 561 F.2d 86, 90 (7th Cir. 1977) (finding a

representative inadequate for being the class attorney's brother).  Nothing in this case warrants

such concerns other than Hall and Fegan being sisters.  Therefore, out of abundant caution I will

declare Hall inadequate.  This does not defeat certification, however, because numerous other

plaintiffs bought BabyBjörn carriers.

In summary, the defendants do not contest that the proposed subclass attorneys are

"qualified, experienced, and generally able to conduct the proposed litigation."  New Directions,

490 F.3d at 313.  Furthermore, with one exception that does not defeat certification, I find that

the plaintiffs do "not have interests antagonistic to those of the [sub]class[es]."  Id.  For these

reasons, I conclude that adequacy has been satisfied for each subclass.  Thus, I now turn to

Rule 23(b)(3).


**D.  Rule 23(b)(3)**

Once the Rule 23(a) prerequisites are satisfied, other requirements under Rule 23(b) must

be satisfied based on the type of class action.  Here the plaintiffs request certification under

section (b)(3), requiring proof of predominance and superiority.  Therefore, they must show "that

the questions of law or fact common to class members predominate over any questions affecting

only individual members," and "that a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Pro. 23(b)(3).  Matters pertinent

to these issues include: "the class members' interests in individually controlling the prosecution

or defense of separate actions," "the extent and nature of any litigation concerning the

controversy already begun by or against class members," "the desirability or undesirability of

concentrating the litigation of the claims in the particular forum," and "the likely difficulties in managing a class action."  Fed. R. Civ. Pro. 23(b)(3)(A)-(D).

The defendants do not contest superiority.[8]  In this case, a class action would be more fair and efficient than alternative methods of adjudication.  See Georgine, 83 F.3d at 632 (noting that superiority requires courts "to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication") (internal quotation marks omitted).  Subclass members would have little economic incentive to litigate their claims individually—thus barring recovery for most absent a class action—and I cannot find difficulties resulting from certification that would make this case unmanageable.  See Amchem Products, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (internal quotation marks omitted).  Therefore, superiority has been satisfied for each subclass.

By contrast, predominance is hotly contested.  It requires that "[i]ssues common to the class must predominate over individual issues."  In re Hydrogen Peroxide, 552 F.3d at 311 (internal quotation marks omitted).  Issues are common or individual based on the nature of evidence that will suffice to resolve the issue.  Id.  Thus "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or

---

[8] In the many hundreds of pages written against class certification in this case, only two paragraphs concern superiority.  (See Regal Lager's Sep. Surreply 25-26.)  Regal Lager contended that superiority cannot be satisfied because of alleged issues affecting only individual subclass members and each consumer's small potential recovery.  Regal Lager seemingly abandoned these arguments later, however, because the defendants do not contest superiority in their proposed findings.

individual issues predominate in a given case."  Id. (internal quotation marks omitted).  "If proof

of the essential elements of the cause of action requires individual treatment, then class

certification is unsuitable."  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d

154, 172 (3d Cir. 2001).  Therefore, "the task for plaintiffs at class certification is to demonstrate

that [each] element … is capable of proof at trial through evidence that is common to the class

rather than individual to its members."  In re Hydrogen Peroxide, 552 F.3d at 311-12.  The

relevant question is not whether each element can be proved but whether such proof will require

evidence individual to class members.[9]

 Predominance thus requires some inquiry into the merits.  See id. at 311 ("[W]e examine

the elements of plaintiffs' claim through the prism of Rule 23.") (internal quotation marks

omitted).  The plaintiffs are suing under § 4 of the Clayton Act, 15 U.S.C. § 15 (2009), which

states that "any person who shall be injured in his business or property by reason of anything

forbidden in the antitrust laws may sue therefor in any district court of the United States."  15

U.S.C. § 15.  This requires proof of "(1) a violation of the antitrust laws …, (2) individual injury

resulting from that violation, and (3) measurable damages."  In re Hydrogen Peroxide, 552 F.3d

at 311.  Under predominance, I must decide for each subclass whether these elements can be

proved with common evidence.

---

[9] Although I may have expressed some doubts about this earlier in the litigation (Doc. ##565 and
567), I find that Newton and In re Hydrogen Peroxide make this point clear.

### 1. Antitrust Violation

For the first element of § 4, the plaintiffs allege violations of § 1 of the Sherman Act, 15 U.S.C. §§ 1-7 (2009), which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. The Supreme Court has held that this "outlaw[s] only unreasonable restraints." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997). Therefore, § 1 requires proof that (1) "the defendant was a party to a contract, combination, or conspiracy"—i.e., concerted action—and (2) this conspiracy "imposed an unreasonable restraint on trade." Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc., 530 F.3d 204, 218 (3d Cir. 2008) (internal quotation marks omitted).

