EXHIBIT "C"

# THE RULE OF REASON:
# AN EMPIRICAL UPDATE FOR THE 21ST CENTURY

*Michael A. Carrier*[*]

INTRODUCTION

One of the most amorphous rules in antitrust is the rule of reason. One of the most important rules in antitrust is the rule of reason. One of the most misunderstood rules in antitrust is the rule of reason.

Put together these three propositions and you have the making of real trouble.

A decade ago, I showed that the rule of reason is far less amorphous than commonly believed.[1] After reviewing all 495 rule of reason cases from 1977 to 1999, I showed that courts actually followed a burden-shifting approach.[2]

In the first stage, the plaintiff must show a significant anticompetitive effect. The plaintiff's failure to make such a showing led to the courts' dismissal of 84% of the cases.[3] In the second stage, the defendant must demonstrate a legitimate procompetitive justification; its failure to do so led to invalidation of the restraint in 3% of the cases.[4]

If the defendant satisfies this burden, the plaintiff can show that the restraint is not reasonably necessary or that the defendant's objectives could be achieved by less restrictive alternatives. At most, 1% of the cases were dismissed because the plaintiff made this showing.[5] Only after the completion of these three stages does the court balance anticompetitive and procompetitive effects. Balancing occurred in 4% of the cases.[6]

---

[*] Professor, Rutgers University School of Law-Camden. I would like to thank Bill Kolasky for the invitation to participate in the rule of reason panel at George Mason Law Review's Twelfth Annual Symposium on Antitrust Law, "Antitrust Policy in the New Administration," Dec. 4, 2008.

[1] Michael A. Carrier, *The Real Rule of Reason: Bridging the Disconnect*, 1999 B.Y.U. L. REV. 1265, 1267.

[2] *Id.* at 1269. The starting point of my survey was 1977, given the importance of *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977), which held that courts are to consider vertical nonprice restraints under the rule of reason. *Id.* at 59. *GTE Sylvania* has consistently been linked to the beginning of antitrust's modern era. *See, e.g.*, Robert H. Lande, *Beyond Chicago: Will Activist Antitrust Arise Again?*, 39 ANTITRUST BULL. 1, 18 (1994); John E. Lopatka, *Stephen Breyer and Modern Antitrust: A Snug Fit*, 40 ANTITRUST BULL. 1, 24 (1995).

[3] Carrier, *supra* note 1, at 1268.

[4] *Id.*

[5] *Id.* at 1268-69.

[6] *Id.* at 1269.

A decade has passed. This Article updates my 1999 study. It concludes that the burden-shifting trend has continued and, in fact, has increased. Courts dispose of 97% of cases at the first stage, on the grounds that there is no anticompetitive effect. They balance in only 2% of cases.

Given the trend in the case law, the burden-shifting framework is an important observation. The rule of reason is even more crucial today than it was a decade ago. The Supreme Court has increasingly overturned per se rules of illegality.[7] In *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,[8] for example, the Court abandoned one of the last pillars of per se analysis, minimum vertical price fixing, in which a manufacturer sets the minimum price at which its distributors resell goods. Because analysis is migrating away from per se analysis and towards the rule of reason, an exploration of what courts actually do in applying the framework may prove useful.

This short Article begins in Part I with an explanation of my methodology. Part II then presents the results. After providing an overview of the conclusions, it explores the instances of balancing in detail. Part III concludes by synthesizing the approaches of many of the appellate courts.

I. METHODOLOGY

This survey is based on a Westlaw search of all federal cases decided between February 2, 1999, and May 5, 2009. I located the cases by searching broadly for all rule of reason cases: "DA(aft 2/2/1999) & antitrust & (Rule +2 Reason)."

Such a search is designed to pick up every instance in which a court applied rule of reason analysis. I assumed that any court conducting such analysis would at least mention the phrase "rule of reason." This would appear to be a reasonable assumption given the importance of labels in antitrust. A court applying rule of reason analysis—as opposed to, say, per-se or quick-look analysis—should naturally refer to the concept. And I include "antitrust" as one of my search terms to restrict the universe of cases to antitrust cases, a helpful limitation given the prevalence of the phrase "rule of reason" in other settings such as environmental, patent, and criminal law.[9]

---

[7] Courts applying per se analysis condemn conduct based on the existence of the activity and do not consider the activity's justifications. *See* Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988).

[8] 551 U.S. 877 (2007).

