EXHIBIT 1

367 Fed.Appx. 305
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

U.S. HORTICULTURAL
SUPPLY, f/k/a E.C. Geiger, Inc.
v.
The SCOTTS COMPANY, U.S.
Horticultural Supply, Appellant.

No. 09-1231.    Argued Dec. 15,
2009.    Filed: March 4, 2010.

**Synopsis**

**Background:** Horticultural products distributor filed suit against producer of consumer and professional horticulture products, claiming damages from unlawful conspiracy to restrain trade with respect to controlled release fertilizer (CRF). The United States District Court for the Eastern District of Pennsylvania, Mary A. McLaughlin, J., 2009 WL 89692, granted summary judgment to producer. Distributor appealed.

**Holdings:** The Court of Appeals, Fisher, Circuit Judge, held that:

1 district court correctly applied "rule of reason" analysis;

2 distributor failed to provide evidence sufficient to survive summary judgment as to definitions of relevant product markets; and

3 distributor also failed to produce sufficient evidence of relevant geographic markets for CRF sold to nurseries.

Affirmed.

West Headnotes (10)

| 1 | **Federal Courts** |
|---|---|
| | 🔑 Summary judgment |
| | **Federal Courts** |
| | 🔑 Summary judgment |

Review by Court of Appeals of grant of summary judgment is plenary and all reasonable inferences are drawn in favor of nonmoving party.

| 2 | **Federal Civil Procedure** |
|---|---|
| | 🔑 Antitrust and price discrimination cases |

In antitrust cases, normal summary judgment principles apply.

| 3 | **Antitrust and Trade Regulation** |
|---|---|
| | 🔑 Rule of reason |

"Rule of reason" analysis requires antitrust plaintiff to demonstrate adverse, anticompetitive effects within relevant product and geographic markets; plaintiff can establish this anticompetitive effect through showing of facially anticompetitive restraints or reduced output, increased prices or reduced quality in goods or services, but alternatively because proof that concerted action actually caused anticompetitive effects is often impossible to sustain, proof of defendant's market power will suffice. Sherman Act, § 1, 15 U.S.C.A. § 1.

| 4 | **Antitrust and Trade Regulation** |
|---|---|
| | 🔑 Market Power;  Market Share |

"Market power," defined as ability to raise prices above those that would otherwise prevail in a competitive market, is essentially a surrogate for detrimental effects.

| 5 | **Antitrust and Trade Regulation** |
|---|---|
| | 🔑 Presumptions and burden of proof |

Plaintiffs in antitrust conspiracy claims have burden of establishing both product and geographic markets which make up relevant competitive market. Sherman Act, § 1, 15 U.S.C.A. § 1.

| 6 | **Antitrust and Trade Regulation** |
|---|---|
| | 🔑 Elasticity of supply and demand |
| | **Antitrust and Trade Regulation** |

 Product market

Outer boundaries of product market are determined by reasonable interchangeability of use or cross-elasticity of demand between product itself and substitutes for it; "interchangeability" implies that one product is roughly equivalent to another for the use to which it is put, and while there might be some degree of preference for the one over the other, either would work effectively.

1 Cases that cite this headnote

7    **Antitrust and Trade Regulation**
      Product market

Well-defined submarket may constitute relevant product market for antitrust purposes; in determining interchangeability between different products within submarket, antitrust plaintiff must still provide evidence of selling price, uses, and physical characteristics, but in determining boundaries of submarket, court can also consider such practical indicia as industry or public recognition of submarket as separate economic entity, product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

1 Cases that cite this headnote

8    **Antitrust and Trade Regulation**
      Manufacturers

Horticultural products distributor bringing antitrust conspiracy claim against producer of consumer and professional horticulture products including controlled release fertilizer (CRF) failed to present sufficient evidence of relevant product markets; even assuming that practical indicia evidence was sufficient by itself to establish relevant product market under rule of reason analysis, distributor still had burden of presenting evidence demonstrating that its pricing decisions were constrained, its evidence did not make reference to rule of reasonable interchangeability and cross-elasticity of demand, and its expert report did not include specific information relating to price increases or price stability for substitute products in relation to rise in price of CRF. Sherman Act, § 1, 15 U.S.C.A. § 1.

1 Cases that cite this headnote

9    **Antitrust and Trade Regulation**
      Geographic market

Relevant "geographic market" is area in which potential buyer may rationally look for goods or services he or she seeks; consequently, geographic market is not comprised of region in which seller attempts to sell its product, but, rather, is comprised of area where customers would look to buy such a product, and evidence of geographic market presented by party claiming unlawful restraint of trade must therefore speak to buyer behavior. Sherman Act, § 1, 15 U.S.C.A. § 1.