### a. Concerted Action

To show concerted action, "a plaintiff must produce evidence that would allow a jury to infer that 'the alleged conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds.'" Toledo Mack, 530 F.3d at 219 (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)). This question calls for evidence related solely to the defendants' conduct. Because subclass members complain of identical misconduct, such evidence will be common to each subclass. See In re Scrap Metal Antitrust Litig., 527 F.3d 517, 535 (6th Cir. 2008) (noting for predominance that "proof of the conspiracy is a common question"); Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 105 (2d Cir. 2007) (concluding that "allegations of the existence of a price-fixing conspiracy are susceptible to common proof"); 7AA Charles Alan Wright et al., Federal Practice

27

and Procedure § 1781 (3d ed. 2005) (noting that "whether a conspiracy exists is a common question" for predominance).  Furthermore, I find no circumstance (and the defendants allege none) where the allegations of concerted action made in this case might require individual evidence.[10]

### b. Unreasonable Restraint

Beyond concerted action in restraint of trade, §1 of the Sherman Act also requires proof that the alleged restraint was unreasonable.  Courts use different methods of analysis to determine whether conduct unreasonably restrains competition.  Some restraints are considered *per se* unreasonable because they "have manifestly anticompetitive effects" and "lack any redeeming virtue."  Leegin, 127 S.Ct. at 2713 (internal quotation marks omitted).  These restraints "always or almost always tend to restrict competition and decrease output."  Id. (internal quotation marks omitted).  Examples include "horizontal agreements among competitors to fix prices or to divide markets."  Id. (internal citations omitted).

By contrast, other restraints are evaluated under the rule of reason.  "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."  Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49 (1977).  Factors to consider include "specific information about the relevant business"; "the restraint's history, nature, and effect"; and "[w]hether the businesses involved have market power."  Leegin, 127 S.Ct. at 2712 (internal

---

[10] The defendants have argued that the allegations cannot be proved with persuasive evidence, but they have given no reason why individual evidence might be required.

quotation marks omitted).  In general, "the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."  Id.

For either method, "competition" may refer to intrabrand or interbrand competition. "Intrabrand competition" refers to retailers competing to sell the same brand (e.g., competition among retailers to sell Maclaren strollers).  And "interbrand competition" refers to manufacturers competing to sell different brands of the same type of product (e.g., competition among manufacturers to sell different upscale strollers).  Id. at 2715.  Although both forms of competition are important because they affect consumer welfare, antitrust law gives priority to interbrand competition.  Id.

In this case, the plaintiffs offered evidence that BRU coerced manufacturers into using vertical price restraints—i.e., resale price maintenance—and other methods to prevent discounting by internet retailers.  Vertical price restraints were once considered *per se* unreasonable because they almost always harm intrabrand competition.  But as mentioned, the Supreme Court announced in Leegin that vertical price restraints should be analyzed under the rule of reason because they can benefit interbrand competition.  Id. at 2725.  Given the issues involved in this case, Leegin must be reviewed carefully.

The Leegin Court discussed three situations where vertical price restraints may benefit interbrand competition.  First, a manufacturer might use resale price maintenance to eliminate intrabrand price competition and thereby encourage retailers to invest in consumer services or promotional efforts that help the manufacturer compete against rival manufacturers.  Id. at 2715-16.  Retailers might otherwise be deterred from paying for such services or promotions because

discounting retailers can free-ride on the investment.  For example, consumers may learn about a product because a high-service retailer invests in fine showrooms, product demonstrations, and helpful employees, but then buy it from a low-service discounting retailer that does not offer these services.  When free-riding deters retailers from making investments that benefit interbrand competition, a vertical price restraint preventing free-riding might be justified.  Id. at 2716. Second, vertical price restraints may promote interbrand competition by facilitating market entry for new brands.  With protected high margins, retailers have more incentive to invest in new brands that are unknown to consumers.  Id.  Third, vertical price restraints may promote interbrand competition by helping manufacturers induce retailers to perform services or promotions that would not be offered even absent free-riding.  Manufacturers can of course make retailers have services or promotions using nonprice restraints.  But offering the retailer a guaranteed margin and threatening termination if it does not meet expectations may most efficiently induce better services and promotions.  Id.

Despite these possible procompetitive effects, the Court warned that "the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated." Id. at 2717.  In particular, the Court observed how a dominant retailer may abuse resale price maintenance:

> A dominant retailer … might request resale price maintenance to forestall innovation in distribution that decreases costs.  A manufacturer might consider it has little choice but to accommodate the retailer's demands for vertical price restraints if the manufacturer believes it needs access to the retailer's distribution network.

Id.  In this situation, "the manufacturer does not establish the practice to stimulate services or to promote its brand" but rather to give an "inefficient retailer[] higher profits," whereas "[r]etailers

30

with better distribution systems and lower cost structures would be prevented from charging

lower prices." Id.  On this matter, the Court cited Toys "R" Us, Inc., where the Seventh Circuit

upheld findings that Toys "R" Us, Inc., coerced toy manufacturers into implementing vertical

restraints to hinder competition from warehouse clubs like Costco, BJ's, and Sam's Club.  221

F.3d at 930-33.

      Given this potential for abuse, the Court concluded that courts evaluating vertical price

restraints must "be diligent in eliminating their anticompetitive uses from the market."  Leegin,

127 S.Ct. at 2719.  For this reason, the Court mentioned certain factors that should be considered

under the rule of reason.  First, "the source of the restraint may be an important consideration."