[9] *See, e.g.*, Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 757, 769 (2004) (allowing agencies to determine whether to prepare an environmental impact statement based on new information); *In re Garner*, 508 F.3d 1376, 1380 (Fed. Cir. 2007) (determining sufficiency of corroboration in analyzing credibility of inventor's testimony in analyzing priority of invention); United States v. Holmes, 406 F.3d 337, 351 (5th Cir. 2005) (reviewing challenge to sufficiency of evidence filed by defendant seeking reversal of conviction).

2009] THE RULE OF REASON: AN EMPIRICAL UPDATE FOR THE 21ST CENTURY 829

The search also is overinclusive given that many cases that use the phrase "rule of reason" do not apply the analysis. Such occasions have arisen in settings in which courts have applied per se illegality, considered class certification, or determined the existence of an agreement.

My survey includes instances in which a court entered a final judgment in an antitrust dispute that it decided (at least in part) under the rule of reason. Nearly all of the included cases involve courts' grants of summary judgment and motions to dismiss. These observations apply only to the antitrust issues of a case; the continued vitality of non-antitrust claims does not affect the inclusion of the case in the survey.

The survey does not include cases that have not reached an ultimate determination, such as denials of summary judgment or motions to dismiss. It also does not cover grants or denials of preliminary injunctions unaccompanied by final findings.[10]

This Article will consider balancing only by judges, not juries. Instances in which courts have balanced anticompetitive and procompetitive effects or have passed upon the validity of jury verdicts can be discovered by traditional research tools; jury balancing cannot. To the extent that unreported jury verdicts are based on a proportionally higher degree of balancing, the figures may shift slightly. But the realization that juries may play a marginally more significant role than can be pinpointed does not materially affect my conclusions.[11]

II. RESULTS

A. *Findings*

As a result of my search, I reviewed 738 cases. Of these, 222 involved a court's final determination in a rule of reason case. Out of the 222 cases, 215 were resolved on the grounds that the plaintiff did not prove an anticompetitive effect. Courts disposed of cases at the following stages:

| Stage | Number | % of cases |
| --- | --- | --- |
| No anticompetitive effect | 215 | 96.8% |
| No procompetitive justification | 0 | 0% |
| Unrebutted procompetitive justification | 1 | 0.5% |
| No less restrictive alternative | 1 | 0.5% |
| Balancing | 5 | 2.2% |
| Totals | 222 | 100% |

---

[10] Carrier, *supra* note 1, at 1269 n.13.
[11] *Id.* at 1267 n.1.

830            GEO. MASON L. REV.            [VOL. 16:4

These findings lead to two important conclusions. First, plaintiffs almost never win under the rule of reason. In 221 of 222 cases (all except a single balancing case[12]), the defendant won.

Second, courts decide almost all rule of reason cases by finding that the plaintiff failed to show an anticompetitive effect. This conclusion reinforces the trend I identified a decade ago. In the previous study, I found that most instances of balancing occurred early in the 1977-1999 period.[13] In particular, courts balanced in 14 cases between 1978 and 1988, while balancing only in 6 cases between 1988 and 1998.[14] This survey is consistent in finding only 5 instances of balancing in the past decade.

Plaintiffs can demonstrate an anticompetitive effect in one of two ways. First, they can show an actual adverse effect, such as an increase in price, reduction in output, or deterioration in quality.[15] Second, they can show a potential adverse effect, as revealed by market power.[16] Plaintiffs proving this element must delineate relevant product and geographic markets and offer proof of the defendant's power in the markets.

A review of the 215 cases in which courts disposed of the case on the ground that the plaintiff failed to demonstrate an anticompetitive effect reveals four patterns:

\* Some courts conclude that the plaintiff does not show an anticompetitive effect without addressing market power (110 cases);

\* Some courts find a lack of market power without discussing anticompetitive effects (66 cases);

\* Some courts assert that there is no anticompetitive effect and no market power (32 cases);

\* A few courts find a lack of anticompetitive effect and a legitimate procompetitive justification for the conduct (7 cases).[17]