10   **Antitrust and Trade Regulation**
      Manufacturers

Horticultural products distributor bringing antitrust conspiracy claim against producer of consumer and professional horticulture products including controlled release fertilizer (CRF) failed to present sufficient evidence of relevant geographic markets; while it argued that geographic markets for CRF were United States at manufacturing level and mid-Atlantic and New England at retail level, documents it offered did not speak to consumer preferences or buyer behavior. Sherman Act, § 1, 15 U.S.C.A. § 1.

*307 On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. No. 04-cv-05182), District Judge: Honorable Mary A. McLaughlin.

**Attorneys and Law Firms**

Timothy C. Russell (Argued), Peter A. Von Mehren, Spector, Gadon & Rosen, Philadelphia, PA, for Appellant.

Robert W. Loftin, Hunton & Williams, Richmond, VA, Amy S. Kline, Joseph F. O'Dea, Jr., Saul Ewing, Philadelphia,

PA, Wendell L. Taylor (Argued), Hunton & Williams, Washington, DC, for Appellee.

Before: FISHER, HARDIMAN and VAN ANTWERPEN, Circuit Judges.

**Opinion**

**OPINION OF THE COURT**

FISHER, Circuit Judge.

U.S. Horticultural Supply, Inc. ("USHS") appeals from an order of the District Court of the Eastern District of Pennsylvania granting summary judgment as a matter of law to The Scotts Company ("Scotts"). *See U.S. Horticultural Supply, Inc. v. Scotts Co.,* 2009 WL 89692 (E.D.Pa. Jan.13, 2009). USHS filed suit claiming damages from an unlawful conspiracy to restrain trade in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. We will affirm.

**I.**

We write exclusively for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

Scotts is a producer of consumer and professional horticulture products that are sold through a network of distributors to both nurseries and greenhouses. Among its various products, Scotts sells controlled release fertilizer ("CRF"). Griffin Greenhouse Supplies ("Griffin") has been a distributor of Scotts products since at least 1993, and in the mid-1990s Griffin began to expand its operations into the eastern part of the United States. USHS was also a horticultural products distributor and sold its products nationwide.

In 1996, USHS and Scotts signed a Horticultural Products Distributor Agreement ("1996 Distributor Agreement"). The 1996 Distributor Agreement provided that Scotts would deliver its products to USHS' warehouses and customers within a defined territory. This territory included North Carolina, Virginia, West Virginia, Pennsylvania, New Jersey, Maryland, Delaware and Connecticut, as well as the District of Columbia and several counties in New York. The Agreement also provided for product delivery to Texas and Louisiana if USHS established branches in those states.

The 1996 Distributor Agreement expired by its terms on December 23, 2000. Scotts, however, continued to provide product to USHS in the absence of an agreement until August 3, 2001. It was on that date that USHS and Scotts agreed to renew their distributorship agreement for a term ending September 30, 2002 ("2001 Distributor Agreement"). The new agreement amended the definition of territory and removed Scotts' obligation to provide product to USHS if USHS expanded into Texas and Louisiana.

During the course of Scotts' business relationship with USHS, Griffin complained on various occasions that USHS was selling CRF below market prices and was reducing the value of the Scotts brand.[1] Scotts acknowledged USHS' aggressive pricing scheme but was not concerned because Scotts believed that USHS *308 could not maintain its low profit margins in the long-term. Griffin proposed that Scotts drop USHS as a distributor in 1999, but Scotts declined to end its business relationship with USHS at that time. Scotts did, however, choose not to renew the 2001 Distributor Agreement upon its expiration on September 30, 2002.

On March 19, 2002, prior to the expiration of the 2001 Distribution Agreement, Scotts and USHS entered into two additional distribution agreements for two other CRF varieties: Ficote and Grocote. The Ficote Agreement expired by its terms on September 20, 2003, and the Grocote Agreement expired by its terms on September 30, 2006.

On November 5, 2004, USHS brought a claim in district court against Scotts and Griffin alleging a conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act.[2] Specifically, USHS alleged that it was terminated as a distributor of Scotts' products because USHS' price-cutting interfered with an agreement between Scotts and Griffin to maintain above market price levels for the sale of CRF in the mid-Atlantic retail market. (Appellant's Br. at 2.)

**II.**

[1] [2] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary and all reasonable inferences are drawn in favor of the non-moving party. *Harrison Aire, Inc. v. Aerostar Int'l, Inc.,* 423 F.3d 374, 380 (3d Cir.2005). In antitrust cases, "normal summary judgment principles apply." *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 357 (3d Cir.2004). A court should find for the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." *Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir.2001) (quoting Fed.R.Civ.P. 56(c)).

### III.

The District Court entered summary judgment for Scotts. On appeal, USHS claims the District Court erred in finding USHS' theory of conspiracy implausible, that there was sufficient evidence of concerted action to defeat summary judgment, and there was sufficient evidence of anticompetitive effect. We find that the District Court was correct in its determination that USHS failed to provide evidence sufficient to survive summary judgment as to the definitions of the relevant product and geographic markets.[3] As such, we affirm the District Court's grant of summary judgment.