Id.  "If there is evidence retailers were the impetus for a vertical price restraint, there is a greater

likelihood that the restraint ... supports a dominant, inefficient retailer."  Id.  Second, courts must

consider whether the restraint-instigator has market power.  Indeed, "that a dominant ... retailer

can abuse resale price maintenance for anticompetitive purposes may not be a serious concern

unless the relevant entity has market power."  Id. at 2720.

      For the rule of reason, the Third Circuit employs a burden-shifting analysis.  See U.S. v.

Brown Univ., 5 F.3d 658, 668-69 (3d Cir. 1993).  "The plaintiff bears an initial burden under the

rule of reason of showing that the alleged combination or agreement produced adverse,

anti-competitive effects within the relevant product and geographic markets."  Id. at 668.  This

can be accomplished in two ways.  In general, the plaintiff must show "the existence of actual

anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality

of goods or services."  Id. (internal citations omitted).  But in the alternative, the plaintiff may

show that the defendant had "the ability to raise prices above those that would prevail in a

competitive market."  Id.  "If a plaintiff meets his initial burden of adducing adequate evidence of

market power or actual anti-competitive effects, the burden shifts to the defendant to show that

the challenged conduct promotes a sufficiently pro-competitive objective."  Id. at 669.  "To rebut,

the plaintiff must demonstrate that the restraint is not reasonably necessary to achieve the stated

objective."  Id.

   In this case, the plaintiffs offered evidence that BRU was a dominant retailer that coerced

vertical restraints to prevent internet discounting.  They argue that because BRU coerced these

restraints, there are only anticompetitive effects.  (Comanor Rep. I ¶¶ 21-25; Comanor Rep. II

¶ 25.)  Nothing in this argument requires evidence that would be individual to subclass members.

Furthermore, the above discussion indicates that the rule of reason may require evidence about

procompetitive or anticompetitive effects within the relevant market, who instigated the

restraints, and whether the defendants had market power.  See Brown Univ., 5 F.3d at 668-69;

Leegin, 127 S.Ct. at 2719-20.  These issues do not require evidence that would be individual to

subclass members.[11]

   For the reasons stated above, I find that the § 1 elements of concerted action and

unreasonable restraint are both "capable of proof at trial through evidence that is common to the

class rather than individual to its members."  In re Hydrogen Peroxide, 552 F.3d at 311-12.

_____

[11] The defendants argue that the alleged relevant markets cannot be proved with common
evidence because subclass members attach different meanings to the term "high-end."  (Hr'g Tr.
128, May 28, 2009 ["5/28 Hr'g Tr."].)  However, defining relevant markets requires economic
analysis of general consumer behavior—i.e., whether products are reasonably interchangeable or
have cross-elasticity of demand—that would certainly be common to each subclass.  See Tunis
Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991) (explaining how economists
determine relevant markets).

Therefore, I conclude that for each subclass predominance has been satisfied with regard to the first element of § 4 of the Clayton Act.

### 2. Antitrust Impact

The second element of § 4 requires a plaintiff to show "individual injury resulting from [a] violation" of antitrust law—"also known as antitrust impact."  In re Hydrogen Peroxide, 552 F.3d at 311.  "In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."  Id.

Antitrust impact requires proof not only of "an injury causally linked to a violation of the antitrust laws" but also of "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 738 (3d Cir. 2004) (internal quotation marks omitted).  In other words, a plaintiff must prove "three quite independent requirements: (1) that it suffered an injury; (2) that its injury was caused by an antitrust violation; and (3) that the injury qualifies as 'antitrust injury.'"  Herbert Hovenkamp, Federal Antitrust Policy: the Law of Competition and its Practice § 16.3c (3d ed. 2005).  The defendants do not contest the third element.[12]

---

[12] Higher consumer prices because of an antitrust violation obviously constitute antitrust injury. See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("A consumer whose money has been diminished by reason of an antitrust violation has been injured 'in his . . . property' within the meaning of § 4."); In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 13 (1st Cir. 2008) ("There is no doubt that the types of injuries alleged here—consumers paying artificially inflated prices due to antitrust violations—are antitrust injuries.").

In this case, the plaintiffs contend that subclass members were injured because they paid higher prices than they would have but for the conspiracies.  They argue that this can be proved with common evidence because every subclass member bought a product from BRU during a period when BRU was charging a higher price for it because other retailers were prevented from discounting.  See In re Linerboard Antitrust Litig., 305 F.3d 145, 151 (3d Cir. 2002) ("If … a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price.") (internal quotation marks omitted).  This argument has two steps: (1) that the conspiracies caused supra-competitive prices at BRU and (2) that every subclass member made a purchase at the supra-competitive price.[13] These steps roughly correspond to causation and actual injury.  Below, I consider whether each step can be proved with common evidence.

### a. First Step: Whether Prices Were Supra-Competitive

With regard to causation, "[i]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under [§] 4."  Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1969).  For their first step, the plaintiffs argue that the restraints in

---

[13] For the purpose of this opinion, "supra-competitive prices" means prices higher than "the prices which would obtain in a competitive regime."  In re Linerboard, 305 F.3d at 151.

this case caused supra-competitive prices at BRU because, without them, BRU would have

lowered prices to compete with internet retailers.  This argument has two parts.