---

12  *See infra* notes 20-23 and accompanying text.
13  Carrier, *supra* note 1, at 1349-50.
14  *Id.*
15  *E.g.*, U.S. Horticultural Supply, Inc. v. Scotts Co., No. 04-5182, 2009 WL 89692, at \*18 (E.D. Pa. Jan. 13, 2009).
16  *Id.*
17  Imaging Ctr., Inc. v. W. Md. Health Sys., Inc., 158 F. App'x 413, 420 (4th Cir. 2005) (holding that the contested arrangement did not present anticompetitive effects and that the defendants "offered evidence of . . . procompetitive benefits" justifying the activity); Inter-County Title Co. v. Data Trace Info. Servs., 105 F. App'x 136, 138 (9th Cir. 2004) (ruling that the plaintiff had "failed to demonstrate anticompetitive effects" and that "undisputed evidence provide[d] a legitimate justification" for the activity); Int'l Healthcare Mgmt. v. Haw. Coal. For Health, 332 F.3d 600, 608-09 (9th Cir. 2003) (finding a lack of anticompetitive effect and presence of procompetitive justification); Kochert v. Greater Lafayette Health Servs., Inc., 372 F. Supp. 2d 509, 516-18 (N.D. Ind. 2004) (holding that the plaintiff had failed to prove harm to competition and market power and that the defendant's activity served "legitimate business purposes" in "improv[ing] efficiencies, reduc[ing] costs, and improv[ing] quality of care"); Toscano v. PGA Tour, Inc., 201 F. Supp. 2d 1106, 1122-23 (E.D. Cal. 2002) (ruling that the plaintiff had failed to show anticompetitive effect, the defendant sports association's rules had "a series

2009] THE RULE OF REASON: AN EMPIRICAL UPDATE FOR THE 21ST CENTURY 831

B. *Balancing Instances*

Courts in five instances balanced anticompetitive effects against procompetitive effects. To be clear, courts typically conducted such balancing in a cursory fashion. Nonetheless, a quick exploration of the cases sheds light on how courts conduct balancing today. In one case, the plaintiff won as a result of such balancing.[18] In four cases, the defendant emerged victorious.[19]

The sole plaintiff victory occurred in *United States v. Visa U.S.A., Inc.*[20] In this case, the Second Circuit considered a rule by which Master-Card and Visa prohibited member banks from issuing American Express or Discover cards. The court upheld the district court's conclusion (reached after a nonjury trial) that the rule violated the rule of reason. It found that the rule had an anticompetitive effect in reducing "overall card output and available card features" and "stunting price competition."[21] The court held that the proffered justification—promoting "cohesion" within the networks—was not necessary.[22] And it concluded that defendants "failed to show that the anticompetitive effects of their exclusionary rules are outweighed by procompetitive benefits."[23]

Courts in the other four balancing cases found for the defendants. In the first case, *California Dental Ass'n v. FTC*,[24] the Ninth Circuit, on remand from the Supreme Court, considered the California Dental Association's rule preventing false or misleading advertising.[25] The court found that the FTC "never quantified any increase in price or reduction in output" and failed to prove price reductions from dentists advertising lower prices.[26] In contrast, the defendant offered procompetitive justifications such as remedying informational asymmetries, facilitating comparative shopping, and

---

of procompetitive justifications," and the plaintiff did not offer a "scintilla of evidence" showing that the defendant's objectives "could be achieved in a less restrictive manner"); KW Plastics v. U.S. Can Co., Nos. CIV. A. 99-D-286-N, 99-D-878-N, 2001 WL 135722, at *22 (M.D. Ala. Feb. 2, 2001) (finding no anticompetitive effect but "readily apparent" procompetitive effects); Bepco, Inc. v. Allied-Signal, Inc., 106 F. Supp. 2d 814, 828-29 (M.D.N.C. 2000) (finding no anticompetitive harm and "pro-competitive benefits inherent in exclusive distributorships").

[18] United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003).
[19] *See* Reifert v. S. Cent. Wisc. MLS Corp., 450 F.3d 312 (7th Cir. 2006); Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145 (9th Cir 2003); County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148 (9th Cir. 2001); Cal. Dental Ass'n v. FTC, 226 F.3d 942 (9th Cir. 2000).
[20] 344 F.3d 229.
[21] *Id.* at 240.
[22] *Id.* at 243 ("MasterCard members have long been permitted to issue Visa cards, and vice versa, without such consequences.").
[23] *Id.*
[24] 224 F.3d 942.
[25] *Id.* at 943.
[26] *Id.* at 957.

reducing manipulation and misleading of patients.[27] The court concluded that the FTC "failed to demonstrate substantial evidence of a net anticompetitive effect."[28]