### A.

[3] [4] [5] The District Court was correct in applying a rule of reason analysis to this Section 1 Sherman Act claim.[4] This analysis requires the plaintiff to demonstrate *309 "adverse, anti-competitive effects within the relevant product and geographic markets." *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 464 (3d Cir.1998). A plaintiff can establish this anticompetitive effect through a showing of facially anticompetitive restraints or reduced output, increased prices or reduced quality in goods or services. *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 210 (3d Cir.2005). In the alternative, this Court has also held that "because proof that the concerted action actually caused anticompetitive effects is often impossible to sustain, proof of the defendant's market power will suffice." *Id.* Market power, defined as the "ability to raise prices above those that would otherwise prevail in a competitive market, is essentially a surrogate for detrimental effects." *Id.* Plaintiffs in Section 1 claims have the burden of establishing both the product and geographic markets which make up the relevant competitive market.[5]

### i.

[6] USHS has the burden of defining the relevant product market. *See Pastore v. Bell Tele. Co. of Pa.,* 24 F.3d 508, 512 (3d Cir.1994). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). " 'Interchangeability' implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively." *Allen-Myland, Inc. v. Int'l Bus. Machs. Corp.,* 33 F.3d 194, 206 (3d Cir.1994). When assessing reasonable interchangeability, "[f]actors to be considered include price, use and qualities." *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991). As we explained in *Tunis Bros.,* "products in a relevant market [are] characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Id.*[6]

*310 Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient. *Queen City Pizza, Inc.,* 124 F.3d at 436.

[7] We have also stated that "a well-defined submarket may constitute a relevant product market" for antitrust purposes. *Tunis Bros. Co.,* 952 F.2d at 723. In determining the interchangeability between different products within a submarket, an antitrust plaintiff must still provide evidence of selling price, uses, and physical characteristics. *See Am. Bearing Co., Inc. v. Litton Indus., Inc.,* 729 F.2d 943, 949 (3d Cir.1984); *Worldwide Basketball & Sport Tours, Inc. v. NCAA,* 388 F.3d 955, 962 (6th Cir.2004). But in determining "[t]he boundaries of such a submarket," we can also consider "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co.,* 370 U.S. at 325, 82 S.Ct. 1502.

USHS argues that there is a distinct market for CRF sold to nurseries and that it presented sufficient "practical indicia" evidence to establish this "submarket." [7] First, USHS offers an internal Scotts document that states that Scotts' competition for manufacturing CRF was "national." This established, according to USHS, a distinct group of CRF manufacturers who sold on a national level. Second, USHS' expert testified that CRF had distinct and separate prices from other substitutes. Next, Scotts had a division

devoted primarily to CRF sales to nurseries and that 85% of its CRF sales were in fact to nurseries. USHS also offers testimony from two former Scotts employees that "CRF was perceived by nurseries as having 'peculiar characteristics and uses,' because CRF was the only type of fertilizer they could apply to crops without fear of toxic runoffs that potentially would violate federal and state environmental regulations." (Appellant Br. at 48.)

USHS further relies on a report from its liability expert, John L. Solow, to establish that CRF is a distinct product market. The report states that at the retail level, CRF and plant protection products ("PPP") are sold to nurseries and water soluble fertilizer and PPP are sold to greenhouses. This demonstrates that these products are complements, rather than substitutes, so a distinct market exists for each.

**8** Even assuming that practical indicia evidence is sufficient by itself to establish the relevant product market under a rule of reason analysis, USHS still has the burden of presenting evidence demonstrating its pricing decisions are constrained. See *Allen–Myland,* 33 F.3d at 208 n. 16.

USHS' evidence does not make "reference to the rule of reasonable interchangeability and cross-elasticity of demand" and is, therefore, legally insufficient. *Queen* **\*311** *City Pizza, Inc.,* 124 F.3d at 436. USHS' evidence fails to discuss price and use implications within its proposed market, which is fatal to the analysis of interchangeable products under a rule of reason analysis in this case. Further, USHS' expert report does not include specific information relating to price increases or price stability for substitute products in relation to a rise in the price of Scotts' CRF. The report states only that CRF had distinct and separate prices from other substitutes, but fails to provide any economic analysis of these substitutes. The failure to present evidence that its pricing decisions are constrained cannot be overcome by the "practical indicia" evidence offered by USHS. As such, USHS failed to satisfy its evidentiary burden to define the relevant product market.

We find the District Court was correct in holding that USHS failed to present sufficient evidence to establish a genuine issue of fact as to the relevant product markets.