First, the plaintiffs contend that the average retail price of each product would have been

lower without the restraints.  For this and other issues, they offer expert testimony by economist

William Comanor.  He explained that vertical price restraints cause higher prices for consumers

because retailers are prevented from discounting.  (5/28 Hr'g Tr. 10; Comanor Rep. ¶ 20.)  See

Leegin, 127 S.Ct. at 2715 ("A single manufacturer's use of vertical price restraints tends to

eliminate intrabrand price competition."); 8 Phillip E. Areeda & Herbert Hovenkamp, Antitrust

Law ¶1604b (2d ed. 2004) ("[R]esale price maintenance tends to produce higher consumer prices

than would otherwise be the case. … Indeed, the restraint that did not hold a product's price

above the level that would otherwise prevail would be unnecessary; its very purpose is to prevent

price cutting.").  The defendants concede this.  (5/27 Hr'g Tr. 203-05.)  Employees of internet

retailers also testified that the restraints prevented them from discounting the products involved

in this case.  (Pl.'s Ex. 112-13.)  Because the restraints caused higher prices, average prices

would clearly have been lower without them.

Second, the plaintiffs argue that BRU would have lowered the price for each relevant

product in response to lower average prices.  Comanor explained that prices tend toward

uniformity in any market.  (Comanor Rep. II ¶ 9.)  When some sellers begin discounting, others

must eventually lower their prices to remain competitive.  The record shows that BRU was no

exception.  BRU stated in a letter to Peg-Perego: "As you may recall, there was another retailer

who chose to lower the retail on the Prima Pappa High Chairs leaving us no choice but to lower

ours in order to be competitive."  (Pl.'s Ex. 48.)  BRU also noted discounting online and stated:

"With this being offered over the internet, it effects [*sic*] our entire chain of stores."  (Pl.'s Ex. 48.)  Later, BRU noted other discounting and stated: "As discussed on previous occasions, retails [*sic*] such as these on the internet affect my entire chain of stores."  (Pl.'s Ex. 49.)  BRU told BabyBjörn: "If they [BRU] purchased Baby Bjorn product they would not discount it. … The only exception to this is if a specialty store goes and … tries to undercut the BRU pricing."  (Pl.'s Ex. 54.)  Finally, BRU admitted: "If we fail to compete successfully, we could face lower sales and … be compelled to offer greater discounts to our consumers."  (Def.'s Resp. App. at A601.)

Furthermore, Comanor noted that e-commerce has increased this trend.  Consumers can easily shop online or compare prices online before going to the store.[14]  Indeed, Comanor cited a recent study finding that "[a]bout 33% of mothers buy baby products and products for small children online" and "[a]nother 61% research such products online before going to shop for them at brick-and-mortar stores."  (Comanor Rep. I ¶ 32.)  Furthermore, many plaintiffs said they checked prices online before going to BRU.  (Lindemann Dep. 25:18-23; McNally Dep. 51:15-52:3; Otazo Dep. 60:6-14; Ragsdale 26: 3-5, 61:16-61:1; Shuck Dep. 28:20-23; Sullivan Dep. 29:12-25; Zarfati Dep. 37:6-13.)  Some also said they would have purchased products online if the prices had been lower than BRU's prices.  (Lindemann Dep. 78:8-12; Sullivan Dep. 79:8-80:5; Zarfati Dep. 60:17-61:16.)  Comanor testified that because sellers must account for this

---

[14] "Online shopping and research have not only made price comparison easy, they have also changed the way people shop.  Even consumers who do not buy online often look online before going to a storefront to purchase products.  As a result, they are better informed about product features and reasonable pricing when going to the store."  Note, Leegin's Unexplored "Change in Circumstances": the Internet and Resale Price Maintenance, 121 Harv. L. Rev. 1600, 1614 (2008).

trend when setting prices, unrestrained internet discounting would have forced BRU to lower prices.  (Comanor Rep. I ¶ 32.)

The defendants respond that BRU would not have lowered prices even with unrestrained internet discounting.  For this and other issues, they offer expert testimony by economist William Myslinski.  He testified that, during certain periods when resale price maintenance was suspended, BRU continued charging MSRP despite internet discounting.  First, when BabySwede replaced Regal Lager in May 2005, resale price maintenance was suspended for BabyBjörn carriers.  (Myslinski Rep. I ¶ 154-55.)  Second, Medela had no distribution policy for the PNS Original from March 2002 until July 2003.  (5/27 Hr'g Tr. 149-50.)  Finally, Jacob Weiss of Babyage.com, Inc. ("Babyage"), an internet retailer, testified that Britax suspended resale price maintenance from spring or summer 2004 to June 2005, during which time Babyage discounted Britax car seats.  (Weiss Dep. 177-78, Oct. 30, 2008.)  Myslinski testified that during each period BRU continued charging MSRP despite internet discounting.  He thus concluded that BRU would not have lowered prices absent the restraints.[15]

The plaintiffs reply that, even though official distribution policies relaxed occasionally, BRU still coerced manufacturers during those periods.  (5/28 Hr'g Tr. 149-50.)  For example, they showed that during one such period BRU compelled Medela to terminate 17 internet retailers.  (Pl.'s Ex. 39.)  Medela then admitted: "We discontinued internet sellers to protect BRU's business and margin and therefore accepted considerable legal risk."  (Pl.'s Ex. 80.)