In the second case, *County of Tuolumne v. Sonora Community Hospital*,[29] the court analyzed a hospital's rule that created privileging criteria for cesarean-sections ("C-sections") that had the effect of foreclosing family doctors from the market.[30] The Ninth Circuit found that there was an anticompetitive effect given the hospital's market share of 100% in the relevant market.[31] It then observed that the defendant offered a legitimate procompetitive justification in "requiring certain, minimum training for doctors who perform C-sections," which would "optimiz[e] patients' health."[32]

At that point, the plaintiff had the burden to show that the defendant's objectives could be achieved through an alternative that was "substantially less restrictive" and "virtually as effective in serving the legitimate objective without significantly increased cost."[33] But its proffered suggestions, in requiring additional information from doctors, necessitated substantial costs.[34] The court thus proceeded to balancing, reaching the conclusion that "any anticompetitive harm is offset by the procompetitive effects" of the hospital's effort to "maintain the quality of patient care that it provides."[35]

In the third case, *Paladin Associates v. Montana Power Co.*,[36] the court addressed an arrangement by which a natural gas pipeline company offered a five-year supply of gas transportation services through a Canadian pipeline.[37] The Ninth Circuit found that the defendant lacked market power and that the five-year term did not harm competition (and in fact lowered prices).[38] The court also pointed to the arrangement's procompetitive justifications, which eliminated the transaction costs of "renegotiating agreements on a yearly basis."[39] The court concluded that "any anticompetitive

---

[27] *Id.*

[28] *Id.* at 958. The Supreme Court had held that the Ninth Circuit "erred by applying 'quick look'/abbreviated rule-of-reason analysis" while also noting that the case did "not . . . necessarily . . . call for the fullest market analysis." *Id.* at 947 (citations omitted). In "[s]eeking to situate [its] inquiry somewhere on the rule-of-reason continuum between abbreviated and full-blown," the Ninth Circuit "employ[ed] a level of inquiry closer to the latter." *Id.* (citations omitted).

[29] 236 F.3d 1148 (9th Cir. 2001).

[30] *Id.* at 1152.

[31] *Id.* at 1159.

[32] *Id.*

[33] *Id.* (emphasis omitted).

[34] *Id.*

[35] *Sonora Cmty. Hosp.*, 236 F.3d at 1160.

[36] 328 F.3d 1145 (9th Cir. 2003).

[37] *Id.* at 1152.

[38] *Id.* at 1157-58.

[39] *Id.* at 1157.

2009] THE RULE OF REASON: AN EMPIRICAL UPDATE FOR THE 21ST CENTURY 833

effects . . . were far outweighed by the [arrangement's] procompetitive benefits."[40]

In the fourth case, *Reifert v. South Central Wisconsin MLS Corp.*,[41] the Seventh Circuit addressed an ethics rule of the National Association of Realtors.[42] The rule "prevent[ed] the targeted solicitation of individuals who . . . exclusively listed their property with another agent" and also "prevent[ed] agents from improperly using multiple listing services as a data bank of potential customers."[43]

The court found that the real estate broker plaintiff's allegations of anticompetitive effects were "overly broad" since the rule did not prevent realtors from making announcements to prospective customers. It found that the rule "aid[ed] competition" by "providing a more transparent marketplace."[44] And it concluded that "[t]he balance between pro- and anticompetitive effects weighs heavily in favor" of the rule.[45]

C. *Two Other Cases of Note*

In addition to the five balancing cases described in the preceding section, courts decided two other rule of reason cases on grounds other than a lack of anticompetitive effect.

In the first case, the court found that the plaintiff did not show that the defendant's objectives could have been achieved in a less restrictive manner. In *Virgin Atlantic Airways Ltd. v. British Airways PLC*,[46] the Second Circuit addressed incentive agreements by which British Airways awarded commissions or discounts to travel agencies and corporate customers for reaching certain sales thresholds.[47] The court found that the agreements could have affected output or quality, but that they also had procompetitive justifications in rewarding loyal customers.[48] And it concluded that the plaintiff did not "suggest[] an alternative program that would achieve the same procompetitive effect as the incentive agreements."[49]

In the second case, *JES Properties, Inc. v. USA Equestrian, Inc.*,[50] the Eleventh Circuit considered a rule adopted by the national governing body