### ii.

USHS also has the evidentiary burden of establishing the relevant geographic markets for CRF sold to nurseries. *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.,* 745 F.2d 248, 260 (3d Cir.1984). The District Court found that USHS failed to present evidence sufficient to survive summary judgment because the evidence offered to establish the relevant geographic market did not speak to buyer behavior. We agree.

**9** "The relevant geographic market is the area in which a *potential buyer* may rationally look for the goods or services he or she seeks...." *Id.* (emphasis added). Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but, rather, is comprised of the area where customers would look to buy such a product. *Tunis Bros. Co.,* 952 F.2d at 726. The evidence of the geographic market presented by the party claiming a Section 1 violation must therefore speak to buyer behavior.

**10** USHS argues that the geographic markets for CRF are the United States at the manufacturing level and the mid-Atlantic and New England at the retail level.

First, in defining the manufacturing level market, USHS offers various internal Scotts documents that suggest that Scotts sold CRF on a nationwide basis and viewed the United States as its internal definition of "market." USHS argues that these documents are evidence of industry perception and should be afforded the appropriate evidentiary weight. The legal standard under *Tunis Bros.,* however, is not what Scotts believes the market is or where Scotts attempts to sell CRF, but rather where CRF distributors, like USHS and Griffin, look to purchase CRF. *Id.* The documents offered by USHS do not speak to this type of buyer behavior and, therefore, they do not provide legally sufficient support for geographic markets of CRF at the manufacturing level. Additionally, USHS' expert report does not further discuss the geographic market for CRF at the manufacturing level.

Second, USHS argues that there are both mid-Atlantic and New England retail markets for CRF distributors. In support of this geographic market, USHS relies on industry publications and various internal Scotts documents. USHS also relies on the territorial restrictions contained in the 1996 Distributor Agreement.

Much like the evidence presented in support of the CRF market for manufacturers, the evidence offered by USHS for the retail geographic market does not speak to consumer preferences or behavior. The internal Scotts documents speak to where Scotts looked to sell its product, **\*312** not where nurseries looked to purchase CRF. Next, the territorial restrictions included in the 1996 Distributor Agreement only speak to where Scotts would ship CRF, not where buyers look to purchase. USHS' expert report also fails to offer analysis

of buyer behavior. The report relies exclusively on the 1996 Distributor Agreement. Further, the report does not define the mid-Atlantic or New England markets. The strongest piece of evidence that speaks to consumer behavior is a comment by USHS' CEO that nurseries and greenhouses have a strong preference for regional distributors. This statement, however, fails to define, even broadly, the regions in which nurseries would seek out CRF.

The District Court was correct in determining that USHS failed to provide sufficient evidence of buyer behavior to survive summary judgment with regard to its definition of the geographic markets for CRF sold to nurseries.

### IV.

For the foregoing reasons, we will affirm the order of the District Court.

Parallel Citations

2010 WL 729498 (C.A.3 (Pa.)), 2010-1 Trade Cases P 77,003

Footnotes

1   The details of the various documents offered by USHS as evidence of the conspiracy between Scotts and Griffin are well known by the parties and will not be discussed in detail.
2   USHS and Griffin reached a settlement as to the claims between those parties and they are not at issue in this case.
3   This is not to say we disagree with the District Court's application of *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), in holding that the allegations advanced by USHS were implausible. Nor do we express disagreement with the District Court's finding that USHS presented insufficient evidence of the alleged conspiracy to create a genuine issue of material fact that Scott entered into an illegal vertical conspiracy to maintain prices and remove USHS from the market. Rather, as a showing of anticompetitive effect within the relevant markets is required to sustain a Section 1 Sherman Act claim, we need not address USHS' other arguments on appeal in order to affirm the District Court's grant of summary judgment.
4   One of the most frequently cited descriptions of the rule of reason analysis comes from Justice Brandeis in *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918):
    
    The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
5   As we conclude that USHS failed to provide sufficient evidence to survive summary judgment as to the relevant product and geographic markets, we need not evaluate the evidence offered as to anticompetitive effect.
6   Cross-elasticity is a measure of reasonable interchangeability. As one treatise observes:
    
    The economic tool most commonly referred to in determining what should be included in the market from which one then determines the defendant's market share is cross-elasticity of demand. Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product.
    
    *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 438 n. 6 (3d Cir.1997) (quoting E. Thomas Sullivan and Jeffrey L. Harrison, *Understanding Antitrust and its Economic Implications* 217 (1994)).
7   At oral argument, there was discussion whether the argument relying on practical indicia evidence was waived by not being raised in the District Court. While it is true that USHS never used the "practical indicia" language with the court below, it did argue that CRF constituted its own submarket and cited to cases that utilized the practical indicia language. On appeal they greatly expand on the limited argument they made to the lower court. For these reasons, we do not find that USHS waived this argument.

**End of Document**     © 2011 Thomson Reuters. No claim to original U.S. Government Works.