---

[15] Myslinski also noted reasons why BRU might charge MSRP while internet retailers discounted.  (Myslinski Rep. III ¶ 19.)  But his theories do not overcome the persuasive evidence to the contrary.

Given this evidence of uninterrupted coercion, I find that BRU permitted internet discounting without needing to lower prices because resale price maintenance could easily be reimposed whenever necessary.

In summary, the plaintiffs offered Comanor's testimony and other evidence that, absent the conspiracies to restrain trade, BRU would have lowered prices to compete with lower average pricing. Their first step of proving impact—i.e., that the conspiracies caused supra-competitive prices at BRU—could thus be proved with common evidence. Myslinski challenged this argument relating to causation with evidence that during certain periods BRU continued charging MSRP while others discounted. But the plaintiffs discredited this evidence by showing that BRU continued enjoying insulation from competition during those periods. Moreover, the defendants have not otherwise undermined Comanor's testimony or the other evidence offered. Therefore, I conclude that for each subclass predominance has been satisfied with regard to the plaintiffs' first step of proving impact.

### b. Second Step: Whether Subclass Members Paid Those Prices

The plaintiffs' second step of proving impact involves showing that every subclass member made a purchase at the supra-competitive price. See In re Linerboard, 305 F.3d at 151. The plaintiffs argue that every subclass member must have paid the supra-competitive price because BRU had uniform pricing. First, they offer evidence that BRU maintained uniform list prices nationwide. (Pl.'s Proff. 25-27.) This means that prices were uniform across BRU stores. Second, Comanor explained that in consumer goods markets "all buyers pay the same prices and receive the same products." (Comanor Rep. I ¶ 15.) In other words, BRU customers do not

individually negotiate prices when they reach the cashier.  (5/27 Hr'g Tr. 219-20.)  This means that BRU prices were uniform across customers within each store.  This case thus differs from In re Hydrogen Peroxide, where "list prices could not be used to measure antitrust impact on a basis common to the class" because some "contracts for the sale of hydrogen peroxide were individually negotiated."  552 F.3d at 314.

The defendants respond that many subclass members could not have paid supra-competitive prices because they made their purchases during sales, using coupons, or under price-matching guarantees, causing them to pay below MSRP.  (5/28 Hr'g Tr. 91; Myslinski Rep. I ¶ 180.)  For example, Zarfati used a coupon reducing the list price by $20.00.  (Zarfati Dep. 36, 54.)  Lindemann used a coupon reducing the list price by 15%.  (Lindemann Dep. 34.)  And Trzupek used a coupon awarding a free baby monitor with her purchase.  (Trzupek Dep. 56.)

The supra-competitive price, however, does not always correspond to MSRP.  Someone who paid below MSRP but more than he would have but for the conspiracy still suffered injury from paying a higher price.  Moreover, I find that this occurred when subclass members made their purchases using coupons or during sales.[16]  But for the restraints, Zarfati would have paid $20 below a lower initial price, Lindemann would have paid 15% below a lower initial price, and Trzupek would have gotten her free monitor upon paying a lower purchase price.  In other words, the presence of coupons or sales does not disprove impact because when list prices have been artificially inflated, fixed or proportional discounts from them are equally inflated.

---

[16] The defendants assert that Comanor conceded that a consumer who purchased during a sale might not have been impacted.  (Def.'s Prop'd Findings ¶ 57.)  But the deposition testimony that they cite concerns a consumer who purchased from an internet retailer, not one who purchased from BRU.  (Comanor Dep. 204:8-21.)

This rationale might not extend to purchases under a price-matching guarantee because, in that situation, the amount paid stems from a competitor's price rather than a fixed or proportional discount from BRU's price.  The defendants never offered evidence, however, that anyone purchased under price-matching guarantees but merely allege the theoretical possibility. (5/28 Hr'g Tr. 91.)  Moreover, Myslinski reviewed evidence of discounts at BRU and found nothing to indicate that price-matching guarantees were offered.  (Myslinski Rep. I ¶ 180 n.204.) Finally, evidence that the conspiracies prevented retailers from discounting makes it unlikely that subclass members could have avoided impact using a price-matching guarantee.  Therefore, the hypothetical problem of price-matching does not defeat certification.

For the reasons stated above, I conclude that the second step of proving impact—i.e., that every subclass member made a purchase at the supra-competitive price—can be proved with common evidence.  Because I drew the same conclusion regarding the first step, predominance appears satisfied for each subclass with regard to antitrust impact.  However, the defendants make one more argument to the contrary.


c. *Final Issue: Whether Non-Price Factors Bar Common Proof*

The defendants contend that impact cannot be proved with common evidence because subclass members may have valued non-price factors differently.  They reason that because resale price maintenance can encourage retailers to provide services that some consumers value more than low prices, see Leegin, 127 S.Ct. at 2715-16, impact cannot be measured based solely on how much subclass members paid.  They also maintain that resale price maintenance encouraged BRU to provide such services.  These include providing helpful employees, making

products immediately available (i.e., no waiting for shipment), letting consumers interact with products, large selection, nice product displays, generous return and exchange policies, store gift registries, and product demonstrations.  (Def.'s Resp. 18-19; Myslinski Rep. I ¶¶ 110-12.)  The defendants argue that because subclass members may have valued such services differently, impact cannot be proved with common evidence.  They quote from a treatise: "[W]here RPM is used as a promotional device … the observed price difference must be adjusted for the value of the promotion.  This value may vary across class members, which makes the inquiry individualized."  2A Phillip E. Areeda et al., <u>Antitrust Law</u> ¶ 398 (3d ed. 2007) [hereinafter 2A Areeda].