---

40  *Id.* at 1158.
41  450 F.3d 312 (7th Cir. 2006).
42  *Id.* at 314-15.
43  *Id.* at 321.
44  *Id.*
45  *Id.*
46  257 F.3d 256 (2d Cir. 2001).
47  *Id.* at 259.
48  *Id.* at 265.
49  *Id.*
50  No. 802CV1585T24MAP, 2005 WL 1126665 (M.D. Fla. May 9, 2005).

for equestrian sport in the United States.[51] Similar to other courts in the Eleventh Circuit (and as discussed below[52]), the court required the plaintiff to show not only anticompetitive effect but also that "the defendant's conduct had no pro-competitive . . . justification."[53] Because the defendants had "not specifically address[ed] whether the alleged . . . conduct restrained competition," the court presumed the existence of an anticompetitive effect.[54] And it pointed to several procompetitive justifications for the rule: minimizing scheduling conflicts, dispersing competitions geographically, promoting the health and welfare of horses, and developing the sport throughout the nation.[55] Apparently because the plaintiff did not disprove the lack of a justification, the court concluded that the rule "does not result in an unreasonable restraint of trade."[56]

III. CIRCUIT DIFFERENCES IN APPLYING THE RULE OF REASON

Although courts are generally consistent in their focus on the importance of the plaintiff's initial demonstration of an anticompetitive effect, their formulations of the rule of reason framework vary. Some of the most notable differences are highlighted in this section.

The most direct expositions of a burden-shifting approach have been offered by the Second and Sixth Circuits. The Second Circuit has stated that the plaintiff initially "must demonstrate that the practice it challenges has had 'an actual adverse effect on competition as a whole in the relevant market.'"[57] If the plaintiff makes this showing, "the defendant must establish the 'pro-competitive redeeming virtues' of the practice."[58] And if the defendant demonstrates this, "the plaintiff must then demonstrate 'that the same pro-competitive effect could be achieved through an alternative means that is less restrictive of competition.'"[59]

---

[51] *Id.* at *2.
[52] *See infra* notes 66-67 and accompanying text.
[53] *JES Props.*, 2005 WL 1126665, at *15 (citation and internal quotation marks omitted).
[54] *Id.*
[55] *Id.* at *15-16.
[56] *Id.* at *16.
[57] CDC Techs., Inc. v. IDEXX Labs. Inc., 186 F.3d 74, 80 (2d Cir. 1999) (quoting K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 127 (2d Cir. 1995)) (emphasis omitted).
[58] *Id.* at 80 n.4 (quoting *K.M.B. Warehouse Distribs.*, 61 F.3d at 127).
[59] *Id.* For a court offering the fourth stage of review—balancing—see *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270, 289 (S.D.N.Y. 2007) ("It is ultimately for a finder of fact to undertake a careful weighing of both the pro- and anti-competitive effects and to determine whether the restraint promotes or inhibits competition."). For a court explaining that the plaintiff in the third stage can show either that the restraint is not reasonably necessary or that the defendant's objectives can be achieved in a less restrictive manner, see *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003).

Similarly, the Sixth Circuit has explained that the plaintiff initially "must establish that the restraint produces significant anticompetitive effects within the relevant product and geographic markets."[60] If the plaintiff meets this burden, the defendant "must come forward with evidence of the restraint's procompetitive effects to establish that the alleged conduct justifies the otherwise anticompetitive injuries."[61] And if the defendant can demonstrate this, "the plaintiff then must show that any legitimate objectives can be achieved in a substantially less restrictive manner."[62]

Some expositions are slightly more open-ended in nature. For example, even though the Ninth Circuit applies a burden-shifting approach, it also uses balancing language. In one case, for example, the court explained that "[t]he rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects."[63] In addition, the court "review[s] all the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and . . . determine[s] whether the anticompetitive aspects of the challenged practice outweigh its pro-competitive effects."[64]

Similarly, the Fifth Circuit has stated that a plaintiff must demonstrate that the challenged activity "unreasonably restrain[s] trade."[65] The court "balance[s] the 'anticompetitive evils of a restrictive practice . . . against any procompetitive benefits or justifications.'"[66] And "[p]roof that the defendant's activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery."[67]

---

[60] Care Heating & Cooling, Inc. v. Am. Standard, Inc., 427 F.3d 1008, 1012 (6th Cir. 2005) (quoting Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club, 325 F.3d 712, 718 (6th Cir. 2003) (internal quotation marks omitted); *see also* Worldwide Basketball & Sport Tours, Inc. v. NCAA, 388 F.3d 955, 959 (6th Cir. 2004).