### i.  First Response to Argument Based on Non-Price Factors

The plaintiffs respond with two arguments.  First, they argue that because BRU coerced the restraints in this case, they cannot have enabled services like those mentioned above.  In other words, the need to account for promotional values does not exist here because the restraints were designed to "support[] a dominant, inefficient retailer," <u>Leegin</u>, 127 S.Ct. at 2719, and not "used as a promotional device," 2A Areeda ¶ 398.

Comanor testified that when a dominant distributor coerces a manufacturer to implement resale price maintenance—rather than the manufacturer adopting it unilaterally—the restraint has only anticompetitive effects.  (Comanor Rep. I ¶¶ 21-25; Comanor Rep. II ¶ 25.)  He reasons that manufacturers and distributors have divergent economic interests regarding resale price maintenance.  Manufacturer interests may be associated with procompetitive effects (creating demand for their products), but distributor interests are associated only with anticompetitive

effects (restricting price competition).  Therefore, when a distributor coerces the imposition of resale price maintenance (satisfying its interest but not the manufacturer's interest), only anticompetitive effects will follow.  Myslinski challenges this opinion by arguing that other economists disagree with Comanor, but the economic literature cited does not substantiate this challenge.  Furthermore, the Supreme Court in Leegin agreed that when a dominant distributor instigates a vertical price restraint, "the manufacturer does not establish the practice to stimulate services or to promote its brand" but instead "supports a dominant, inefficient retailer."  Leegin, 127 S.Ct. at 2717, 2719.  Therefore, the dispositive issue becomes whether BRU was a dominant distributor that coerced the restraints.

With regard to dominance, Comanor testified that BRU was sufficiently dominant to coerce each manufacturer into preventing internet discounting.  (Comanor Rep. II ¶¶ 32-36.)  He concluded from empirical evidence that BRU was by far each manufacturer's most important distributor.  From mid-2000 to mid-2005, BRU sold 50% of Regal Lager's BabyBjörn baby carriers, whereas the next-most-dominant retailer sold only 7.8%.  (Comanor Rep. II App. A at BB-14.)  From 2000 to 2005, BRU sold 28.2% of Medela's breastpumps, whereas the next-most-dominant retailer sold only 3.9%.  (Comanor Rep. II App. A at ME-14.)  From 2000 to mid-2007, BRU sold 57.8% of Kidsline's baby bedding, whereas the next-most-dominant retailer sold only 19.1%.  (Comanor Rep. II App. A at KL-18.)  From 2004 to 2007, BRU sold 32.1% of Maclaren's strollers, whereas the next-most-dominant retailer sold only 12.7%.  (Comanor Rep. II App. A at MC-10.)  From 2003 to mid-2006, BRU sold 44.89% of Britax's car seats, whereas the next-most-dominant retailer sold only 5.54%.  (Comanor Rep. II App. A at BR-10.)

The plaintiffs also offered evidence that manufacturers recognized BRU's dominance. For example, Britax recognized its "[f]inancial dependence on BRU."  (Pl.'s Ex. 76.)  Medela bemoaned that "BRU is our largest customer, 13% of sales," and noted that "[i]f BRU doesn't order, we have a bad month."  (Pl.'s Ex. 37.)  Medela also stated: "BRU is [*sic*] main player and top account for Medela."  (Pl.'s Ex. 29.)  Regal Lager stated that "[i]t's hard to say no when they [BRU] have over 50% of our business!"  (Pl.'s Ex. 20.)  And Kidsline stated that "Babies 'R' Us … is the dominant superstore retailer."  (Pl.'s Ex. 86.)

With regard to coercion, the plaintiffs offered evidence that BRU indeed coerced the restraints.[17]  This includes internal documents of defendants and depositions of employees of internet retailers.  The evidence indicates that BRU pressured the manufacturers to prevent internet discounting, they responded by curtailing specific retailers or implementing distribution policies targeting internet retailers, and this response benefitted BRU but harmed the manufacturers.

For example, Jacob Weiss of Babyage, an internet retailer, testified that Peg-Perego's sales representative admitted that BRU had threatened to charge Peg-Perego for each sale that Babyage made unless Peg-Perego made Babyage stop discounting.  (Weiss Dep. 193:20-194:4, 372:6-13.)  He also testified that Charles Ginn of Kidsline told him: "No, you can't match Babies 'R' Us and if you're not going to change your prices … we'll terminate you and you won't get any more products."  (Weiss Dep. 195:5-9.)  When pressed to explain, Ginn responded: "Oh, you really think I'm going to make a decision between an important customer and a very important

---

[17] Comanor also conducted regression analyses to prove this point, but I find the deposition testimony and other evidence adequate.

customer." (Weiss Dep. 195:11-13.) Finally, Weiss testified that Lenny Aaronson of Medela admitted that their distribution "policy was prompted by Babies 'R' Us." (Weiss Dep. 275:17-20.) Aaronson explained that "Babies 'R' Us was not happy with the competition that they were getting from Internet retailers … and they were forcing Medela to take action to make sure that nobody" continued discounting. (Weiss Dep. 276:1-9.)