[61] *Care Heating*, 427 F.3d at 1012 (quoting *Nat'l Hockey League*, 325 F.3d at 718) (internal quotation marks omitted).

[62] *Id.*

[63] Int'l Healthcare Mgmt. v. Haw. Coal. For Health, 332 F.3d 600, 608 n.6 (9th Cir. 2003) (quoting Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145, 1156 (9th Cir. 2003)) (internal quotation marks omitted).

[64] *Id.*; *see also* Van Well Nursery, Inc. v. Mony Life Ins. Co., No. CV-04-0245-LRS, 2007 WL 716042, at *5 (E.D. Wash. Mar. 6, 2007) ("The balancing process of the rule of reason is not applied to a particular agreement or practice until after the plaintiff has established that the challenged conduct constitutes a restraint on competition.").

[65] Apani Sw., Inc. v. Coca-Cola Enters., Inc., 300 F.3d 620, 627 (5th Cir. 2002) (internal quotation marks omitted).

[66] *Id.* (quoting Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc., 123 F.3d 301, 307 (5th Cir. 1997)).

[67] *Id.* (emphasis omitted); *see also* Viazis v. Am. Ass'n of Orthodontists, 314 F.3d 758, 765 (5th Cir. 2002) (evaluating "net potential for competitive harm" by weighing anticompetitive effects against procompetitive benefits); Moore v. State Farm Mut. Auto. Ins. Co., 520 F. Supp. 2d 815, 823 (E.D. La. 2007) (noting that, in applying the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable re-

In the Eighth Circuit, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."[68]

Two other circuits deserve mention given their unique formulations. The Third Circuit has noted that courts "weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."[69] Courts in this jurisdiction also have explained that to satisfy the initial step in the rule of reason framework, plaintiffs must demonstrate a "substantial adverse, anti-competitive effect," which they can do by proving

> (1) that the defendants contracted, combined or conspired among each other, (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.[70]

Lastly, the Eleventh Circuit requires a plaintiff to show not only anticompetitive effect but also that "the defendant's conduct has no pro-competitive benefit or justification."[71] The Northern District of Georgia, in particular, has reiterated this on numerous occasions. Just to pick one example, the court explained that a plaintiff must prove "(1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification."[72]

---

straint on competition" (quoting Cont'l T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49 (1977)) (internal quotation marks omitted)).

[68]  Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761, 772-73 (8th Cir. 2004) (quoting State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)); *see also* S & S Commc'ns v. Local Exch. Carriers Ass'n, No. CIV 02-1028, 2006 WL 519651, at *9 (D.S.D. Mar. 1, 2006) (requiring a plaintiff advancing a rule of reason claim to show an agreement that is "intended to harm or unreasonably restrain competition" and that "actually causes injury to competition").

[69]  Bishop v. GNC Franchising LLC, 403 F. Supp. 2d 411, 422 (W.D. Pa. 2005) (quoting Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988)), *aff'd*, 248 F. App'x 298 (3d. Cir. 2007) (internal quotation marks omitted).

[70]  *Id.* at 422-23 (citation omitted); *see also* Brunson Commc'ns, Inc. v. Arbitron, Inc., 239 F. Supp. 2d 550, 565 (E.D. Pa. 2002).

[71]  Spanish Broad. Sys. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1071 (11th Cir. 2004) (quoting Levine v. Cent. Fla. Med. Affiliates, 72 F.3d 1538, 1551 (11th Cir. 1996)) (internal quotation marks omitted).

[72]  Corey Airport Servs., Inc. v. City of Atlanta, No. 1:04-CV-3243-CAP, 2008 WL 4452386, at *49 (N.D. Ga. Sept. 30, 2008) (quoting *Spanish Broad. Sys.*, 376 F.3d at 1071) (internal quotation marks omitted); *see also* Jacobs v. Tempur-Pedic Int'l, Inc., No. 4:07-CV-02-RLV, 2007 WL 4373980, at *3 (N.D. Ga. Dec. 11, 2007); Glades Pharms., LLC v. Murphy, No. 1:06-CV-0940-TWT, 2006 WL 3694625, at *3 (N.D. Ga. Dec. 12, 2006).

CONCLUSION

In the first decade of the twenty-first century, courts have continued their use of a burden-shifting framework in applying the rule of reason. They almost never balance. And they dispose of 97% of rule of reason cases on the grounds that the plaintiff cannot show an anticompetitive effect.