Jack Kiefer of Babyage testified that manufacturers across the industry (including the defendants) unexpectedly terminated Babyage or demanded higher prices when they began selling to BRU or during the early 2000s. (Kiefer Dep. 58:19-61:17, 82:22-83:13, 206:13-207:3.) One sales representative told him: "[W]e're getting a lot of pressure from Babies 'R' Us, you're going to need to raise your prices, there is nothing I can do to protect you." (Kiefer Dep. 61:14-17.) Similarly, Joe Randazzo of The Baby Club of America, Inc. ("Baby Club"), another internet retailer, testified that manufacturers began calling to stop discounting only when BRU came onto the scene during the late 1990s. (Randazzo Dep. 41:10-22, Nov. 19, 2008.) Finally, Dean Letendre of Baby Club testified that across many conversations with manufacturers "there is an overriding inference that Babies 'R' Us is behind these policies or agreements" that they began implementing to prevent discounting. (Pl.'s Supp. Proffer Ex. A. at A8.)

Furthermore, internal documents also indicate that BRU coerced the restraints. Medela stated: "We discontinued internet sellers to protect BRU's business and margin and therefore accepted considerable legal risk." (Pl.'s Ex. 80.) BRU negotiated to expand Maclaren-stroller sales in exchange for Maclaren implementing "a better retail price." (Pl.'s Ex. 64.) BRU agreed to meet with Regal Lager and BabyBjörn about selling carriers only when they agreed to change their distribution policy (Pl.'s Ex. 156), and BRU waited to order carriers until the day after their

44

new policy became effective (Pl.'s Exs. 61-62). Finally, Britax stated that its distribution policy

was designed to "eliminate the potential of margin equalization requests from Britax's largest

customer base," which evidence shows was BRU. (Pl.'s Ex. 126.) Britax explained that the

policy "allows BRU to directly benefit from consumers no longer finding discounted Britax

products on the Internet."[18] (Pl.'s Ex. 120.)

In summary, the defendants argued that impact cannot be proved with common evidence

because resale price maintenance encouraged BRU to provide services that subclass members

may have valued differently. In response, the plaintiffs offered evidence that the restraints cannot

have caused these services because the restraints were designed to "support[] a dominant,

inefficient retailer," Leegin, 127 S.Ct. at 2719, and not "used as a promotional device," 2A

Areeda ¶ 398. Comanor explained that resale price maintenance does not encourage

procompetitive services when imposed by a dominant distributor, see Leegin, 127 S.Ct. at 2717,

BRU was a dominant distributor, and the plaintiffs offered evidence that BRU coerced the

restraints. For this reason alone, I would reject the defendants' argument. However, the

plaintiffs also have a second argument.


ii. Second Response to Argument Based on Non-Price Factors

The plaintiffs maintain that the restraints never caused BRU to improve or create

consumer services. First, they offered evidence that manufacturers had to pay for many services

---

[18] Britax also stated that "[t]he introduction of a Price Policy has achieved retail pricing stability and protected BCS [Britax] from a loss of distribution. However, Roundabout sales have fallen 5% since retail discounting was prohibited." (Pl.'s Ex. 128.)

directly.  Each manufacturer paid fees reimbursing BRU for advertisements and promotions (e.g., coupons or displays).  (Pl.'s Exs. 20, 64, 134-35, 138-39, 169-70.)  BRU also charged return allowances reimbursing it for money refunded to consumers.  (Pl.'s Exs. 20, 134.)  BRU was thus an "'expensive' account."  (Pl.'s Ex. 134.)  Cf. Toys "R" Us, 221 F.3d at 938 ("[T]he manufacturers were paying for the services TRU furnished, such as advertising, full-line product stocking, and extensive inventories.  These expenses, we may assume, were folded into the price of the goods the manufacturers charged to TRU, and thus these services were not susceptible to free riding.").

Second, the plaintiffs argued that other services (e.g., having brick-and-mortar stores) are integral to BRU's business model and would exist without the restraints.  (5/28 Hr'g Tr. 20.)  For example, Myslinski indicated that BRU would maintain gift registries irrespective of resale price maintenance.  (Myslinski Rep. III ¶ 19.)  Because the restraints did not cause the services that BRU provided, any services that BRU customers might have valued would have remained the same without the antitrust violation.  For this reason, the defendants' argument may be rejected once again.

In summary, the plaintiffs demonstrated how common evidence could prove that the conspiracies caused supra-competitive prices at BRU and that every subclass member made a purchase at the supra-competitive price.  The defendants responded that impact cannot be proved with common evidence because subclass members may have valued BRU's services differently, but I disagreed for two separate reasons.  Therefore, I conclude that antitrust impact is "capable of proof at trial through evidence that is common to the class rather than individual to its

members."  In re Hydrogen Peroxide, 552 F.3d at 311-12.  Predominance has thus been satisfied

for each subclass with regard to the second element of § 4 of the Clayton Act.


### 3.  Measurable Damages

Finally, the third element of § 4 requires proof of "measurable damages."  In re Hydrogen

Peroxide, 552 F.3d at 311.  An antitrust plaintiff "must make a showing regarding the amount of

damages," but "the standard [of proof] is somewhat relaxed."  Rossi v. Standard Roofing, Inc.,

156 F.3d 452, 484 (3d Cir. 1998).  See In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d

1144, 1176 (3d Cir. 1993) (noting that a "relaxed measure of proof is afforded to the amount" of

damages).  "It is not necessary to show with total certainty the amount of damages sustained."

Rossi, 156 F.3d at 483.  Once injury has been shown, "the jury is permitted to calculate the actual

damages suffered using a reasonable estimate, as long as the jury verdict is not the product of

speculation or guess work."  Id. at 484.  Therefore, predominance requires only a viable method

whereby damages can be reasonably estimated based on common evidence.

Comanor testified that the appropriate amount of damages is the "overcharge amount,"

i.e., the amount that BRU charged minus what it would have charged but for the antitrust

violation.  (Comanor Rep. I ¶¶ 35-36.)  He testified that this amount could be calculated using a

benchmark analysis.[19]  See In re Linerboard, 305 F.3d at 153-55 (finding that a benchmark

analysis based on data can be effectively used in an overcharge situation).  First, the actual

markup that BRU received may be calculated using the price BRU charged (usually MSRP) and

---

[19] Myslinski conceded that benchmark analyses are accepted in antitrust economics.  (Myslinski
Dep. 383:10-22.)

the wholesale price—i.e., retail price ÷ wholesale price.  Second, the markup that BRU would

have charged but for the antitrust violation may be reasonably estimated by using the average

markup of a comparable distributor—the "benchmark," in other words.  Finally, total damages

can be calculated by multiplying the number of products sold by the difference between the

actual markup and the but-for markup.  (Comanor Rep. II ¶¶ 73-74.)  To demonstrate, Comanor

calculated BRU's actual markup for Maclaren strollers and compared it with average markups

for Target, Sears, and Walmart.[20]  (Comanor Rep. II ¶¶ 75-76; Comanor Rep. III App. E.)

The defendants concede that the method of comparing markups and Comanor's

calculation of actual markups are sound.  (5/28 Hr'g Tr. 137.)  They argue, however, that

Comanor's proposed benchmarks are inadequate.  Myslinski testified that Target, Sears, and

Walmart are not comparable to BRU because they sell merchandise other than baby

products—e.g., groceries, hardware, office supplies, electronics, etc.  (Myslinski Rep. III ¶ 64.)

He also said that using one average markup for the benchmark may produce incorrect results

because markups differ among products.  (Myslinski Rep. III ¶ 66.)  For example, Myslinski

observed that BRU's actual markups for certain products unrelated to this case varied

substantially in 2004.  (Myslinski Rep. III App. 2. Table 6.)

Comanor responded that BRU may be compared with Target, Sears, and Walmart

because they have similar size and perform the same distribution function—buying products

from suppliers, storing them in warehouses, advertising them to consumers, and selling them in

large stores.  (5/28 Hr'g Tr. 132; Comanor Rep. III ¶ 66.)  Comanor also testified that, based on

---

[20] Comanor also proposed using Amazon.com, Inc. ("Amazon"), the largest internet retailer.
This benchmark is inadequate because Amazon does not maintain brick-and-mortar stores.

economic analysis, one average markup for various consumer goods should be similar to the markups for the products in this case.  (Comanor Rep. III ¶ 67.)  The defendants offered no evidence directly relevant to this conclusion.

Considering the entire record, I find Comanor's position most persuasive.  His proposed benchmarks are not perfect, but they will give "a reasonable estimate" of damages.  Rossi, 156 F.3d at 484.  And nothing more is required.  Thus, I conclude that measurable damages are "capable of proof at trial through evidence that is common to the class rather than individual to its members."  In re Hydrogen Peroxide, 552 F.3d at 311-12.  Predominance has thus been satisfied for each subclass with regard to the final element of § 4 of the Clayton Act.

In summary, the defendants do not contest superiority and I found predominance satisfied for each element of § 4 of the Clayton Act.  Therefore, I conclude that Rule 23(b)(3) has been satisfied for each subclass.


## IV. CONCLUSION

In re Hydrogen Peroxide teaches that for Rule 23(b)(3) certification a plaintiff must explain how the case will be tried and demonstrate that proof can be made using common evidence.  A defendant may then poke holes in the plaintiffs' case under Rule 23 using expert testimony, empirical evidence, or other methods.  Having resolved their disputes and analyzed all relevant evidence, I conclude that the plaintiffs have carried their burden under each requirement of Rule 23(a) and (b)(3).  Therefore, I will grant the motion for class certification.  However, I will dismiss the claim against Kidsline without prejudice because the plaintiffs lack standing and will also dismiss Hall, Otazo, and Sullivan for reasons stated above.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: