EXHIBIT 3



**JERSEY ASPARAGUS FARMS, INC., Plaintiff, v. RUTGERS UNIVERSITY, Defendant.**

**Civil No. 10-2849 (FLW)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2011 U.S. Dist. LEXIS 58053**

**May 31, 2011, Decided
May 31, 2011, Filed**

**COUNSEL:** [*1] For **JERSEY ASPARAGUS FARMS INC.**, <u>Plaintiff</u>: DONALD CLARK SIMPSON, MOORESTOWN, NJ.

For **RUTGERS UNIVERSITY**, <u>Defendant</u>: STEPHEN R. BUCKINGHAM, *LEAD ATTORNEY*, **MICHAEL J. HAHN**, LOWENSTEIN SANDLER, PC, ROSELAND, NJ.

**JUDGES:** Honorable Freda L. Wolfson, United States District Judge.

**OPINION BY:** Freda L. Wolfson

**OPINION**

<u>**WOLFSON, United States District Judge:**</u>

This matter arises out of a now-terminated, exclusive license agreement through which Plaintiff Jersey Asparagus Farms, Inc. ("JAFI") was authorized by Defendant Rutgers University ("Rutgers") to sell the latter's patented varieties of asparagus. Presently before the Court is Plaintiff's motion to amend the Amended Complaint and to file its Proposed Second Amended Complaint ("SAC"). Also before the Court is Defendant's motion to dismiss the Amended Complaint for lack of statutory standing pursuant to *Federal Rule of Civil Procedure 12(b)(1)* or, in the alternative, for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)*.

At oral argument, the parties agreed with the Court that, in the interest of judicial economy, the Court should focus its inquiry on the SAC in ruling on both parties' motions. For the reasons that follow, the Court grants Defendant's [*2] motion to dismiss with prejudice with respect to Plaintiff's federal and state RICO claims. Plaintiff's antitrust and Declaratory Judgment Act, *28 U.S.C. § 2201, et seq.* ("DJA"), claims are dismissed without prejudice. The Court denies Plaintiff's motion to amend and file its Second Amended Complaint, yet grants Plaintiff leave to file a Third Amended Complaint in the manner described herein.

**I. BACKGROUND**

On both motions to dismiss for statutory standing (*Rule 12(b)(1)*) and motions to dismiss for failure to state a claim (*Rule 12(b)(6)*), I must accept as true the plaintiff's material allegations and construe them in the light most favorable to the plaintiff. *Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 73-4 (3d Cir. 2011)* (citing *Alston v. Countrywide Fin. Corp., 585 F.3d 753, 758 (3d Cir. 2009))*. Thus, the following facts are taken from Plaintiff's SAC.

**A. Facts**

While JAFI served as Rutgers' exclusive distributor for over twenty years, their relationship soured once JAFI allegedly discovered that some of the patents underlying the parties' license agreement had expired or were

otherwise invalid. Generally, Plaintiff brings antitrust monopolization, RICO, and DJA claims against [*3] Rutgers for its actions in allegedly fraudulently obtaining the patents and entering into the exclusive license agreement premised on those patents, as well as for seeking return of plants provided to JAFI and the payment of royalties under the license agreement. As explained in more detail below, Plaintiff's Second Amended Complaint alleges that the exclusive license agreement authorized Plaintiff to cross-breed Rutgers patented asparagus parent plants, harvest all-male hybrid seed from those plants, and sell that seed to farmers with a license restriction prohibiting both Plaintiff and the purchasing farmers from asexually reproducing new hybrid plants by dividing the crowns of the plants grown from the purchased seed.

1. Asparagus Reproduction

As background for the ensuing discussion, I include a brief primer on asparagus reproduction. Asparagus may be reproduced sexually or asexually. Sexual reproduction is typically referred to as natural "propagation," and describes the process by which two parent plants are bred to produce seed. The seed produced is hybrid if the parent plants were from two different varieties.

Additionally, the crown (*i.e.*, the root system of a one-year old asparagus [*4] plant) of an asparagus plant may be divided in such a manner as to produce new plants. This is referred to as asexual reproduction or crown division. The process of crown division effectively clones the plant, keeping intact its hybrid or non-hybrid nature.

2. Fraud on the PTO Allegations

According to the Proposed Second Amended Complaint, Rutgers began developing an all-male, hybrid asparagus seed in the late 1970's. PSAC, ¶ 20. Rutgers ultimately obtained patents for ten varieties of such all-male, hybrid asparagus ("Rutgers' varieties"). Id. These varieties are Greenwich, Jersey Giant, Jersey Knight, Jersey General, Jersey Titan, Jersey Gem, Jersey Jewel, NJ854, NJ953, and NJ977. Id. at 22. Rutgers, further, produced three additional varieties for which it has not obtained patents--Jersey King, Jersey Prince, and Jersey Supreme. Id. at ¶ 23. Plaintiff alleges that, despite not having obtained patents for these latter three varieties, Rutgers attempts to control the use and sale of these varieties through the patents for the varieties' parent plants. Moreover, Rutgers obtained patents over several parent plants from which the hybrid varieties were cross-bred. See id. at ¶¶ 22 -24. In [*5] Plaintiff's view, Rutgers fraudulently obtained almost all of its patents by asserting on its patent applications that each asparagus variety had not been described in a publication, and/or been in public use, or on sale, or both, in the United States for more than one year prior to the date upon which the respective applications were filed. [1] Id. at ¶¶ 9, 27.

> [1] Plaintiff alleges that all patents, except that for the "Jersey General" variety, were obtained by this sort of fraud. Id. at ¶ 27.

Plaintiff specifically alleges that in each of the patent applications, the inventors (who worked for Rutgers) filed declarations stating

> . . . that we do not know and do not believe that this invention or discovery thereof was ever known or used before our invention or discovery thereof, or has been . . . described in any printed publication in the country before our invention or discovery thereof, or more than one year prior to this application, or in public use or on sale in the United States for more than one year prior to this application.

Id. at ¶ 7. [2] By way of example, Plaintiff describes the patent application for the Greenwic variety, which application was filed in 1983. Plaintiff alleges [*6] that this variety was in public use as early as 1978 at Oklahoma State University and Michigan State University, id. at ¶ 29, and that a Michigan-based research farm sold harvested Greenwich spears more than one year prior to the filing of the Greenwich patent application. Plaintiff alleges that similar examples of prior publication, use, or sale (collectively, "prior use") occurred in connection with the Jersey Giant, Jersey Knight, Jersey Titan, Jersey Gem, Jersey Jewel, Jersey Deluxe and NJ977, NJ44P, and NJ22-34 (the male parent plants for the Jersey Deluxe variety) applications. Id. at ¶¶ 30-42. Plaintiff alleges that the inventor misrepresentations are material because, without the declaration that no publication, use, or sale had occurred more than one year prior to the filing of the applications, no patent would have been issued and "the public would be free to use [Rutgers'] invention[s]." Id. at ¶ 28.

2   This quote is taken directly from Plaintiff's SAC. As noted *infra*, copies of the patents have been provided by Rutgers to the Court; however, no copy of these declarations was provided in connection with Rutgers' motion to dismiss.

3. Antitrust Allegations

Plaintiff alleges that [*7] Rutgers used its fraudulently obtained patents to "dominate and control the nationwide market for asparagus crowns and seed that produce 'all-male plants' and to expand its domination over the entire market for asparagus crowns and seeds in the colder, wet climate market." Id. at ¶ 45. Specifically, Plaintiff alleges, Rutgers engages in anti-competitive activities by establishing an exclusive licensing program that, in conjunction with Rutgers' patents, prevents JAFI and other competitors from "selling asparagus crowns and seeds that produce 'all-male' plants ...." Id. at ¶ 46. By virtue of this licensing program, farmers may purchase Rutgers' patented varieties only through selected licensees. The farmers are, further, prevented from asexually reproducing new plants through crown-division. Id.

Plaintiff categorizes Rutgers' anticompetitive conduct or scheme into what it contends are four distinct steps:

(1) Rutgers uses fraudulently obtained patents to limit asexual reproduction of its patented all-male hybrid varieties.

(2) Rutgers exclusively licenses the right to grow the seed and sell the seed to a distributor.

(3) As a result of the licensing program, the only source of the seed [*8] is the through the distributor.

(4) "Because Rutgers controls asexual reproduction of the fraudulently patented plant, it's [sic] exclusive licensing of seed production also effectively controls the market for asparagus crowns: the only way that either a distributor or a farmer can acquire asparagus crowns in the fraudulently patented plant is to either buy seed and grow the crowns or buy the crowns from an intermediary who has grown the crowns -- from seed acquired from the exclusive distributor. Thus, it is impossible (without the threat of patent infringement claims) for anyone to grow the fraudulently patented asparagus variety unless the plants ultimately passed through the exclusive seed distributor."

Id. at ¶ 47.

For the unpatented hybrid varieties, JAFI alleges that Rutgers utilized similar tactics by claiming that it owned and controlled all right, title and interest in the varieties' parent plants. See id. at ¶ 55. Furthermore, through the exclusive licencing practice, JAFI alleges that Rutgers created, and maintains, a monopoly with respect to the sale of these varieties. In addition, JAFI alleges that Rutgers continued to behave as if had active patents on the parent plants [*9] even after those patents expired. Id.

Thus, other than by purchasing seeds, the only means by which a new crop may be had from the Rutgers' varieties is if a farmer practices crown division. Id. at ¶¶ 58-65. Through crown-division, 2 to 5 new plants may yield from the original crown. However, because Rutgers prohibits farmers from practicing crown-division, farmers who wish to use Rutgers' varieties must repurchase those varieties every year. The prohibition against crown-division, in Plaintiff's view, decreases competition by increasing farmers' costs. Id. at ¶ 65 ("As a result of [Rutgers'] unfair competitive advantage, Rutgers is able to artificially increase the cost of crowns."). 3

3   In addition, Plaintiff alleges in the SAC that Rutgers made it a condition of the exclusive licenses issued in 2001 that JAFI "could not breed its own varieties of asparagus and that JAFI could not market or sell any varieties of asparagus (other than Rutgers's varieties) that competed with the Rutgers's varieties without giving Rutgers 9 months prior written notice of intent to do so." Id. at ¶ 57. While the SAC includes these exclusive dealing allegations, at oral argument, Plaintiff clarified that [*10] it is not bringing an exclusive dealing or restraint of trade claim under *§ 1* of the Sherman Act. It only brings a monopolization claim under *§ 2* of the Sherman Act.

In terms of antitrust injury, JAFI alleges that it has sustained injury to itself and, further, that others sustained

injury as a result of Rutgers' anticompetitive conduct as well. With regard to those injuries it sustained, JAFI alleges the following types of injuries:

> a. paying licensing and royalty fees that it would not otherwise have paid;
>
> b. incurring higher expenses (and thus making less profit) because it was not permitted to asexually reproduce and sell "all-male" hybrid plants and was instead only allowed to sell seed or crowns grown from seed;
>
> c. lost sales because the costs illegally imposed by Rutgers resulted in higher pricing of the seed and crowns sold by JAFI and the resulting economic factors caused potential purchasers to not buy the seed or crowns.

Id. at ¶ 126.

In JAFI's view, but for the fraudulently-obtained patents, Rutgers could not have legally retained control over the market beyond the first generation of planted hybrid seed

> because JAFI, farmers and/or distributors could then bypass Rutgers and asexually [*11] reproduce the plants. This in turn would have forced market prices for seed down, as Rutgers would have had to reduce the royalty it charged for seed sales in order to allow the price of seed to compete with the price of asexually reproduced crowns.

Id. at ¶ 84. Moreover, JAFI alleges that "[h]ad Rutgers not prevented JAFI from doing so, JAFI could have, and would have, asexually reproduced the male hybrid asparagus plants and thus competed directly with Rutgers (and without the need to pay Rutgers any royalties or licensing fees)." Id. at ¶ 83. JAFI alleges that it cannot currently sell plants in its possession to end-using farmers for crown division because such farmers are fearful that Rutgers will sue them under the fraudulently obtained and expired patents. Id. at ¶¶ 90-91.

With regard to injuries sustained by others, JAFI alleges that: (1) farmers paid higher prices for asparagus seed and crown and that they were forced to re-purchase seed each year because they were not permitted to practice crown-division; (2) the public paid higher prices for asparagus; and (3) companies that sell seed and crowns incurred higher costs to produce the crowns by being forced to purchase seeds solely [*12] through Rutgers' exclusive licensee, here, JAFI.

4. The License Agreement

The licensing agreement required that JAFI pay an up-front licensing fee of $250,000, and agree to pay Rutgers royalty fees ranging from 25% to 50% of JAFI's gross sales of the Rutgers' varieties hybrid seeds. Id. at ¶ 67. The licensing agreement permitted JAFI to sexually reproduce the Rutgers' varieties through male and female parent plants in order to make the hybrid seeds to be sold. [4] Id.

> [4] Plaintiff obtained the tissue culture of the parent plants from Rutgers and contracted with a third party to grow the plants and cultivate the seeds. Id. at ¶¶ 88-90. JAFI's use of this third party has no relevance to its claims here, thus, additional allegations relating to this party are omitted from discussion.

As with the restrictions placed on end-using farmers, the license agreement prohibited JAFI from asexually reproducing through cross-division of the crowns. Id. at ¶ 68. It is important to note that the license agreement specifically references the Rutgers plant variety patents. For example, the Jersey Giant hybrid asparagus agreement states that Rutgers "owns and controls all right, title and interest in and to [*13] [sic] two asexually reproduced asparagus parent plants registered under the designations Donna and Scott Howard," Buckingham Decl., Exh. B ("License Agmt.") at 1, and that these licensed plants are the Donna and Scott Howard "claimed by United States Plant Patents PP 5,652 and PP 5,549, respectively ...." Id. at Art. I, b. [5] Moreover, the agreement states that "[t]he term Jersey Giant as used in this Agreement shall mean the F-1 hybrid seed produced by crossing the Licensed Plant Materials, Donna and Scott Howard, as identified in U.S. Plant Patent PP 5,551." Id. at Art. I, d. The license agreement grants JAFI "an exclusive license to use said parent plants in combination to produce Jersey Giant hybrid seed, and an exclusive license to use and sell said seed." Id. at Art., Ia. It imposes upon JAFI an obligation to "print in all catalogues, price lists and other advertising" a notice

stating "This variety is protected by U.S. Plant Patent No. PP 5,551, and is produced and sold by Jersey Asparagus Farms under license. Asexual reproduction is prohibited by law," and requires that JAFI imprint a similar marking on all packages of seed sold. Id at Art. XVII, a-b. In terms of expiration [*14] date, the agreement provides that it "shall continue in full force and effect . . . to the end of the last expiring patents identified by this Agreement ...." Id. at Art. XV.

> 5   The Court may consider the sample license agreement in conjunction with the motion to dismiss because it is integral to Plaintiff's complaint. See *Lum v. Bank of Am., 361 F.3d 217, 222 n. 3 (3d Cir. 2004)*; *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)*. Furthermore, the parties agreed at oral argument that this license is representative of the type of licenses entered into by the parties for other varieties although each license incorporates different dates of expiration and some licenses are for the parent plants while others are for the hybrid variety itself.

By transferring the parent plants to JAFI, the agreement also provides that a bailment is created. Id. at Art. Ie. In the words of the agreement,

> [t]he transfer of [the plants and their asexually reproduced progeny and derivatives] to Jersey Asparagus Farms, Inc. by Rutgers . . . is to be considered a bailment for purposes of this Agreement and not as a conditional or unconditional sale, and any and all such materials in [JAFI's] [*15] possession at any time shall be considered to be possessed by [JAFI] by way of a bailment.

Id. This bailment clause does not reference the hybrid seed propagated from the parent plants; rather, it references only the parent plants themselves. The agreement, further, provides that, upon cancellation by either party, all plants and hybrid seed must be returned to Rutgers, transferred to another exclusive licensee, or destroyed. Id. at Art. IX.

5. Post-patent Expiration Royalty Payments

After JAFI and Rutgers maintained their license relationship for some time, JAFI became aware that some of the Rutgers patents and the parties' license agreements had expired. Id. at ¶ 92. Once JAFI became aware of the expirations, JAFI ceased paying Rutgers royalties on the sale of the Rutgers' varieties seeds. Id. at ¶ 93. Rutgers then demanded that JAFI either destroy or return all the Rutgers' varieties plants "as though the patents were still in effect." Id. In addition, Plaintiff alleges, Rutgers demanded royalty payments for the Jersey Supreme variety even though Rutgers did not procure a patent for that variety and there was no formal license agreement relating to that variety. Id. at 95.

6. RICO [*16] Allegations

Plaintiff, generally, alleges that Rutgers, the former-employee inventors of Rutgers' patents, and owners of farms that grew Rutgers' plants on Rutgers' behalf, comprised a "patent enterprise." See id. at ¶¶ 130-153. JAFI alleges that the enterprise obtained the patents though the mails and/or wire, and that the predicate RICO acts are the same patent-application misrepresentations alleged in connection with Plaintiff's antitrust claim. Id. at ¶¶ 154-165. With respect to the injuries suffered, Plaintiff alleges that it paid royalties "that it would not have had to pay but for the patents," that the amount of royalties was too high, and that Rutgers' assertions that JAFI may no longer sell the plants has "created doubt as to the right of JAFI to sell asexually reproduced plants or seed from such plants." Id. at ¶ 187.

With respect to the New Jersey RICO claim only, Plaintiff further alleges that Defendant "used the fraudulently obtained patents in bad faith by attempting to extend the patent monopolies (exclusive control over asexual reproduction) into the production of seed and crowns produced from seed," Id. at ¶ 175, and that Rutgers intentionally staggered its patent applications [*17] for the various varieties so that it would always have active patents, id. at ¶ 178, as well as other patent-misuse transgressions.

7. Declaratory Judgment Act Allegations

In connection with its DJA claim, Plaintiff alleges that Rutgers has attempted to enforce several currently active, non-expired patents against it. Id. at ¶¶ 188-89. Plaintiff, further, asserts that Defendant relied upon these fraudulently-obtained patents "and the license agreements employed thereto" to force "Plaintiff to destroy or return parent plants sold to JAFI under the various licensing

Case 2:05-cv-06792-AB Document 623-3 Filed 06/10/11 Page 7 of 20

Page 6
2011 U.S. Dist. LEXIS 58053, *17

agreements, and also destroy or turn over plants asexually reproduced from those parent plants in an effort to prevent JAFI from asexually reproducing the plants." Id. at ¶ 192. In JAFI's view, Rutgers "has no right to prevent JAFI from asexually reproducing a plant that is the subject of an invalid plant patent." Id. at ¶ 193. Accordingly, JAFI asserts, it is entitled to a declaration that the patents are invalid, that it need not pay royalties if it produces seed from plants that were the subject of the patents, that it can asexually reproduce the plants, and that it must not return or destroy the plants. Id. at ¶¶ 196-97. [*18] Importantly, the Court notes that the allegations limit the DJA claim to active patents in paragraphs 188 and 189, but then seek a declaration as to expired patents in paragraphs 196 and 197.

**B. Procedural History**

Based on these alleged facts, JAFI filed its initial complaint on June 3, 2010. The Amended Complaint was filed a month later, in July of 2010. Thereafter, Defendant Rutgers filed its motion to dismiss pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*. While the motion to dismiss was pending, JAFI filed a motion to amend the Amended Complaint, attaching a copy of a proposed Second Amended Complaint. [6] As noted, this complaint asserts an antitrust monopolization claim under *section 2* of the Sherman Act, federal and state RICO claims, and a Declaratory Judgment Act claim. The Court held oral argument on the parties' motions on May 4, 2011, and reserved decision. The Court now rules upon the parties' motions to amend and to dismiss, focusing upon the allegations of the SAC, as agreed by the parties.

> 6   JAFI could not file the Second Amended Complaint as of right because JAFI did not file it within 21 days of Rutgers' motion to dismiss. See *Fed. R. Civ. P. 15(a)(1)(B)*. [*19] In addition, following its motion to amend, Plaintiff then filed a motion for recusal, which the Court denied in a prior opinion.

**II. STANDARD OF REVIEW**

Defendant has moved to dismiss the complaint for lack of statutory standing and for failure to state a claim. According to the Third Circuit, "[a] dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim." *Baldwin, 636 F.3d at 73*. Likewise, with respect to Plaintiff's motion to amend, leave to amend should be denied where "the proposed claim would be subject to dismissal under *Rule 12(b)(6)*." *Travelers Indem. Co. v. Dammann & Co., Inc., 594 F.3d 238, 256 n.4 (3d Cir. 2010)*. Thus, the following discussion of the *Rule 12(b)(6)* standard is equally applicable to both Defendant's and Plaintiff's motions.

The Federal Rules of Civil Procedure provide that a complaint "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." *Fed.R.Civ.P. 8(a)*. The purpose of a complaint is "to inform the [*20] opposing party and the court of the nature of the claims and defenses being asserted by the pleader and, in the case of an affirmative pleading, the relief being demanded." 5 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1182 (3d ed. 2004).

In reviewing a motion to dismiss for failure to state a claim under *12(b)(6)*, a court must take all allegations in the complaint as true, viewed in the light most favorable to the plaintiff "and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)* (citation and quotations omitted). In *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*, the Supreme Court "retired" the language in *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)*, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly, 550 U.S. at 561* (quoting *Conley, 355 U.S. at 45-46*). Rather, the factual allegations in a complaint "must be [*21] enough to raise a right to relief above the speculative level." *Id. at 555*. The Third Circuit summarized the pleading requirement post- Twombly:

> The Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that

discovery will reveal evidence of 'the necessary element.'

*Phillips, 515 F.3d at 234* (quoting *Twombly, 550 U.S. at 556*).

In affirming that the Twombly standard applies to all motions to dismiss, the Supreme Court recently further clarified the *12(b) (6)* standard. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal, U.S. , , 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)*. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal, 129 S.Ct. at 1950*. Accordingly, "a court considering a motion to dismiss can choose to begin by identifying [*22] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. In short, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009)*.

The Third Circuit recently reiterated that "judging the sufficiency of a pleading is a context-dependent exercise" and "[s]ome claims require more factual explication than others to state a plausible claim for relief." *West Penn Allegheny Health System, Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010)*. This means that, "[f]or example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy." Id. That said, the *Rule 8* pleading standard is to be applied "with the same level of rigor in all civil actions." Id. (quoting *Iqbal, 129 S.Ct. at 1953*).

### III. DISCUSSION

**A. Motion to Dismiss**

Defendant moves to dismiss Plaintiff's claims for lack of statutory standing and, alternatively, on substantive grounds. I address each claim in turn, turning first to the antitrust claim.

**1. Antitrust Monopolization/Walker Process** [*23] **Claim**

Under *section 2* of the Sherman Act, persons "who . . . monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of ... trade or commerce," may be subjected to civil liability for their actions. *15 U.S.C. § 2*. To state a claim for monopolization, a plaintiff must plead two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Race Tires America, Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 75 (3d Cir. 2010)* (quoting *Eastman Kodak Co. v. Image Tech. Svcs., Inc., 504 U.S. 451, 481, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992))*. Here, Plaintiffs' monopolization claim hinges on its allegation that Defendant committed a fraud on the PTO by failing to disclose certain prior uses in its patent applications.

While the SAC does not refer to Plaintiff's antitrust claim as such, it is essentially a "Walker-Process" claim. 7 In *Walker Process Equipment Inc. v. Food Machinery and Chemical Corp., 382 U.S. 172, 86 S. Ct. 347, 15 L. Ed. 2d 247 (1965)*, the Supreme Court specifically addressed monopoly allegations [*24] linked to allegedly-fraudulently procured patents. In that case, Plaintiff Food Machinery & Chemical Corp. ("Food Machinery") brought a patent infringement suit against Defendant Walker Process Equip., Inc. ("Walker Process"). After realizing that its patent had expired, Food Machinery moved to dismiss its own complaint. In response, Walker Process added a monopolization counterclaim against Food Machinery, alleging that it monopolized by "fraudulently and in bad faith obtaining and maintaining . . . its patent." *Id. at 174*.

> 7   In some cases, court have analyzed a claim by a licensee seeking to escape payment of future royalties, or disgorgement of previously-paid royalties, as a breach of contract claim premised on fraudulent procurement of a patent. See e.g., *Transitron Electronic Corp. v. Hughes Aircraft Co., 649 F.2d 871 (1st Cir. 1981)* cited in Phillip E. Areeda, et al., FUNDAMENTALS OF ANTITRUST LAW § 701.a n.22. Here, Plaintiff's claim is more properly characterized as a Walker Process claim because it is brought under the rubric of antitrust law.

Walker Process, specifically, alleged that Food Machinery misrepresented to the PTO that it was unaware of its invention being in public [*25] use in the Unites States for more than a year prior to filing for a

patent. [8] Ruling in favor of Walker Process, the Court held that proof that a patent holder knowingly and willfully misrepresented facts indicating invalidity to the PTO would deny the patent holder its exemption from the antitrust laws provided by that patent. *Id. at 176-80.* Walker Process, therefore, stands for the proposition that "enforcement of a patent obtained by fraud constitutes [an] unlawful exclusionary act" under *section 2* of the Sherman Act. Phillip E. Areeda, et al., FUNDAMENTALS OF ANTITRUST LAW § 701.f ("ANTITRUST LAW"). Claims based on this theory have been asserted based on a monopolist's use of licensing to increase a rival's costs, a monopolist's attempted enforcement of its fraudulently-procured and invalid patent against would-be competitors, and communications to customers threatening infringement. Id.

> [8] "The Patent Act bars issuance of a patent if the application is filed more than one year after (1) the product was sold or offered for sale and (2) the invention is ready for patenting." However, "[a] sale for experimental use negates the on-sale bar." *In re Ceccarelli, 401 Fed.Appx. 553, 554 (Fed.Cir. 2010)* [*26] (internal citations omitted).

"Walker Process fraud is a variant of common law fraud, and . . . the elements of common law fraud include: (1) a representation of a material fact, (2) the falsity of that representation, and (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter)." *Hydril Co. LP v. Grant Prideco LP, 474 F.3d 1344 (Fed.Cir. 2007).* Under a Walker Process theory, it is not sufficient to allege that a patent was obtained fraudulently--such an allegation would state a claim for patent misuse or inequitable conduct that may only be asserted as a defense to a patent enforcement action. Rather, a plaintiff must allege that the fraudulently-obtained patent "threatens to perpetuate, reinforce, or create a monopoly in a properly defined market." ANTITRUST LAW at § 701.a. Hence, in addition to alleging that the patent-holder obtained the patent through an actual fraud perpetrated on the PTO, the sufficiency of which is tested under the law of the Federal Circuit, a Walker Process plaintiff "must also [allege] the basic elements of an antitrust violation defined by the regional circuit's law [*27] ...." *Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1346-48 (Fed. Cir. 2007).* [9]

> [9] Some courts state the Walker Process elements as:
>
> > (1) the patent at issue was procured by knowing or willful fraud on the USPTO; (2) the defendant was aware of the fraud when enforcing the patent; (3) there is independent evidence of a clear intent to deceive the examiner; (4) there is unambiguous evidence of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission; and (5) the necessary additional elements of an underlying violation of the antitrust laws are present.
>
> *Nobelpharma AB v. Implant Innov., Inc., 141 F.3d 1059 (Fed.Cir. 1998)*; *In re Netflix Antitrust Litig., 506 F.Supp.2d 308, 314 (N.D.Cal. 2007).*

### a. Fraud on the PTO Allegations

Defendant challenges Plaintiff's fraud on the PTO allegations, arguing that they fail to satisfy *Federal Rule of Civil Procedure 9(b)*'s heightened pleading standard. To sufficiently allege that an inventor committed fraud before the PTO, a plaintiff must assert that the inventor possessed fraudulent intent and that the inventor's misrepresentations or omissions were material. Defendant's challenge to Plaintiff's allegations here centers [*28] on a failure to properly plead intent.

As noted, Plaintiff's key allegation is that there were several prior uses of the patented asparagus varieties that were not disclosed to the PTO. For example, the SAC states that the Jersey Giant variety was planted by Oklahoma State University and Michigan State University more than two years prior to Defendant's filing of the Jersey Giant patent application in 1983, and was sold to Walker Brothers Farm in April 1981. SAC at ¶ 30. Another example is the Jersey Knight variety, about which the SAC alleges that "J. Howard Ellison, the principal patent applicant . . . distributed between 150,000 and 200,000 Jersey Knight seeds to more than 60 different recipients, most of which were United States farmers, commercial organizations, county agents, or research organizations. Such distribution constitutes 'public use ....'" Id. at ¶ 31. In addition, the SAC generally

avers that the varieties were described in publications more than one year prior to each patent application. Id. at ¶ 27. [10]

> 10   One specific example alleged by Plaintiff is a 1995 newspaper article carrying the banner "Ready to Plant in 1996," in which article Dr. Stephen Garrison of Rutgers [*29] was photographed with Sam Walker, one of the owners of JAFI, and the manager of Michigan Asparagus Industry Research Farm. Id. at ¶ 38d. The article announced the potential release of a new variety whose female parent plant was NJ44P. Id. The patent application for NJ44P was not filed until ten years later, in 2006. Id. at ¶ 38.

The SAC alleges that the inventors identified in the patent applications signed declarations stating, *inter alia*, that

> we do not know and do not believe that this invention or discovery thereof was ever known or used before our invention or discovery thereof . . . more than one year prior to this application, or in public use or on sale in the United States for more than one year prior to this application.

Id. at ¶ 7. Further, Plaintiff asserts, "the party seeking the patent has an affirmative duty to disclose all information that is material to the Patent Office's decision to grant or deny the patent." Id. at ¶ 8. Thus, by signing the aforesaid declarations without disclosing each pre-application planting, sale, or inclusion in a publication, the SAC alleges that Defendant filed a false declaration and failed to disclose all material information to the patent [*30] office.

In Defendant's view, these assertions fail to allege scienter, *i.e.*, that Rutgers was aware of the false statements or that it intentionally submitted the statements with the intent to deceive the PTO. Defendant relies, principally, on *Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312 (Fed. Cir. 2009)*, an inequitable conduct case, in support of this argument. Moreover, Defendant argues, by looking at the face of the patents themselves, one can discern that the alleged undisclosed prior uses were, in fact, disclosed to the PTO. Indeed, as noted supra, the Court may consider the patents in ruling on a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* because the patents are documents integral to the SAC.

Defendant is correct in that the patents indicate that some of the prior uses were disclosed to the PTO. For example, the Jersey Giant patent explains that "actual results of growing our new variety in substantially different geographical locations, and in soil virgin to asparagus as well, follows hereafter and indicates the superiority we have developed in 'Jersey Giant.'" Buckingham Decl., Ex. 2, Col. 2, Table 4. Thereafter, the patent references "Bixby, [*31] Oklahoma" in a table along with results from growing the variety in 1979 and 1980-- more than two years prior to the 1983 patent application. In addition, Michigan is referenced in another table and yields from 1981 and 1982 are disclosed. Id. at Col. 2, Table 5. However, there is no reference in the patent of a sale to Walker Brothers Farm in 1981. Similarly, while the Jersey Knight patent indicates that variety had been subjected to "a very extensive research program which has been carried on for years . . . " Id., Ex. 3, Col. 1, 6-7, there is no specific reference to the alleged distribution of "150,000 and 200,000 Jersey Knight seeds to more than 60 different recipients ...." Therefore, it appears that only some of the alleged undisclosed prior uses are refuted by the patent applications themselves. For those allegations not clearly refuted by the face of the applications, the Court must accept the allegations as true on a motion to dismiss and may not resolve factual disputes.

In connection with those prior uses not refuted by the patents themselves, Defendant argues that Plaintiff's allegations do not foreclose the possibility that the undisclosed uses constitute experimental uses, [*32] which need not be disclosed to the PTO. Indeed, a sale that is experimental would not constitute a "prior sale." *Del. Valley, 597 F.3d at 1379*. Defendant's argument fails, however, because the Court may not determine on a motion to dismiss whether an undisclosed use is an experimental one; the Court must accept the Plaintiff's allegations of prior use as true. And, the determination whether the experimental use exception applies involves factual proofs typically resolved on summary judgment. See *Minton v. National Ass'n. of Securities Dealers, Inc., 336 F.3d 1373 (Fed. Cir. 2003)*. [11] While Defendant also argues that Plaintiff must allege that the prior uses were not experimental, there are no cases requiring a plaintiff to plead the "magic words" that all uses were not

Case 2:05-cv-06792-AB   Document 623-3   Filed 06/10/11   Page 11 of 20

Page 10
2011 U.S. Dist. LEXIS 58053, *32

experimental uses. Rather, the question of experimental use is subsumed in the heightened 9(b) pleading standard of intent and materiality, which standard is explained in more detail below. [12]

> [11] For example, the experimental use exception to the prior sale doctrine includes both legal and factual determinations. As explained by the Minton Court,
>
>> An assessment of the validity of a patent claim in light of an alleged sale [*33] involves, first, determining whether a sale is truly a "sale" within the meaning of *35 U.S.C. § 102(b)*, a question of law based on underlying facts . . . "[A] patent is presumed to be valid, *35 U.S.C. § 282*, and this presumption can only be overcome by clear and convincing evidence of facts to the contrary," ....
>
> *Id. at 1376* (internal citations omitted).
>
> [12] Defendant further argues that Plaintiff's failure to disclose theory is implausible and, accordingly, fails to satisfy Twombly's and Iqbal's requirement that a pleading be "plausible on its face." See *Iqbal, 129 S.Ct. at 1949* (quoting *Twombly, 550 U.S. at 570*). In Defendant's view, that the patents disclose the types of prior uses that JAFI contends were omitted, renders Plaintiff's allegations that Rutgers intended to deceive the PTO implausible. While the disclosed uses call into question some of plaintiff's allegations, other allegations of non-disclosure are not refuted by the patents.

Exergen holds that allegations of fraud on the PTO must include facts that "give rise to a reasonable inference of scienter, including both (1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and [*34] (2) specific intent to deceive the PTO." *575 F.3d at 1330*. In this regard, the allegations must plausibly suggest a "deliberate decision to withhold a known material reference or to make a knowingly false misrepresentation--a necessary predicate for inferring deceptive intent." *Id. at 1331* (internal quotation marks omitted) (quoting *Molins PLC v. Textron, Inc., 48 F.3d 1172 (Fed. Cir. 1995))*. Further underscoring the high pleading standard to which allegations regarding fraud on the PTO must ascribe, the Exergen Court pronounced that "[t]o allow plaintiffs and their attorneys to subject companies to wasteful litigation based on the detection of a few negligently made errors . . . would be contrary to the goals of *Rule 9(b)*, which include the deterrence of frivolous litigation based on accusations that could hurt the reputations of those being attacked." Id.

It is important to note, at the outset, that Exergen does not address the pleading standard applicable on a motion to dismiss under *Rule 12(b)(6)*. [13] Unlike the instant suit, which is still in the nascent stages of litigation, Exergen involved a motion to amend after a full trial on the merits. Here, though the complaint has been [*35] amended, discovery has not yet commenced. In addition, many of Exergen's qualms with the fraud allegations in that case related to a failure to specify which individual inventors made the omissions and which claim limitations within the numerous patent claims were affected by those omissions. See *575 F.3d at 1328-29*. Here, by contrast, the plant patents include only one claim, and Plaintiff has named specific individuals.

> [13] Exergen is not a Walker Process case, but an inequitable conduct case. *Id. at 1318*. Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent. This judge-made doctrine evolved from a trio of Supreme Court cases that applied the doctrine of unclean hands to dismiss patent cases involving egregious misconduct." *Therasense v. Becton, Dickinson and Co.,  F.3d  , 2011 U.S. App. LEXIS 10590, 2011 WL 2028255 at *4 (Fed.Cir., May 25, 2011)*. Over time, the doctrine has been expanded to render a patent unenforceable. Id. Walker Process cases, which include antitrust elements as well, require "higher threshold showings of both materiality and intent than are required to show inequitable conduct." *Dippin' Dots, 476 F.3d at 1346*.

In my view, the [*36] Federal Circuit decision in Hydril, which addressed the sufficiency of Walker Process allegations on a motion to dismiss at the early stages of litigation, is more instructive here. That case involved allegations that a defendant monopolized drill pipe product markets by enforcing a fraudulently-obtained patent. *Hydril, 474 F.3d at 1345*.

Case 2:05-cv-06792-AB   Document 623-3   Filed 06/10/11   Page 12 of 20

Page 11
2011 U.S. Dist. LEXIS 58053, *36

The patent holder-defendant, Grant Prideco LP ("Grant") procured a patent for a combination of drill pipe "with specified diameters and connections that fit such pipe." *Id. at 1346*. The plaintiff, Hydril Company LP and Hydril U.K. Ltd. (collectively, "Hydril"), manufactured threaded connections for drill pipe and sold those connection through licensees. In addition, Hydril sometimes sold finished drill pipe that included its threaded connections and pipe manufactured by another company.

One of Hydril's licensees received a threatening letter from Grant, in which Grant asserted that the licensee's sales of a particular threaded connection violated Grant's patent. Hydril brought suit against Grant alleging that it had previously entered into a shared licensing agreement with Grant through which both parties granted licenses to each other for the use of [*37] certain connections. Hydril alleged in its complaint that Grant violated the terms of the parties' licensing agreement and, relevant here, engaged in monopolization in violation of *§ 2* of the Sherman Act.

Analyzing Hydril's antitrust claim under the Walker Process line of authority, the Federal Circuit held that Hydril sufficiently alleged fraud. In reaching that conclusion, the court found it sufficient that Hydril alleged that Grant had fraudulently obtained its patent by "fail[ing] to disclose to the USPTO material prior art of which [it] was aware" (which the complaint described) and that "[t]he [p]atent as issued would not have been granted to Grant . . .had Grant . . . not omitted from its disclosures such known information on the prior art." *Id. at 1350*. In its view, these allegations assert that "Grant . . . obtained its patent by knowingly and deliberately concealing from the Patent Office prior art that it knew would have resulted in a denial of its application," and such allegations "go far beyond a simple failure to disclose to the Patent Office prior art that the examiner would have deemed material." Id.

Notably absent from Plaintiff's allegations here is the assertion that [*38] any of the inventors of the Rutgers patents *knew* that the prior uses not included in the patent applications constituted material prior uses that should have been disclosed to the PTO. [14] The plaintiff in Hydril alleged that Grant obtained its patents by "*knowingly and deliberately concealing*" material prior art "*of which [it] was aware*" from the PTO in order to obtain a patent it knew it would not otherwise be entitled to procure. Id. (emphasis added). Here, Plaintiff has merely alleged that the inventors committed a fraud by signing a declaration that they "did not know and do not believe that" there were any prior uses or sales that needed to be disclosed. See SAC, ¶ 7. Plaintiff's remaining fraud allegations point to uses/sales not included in the patent applications as "examples of the falsity of the [inventors'] declaration[s]." See e.g., SAC, ¶ 36. While Plaintiff has given a detailed description of the alleged prior uses/sales in the SAC, absent an allegation that Defendant intentionally omitted reference to these uses/sales in order to defraud the PTO, the Court must conclude that Plaintiff's claim fails to allege the requisite scienter. Moreover, as explained *supra*, certain [*39] references were actually disclosed in the patent application.

> 14  Moreover, the Hyland Court emphasized that it did not have a copy of the patent application or the prosecution history before it such that it could "tell whether it is contended that in obtaining the patent Grant . . . made affirmative misstatements to the Patent Office about the prior art." Id. This qualification by the court further distinguishes Hyland from the case here where Defendant has provided copies of the patents for the Court to review, which patents make clear that some of the alleged prior uses were disclosed in the patent applications.

An example of allegations determined to have sufficiently alleged scienter in a manner consistent with Hydril can be found in *Ritz Camera & Image, LLC v. SanDisk Corp., -- F.Supp.2d --, 2011 U.S. Dist. LEXIS 18399, 2011 WL 741227, *4 -*5 (N.D. Cal. 2011)*. In that case, the Northern District of California found sufficient, allegations that the law firm responsible for prosecuting the disputed patents began keeping records of prior invalidating art several months before the patents were reexamined, yet failed to disclose its record-keeping to the PTO. Furthermore, the challenger asserted, that if the PTO had [*40] been aware of the prior art, it would not have survived reexamination nor would it have issued in the first instance. *2011 U.S. Dist. LEXIS 18399, [WL] at *4*. Similarly, the court in *Correct Craft IP Holdings, LLC v. Malibu Boats, LLC, No. 09-cv-813, 2010 U.S. Dist. LEXIS 13577, 2010 WL 598693, *7 (M.D. Fla. 2010)*, held, allegations that two inventors "knowingly submitted false declarations of joint inventorship in order to resolve an inventorship dispute and permit the . . . patent to claim priority to the [a previously-issued] design patent [along with] clear, independent evidence of both

[inventors'] intent to deceive in the form of deposition and court testimony," sufficiently alleged scienter under *Rule 9(b)*). [15]

[15] The court, however, dismissed the claim for failure to adequately allege materiality.

The SAC's allegations here read, instead, as if they assert a claim of negligent misrepresentation. Areeda and Hovenkamp explain in their noteworthy antitrust treatise how an inventor could negligently make a false misrepresentation, which falsity would have barred issuance of the patent:

> The "inventor" might have misread records, or "forgotten" some experiment or result, or failed to view a particular experiment with reasonable care, or poorly [*41] informed those who prepared the patent application and otherwise responded to the patent examiner.

ANTITRUST LAW at § 701h1.

Negligent misrepresentations, however, are not actionable under Walker Process. As stated by the Federal Circuit in *Eli Lilly and Co. v. Zenith Goldline Pharmaceuticals, Inc., 471 F.3d 1369 (Fed.Cir. 2006)*,

> [Even] [g]ross negligence . . . is insufficient to justify an inference of intent to deceive the PTO. In a case involving an omission of a material reference to the PTO, the record must contain clear and convincing evidence that the applicant made *a deliberate decision to withhold a known material reference.* Beyond that, the applicant must have withheld the material subject matter with the intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible.

*Id.* at 1382 (internal citations and quotation marks omitted) (emphasis added). [16]

[16] While Eli Lilly is an inequitable conduct case, the Court nonetheless finds its analysis instructive here on the question of fraudulent intent.

Furthermore, where the alleged misrepresentation is one of omission, *e.g.*, that an inventor [*42] failed to disclose material prior sales, as opposed to one of commission, *e.g.*, that an inventor made an affirmative misrepresentation about a prior sale, a plaintiff must not only allege that the inventor knew of the prior sale but also that he knew the relevance of that prior sale to the application. ANTITRUST LAW at § 701i. Pleading such allegations becomes even more difficult where, like here, review of the patents reveals that some prior uses were disclosed while others were not. In that instance, a plaintiff must allege that the few non-disclosed prior uses were deliberately omitted and were sufficiently material on their own to have rendered the patent application invalid. [17] No such allegations are present in the SAC.

[17] See generally *Therasense, 2011 U.S. App. LEXIS 10590, 2011 WL 2028255 at *11* (describing the materiality requirement of inequitable conduct cases as a "but-for" causation standard). Defense counsel made the Court aware of this recently-decided decision in a short supplemental letter memorandum filed May 26, 2011. However, the Court has not found it necessary to consider that supplemental memorandum or any further briefing on the issue and instead relies upon its own reading of the case [*43] in this Opinion.

The Federal Circuit's recent *en banc* decision in *Therasense v. Becton, Dickinson and Co., F.3d , 2011 U.S. App. LEXIS 10590, 2011 WL 2028255 (Fed.Cir., May 25, 2011)*, provides additional support for my ruling. [18] Just like Exergen, Therasense involved a motion to amend after a full trial on the merits and is an inequitable conduct case, as opposed to a Walker Process case. And, unlike the allegations here, Therasense involved an omission of prior art as opposed to a prior public use or sale. This distinction is important for policy reasons. There is an argument that prior art is publically available and "as accessible to the Patent Office . . . as it is to the applicant," and, therefore, that "it is unwise [for the antitrust laws] to impose upon patent applicants any duty of general disclosure about the prior art." ANTITRUST LAW at § 701j. The same cannot be said for an applicant's failure to disclose a prior public use or sale because that knowledge is not publically available. See id. Nonetheless, while Therasense is not "on all fours" with the claims and procedural posture of the case before this Court, as explained *infra*, the language of

Therasense is emblematic of the increasingly [*44] strict approach the Federal Circuit is taking toward fraud-on-the-PTO allegations.

> 18 My discussion of Therasense focuses on the majority decision to the exclusion of the partial concurrence and dissenting opinions. Eleven judges are represented in the decision, with six joining the majority opinion.

In Therasense, the owner of a patent for diabetic blood glucose test strips failed to disclose prior art that it had previously disclosed before the European Patent Office (the European counterpart to the U.S. PTO) in connection with a similar patent application before that office. *2011 U.S. App. LEXIS 10590, [WL] at *4*. In clarifying the standard applicable to claims of inequitable conduct, the court took pains to express how the doctrine has been "overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system." *2011 U.S. App. LEXIS 10590, [WL] at *8* (quoting *Kimberly-Clark Corp. v. Johnson & Johnson, 745 F.2d 1437, 1454 (Fed.Cir. 1984))*. The court reiterated that

> [T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's [*45] interests adequately, perhaps.

Id. (citations omitted). Hence, the court commented, "[w]hile honesty at the PTO is essential, low standards for intent and materiality have inadvertently led to many unintended consequences, among them, increased adjudication costs and complexity, reduced likelihood of settlement, burdened courts, strained PTO resources, increased PTO backlog, and impaired patent quality. " *2011 U.S. App. LEXIS 10590, [WL] at *9*. Accordingly, the court took the opportunity in Therasense to "tighten[ ] the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." Id.

Having expressed its displeasure with how the inequitable conduct doctrine has been overused, the court, thereafter, reaffirmed that "[b]ecause direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence" on a motion for summary judgment or after a trial. *2011 U.S. App. LEXIS 10590, [WL] at *10*. However, the evidence must strongly suggest that the "single most reasonable inference able to be drawn [is a] finding of deceitful intent in the light of all the circumstances." Id. (internal citations omitted). Thus, "[w]henever evidence [*46] proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference." Id. Moreover, "[t]he absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." Id.

Further, while the Therasense opinion impacts the analysis of Plaintiff's Walker Process claim, it does not necessarily close the coffin on Plaintiff's claim. As noted, Therasense does not address the initial pleading stage nor does it suggest that a challenger could never plead a claim of inequitable conduct. [19] Its focus is to sharpen the inquiry in order to weed out frivolous inequitable conduct-based claims, and to redirect the doctrine to its equitable roots. In this connection, the court noted that "[b]ecause inequitable conduct renders an entire patent (or even a patent family) unenforceable, as a general rule, this doctrine should only be applied in instances where the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim." *2011 U.S. App. LEXIS 10590, [WL] at *12*. The same holds true for Walker Process claims, where the effect [*47] of a favorable ruling for the plaintiff would strip the patent holder of its exemption from the antitrust laws. That determination should not be made lightly; "[j]ust as it is inequitable to permit a patentee who obtained his patent through deliberate misrepresentations or omissions of material information to enforce the patent against others, it is also inequitable to strike down an entire patent where the patentee committed only minor missteps or acted with minimal culpability." Id. (citation omitted).

> 19 To the contrary, the court remanded the case to the district court to determine if the challenger could satisfy the clarified intent and materiality standard set forth in the court's decision. *2011 U.S. App. LEXIS 10590, [WL] at *16*.

In sum, based on my reading of the Federal Circuit's decision in Hydril, and considering the recent narrowing of the inequitable conduct doctrine by Therasense, I

Case 2:05-cv-06792-AB   Document 623-3   Filed 06/10/11   Page 15 of 20

Page 14
2011 U.S. Dist. LEXIS 58053, *47

conclude that the SAC fails to sufficiently allege scienter. Since Plaintiff has requested leave to further amend, the Court grants that request. I note, in this regard, that although my ruling focuses primarily on scienter, in granting Plaintiff the opportunity to amend one last time, Plaintiff must carefully craft its [*48] allegations to satisfy the Federal Circuit's dictates regarding both scienter and materiality.

**b. Remaining Antitrust Elements**

In light of the foregoing analysis, the Court need not reach Defendant's other arguments for dismissal under Third Circuit law, such as challenges to the Plaintiff's definition of the relevant market. The Court notes, however, that there appear to be additional deficiencies with the SAC and, thus, I do not anticipate Plaintiff being granted another opportunity for leave to amend if, after its Third Amended Complaint is filed, its allegations fail to satisfy the strictures of Third Circuit antitrust law.

Indeed, the Court queries whether Plaintiff will be able to surmount the substantial challenges to bringing the type of antitrust claim Plaintiff seeks to bring here. One such challenge is that of defining the relevant market. In the SAC, Plaintiff does not plead cross-elasticity of demand--a critical allegation needed to define the relevant market for antitrust purposes. A plaintiff must allege cross-elasticity of consumer demand because "the outer boundaries of a relevant market are determined by reasonable interchangeability of use." *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 438 (3d Cir. 1997)*. [*49] That is, "products in a relevant market [are] characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *U.S. Horticultural Supply v. Scotts Co., 367 Fed.Appx. 305, 309 (3d Cir. 2010)* (discussing *Queen City Pizza, 124 F.3d at 438 n.6*).

The SAC alleges only that there is a stark price differential between the Rutgers varieties and non-Rutgers' varieties. Third Circuit case law holds, however, that a plaintiff must allege "selling price, uses, and physical characteristics." *Scotts, 367 Fed.Appx. at 310* (citing *Am. Bearing Co., Inc. v. Litton Indus., Inc., 729 F.2d 943, 949 (3d Cir. 1984))*. Plaintiff argues that price allegations are sufficient, citing to *AD/SAT, Div. of Skylight, Inc. v. Associated Press,181 F.3d 216 (2d Cir. 1999)*, but even that case acknowledges that "significant price differences do not always indicate distinct markets." *Id. at 228*. Admittedly, it is difficult to follow SAC's alternative relevant market theories: one being a nationwide market limited to Rutgers' patented varieties and the other including non-Rutgers varieties [*50] but limited regionally to "wet climates." See SAC, ¶¶ 100-20. Here, under either definition of the relevant market, the SAC fails to adequately plead cross-elasticity of demand.

Antitrust standing poses another formidable hurdle for Plaintiff. [20] Allegations of antitrust standing must encompass several elements, most notably, antitrust injury. See *2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 740-41 (3d Cir. 2004)* (describing antitrust injury as "a necessary . . . condition" and "an important part of antitrust standing").

> 20   Although some courts first consider antitrust standing before reaching the merits of an antitrust claim, the Supreme Court has made clear that the merits may be reached first. See *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, L.L.P., 540 U.S. 398, 416 n. 5, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)*. Moreover, the antitrust standing doctrine includes prudential elements and is, therefore, not coterminous with Article III standing, which standing must be first confirmed before a federal court can reach the merits of a dispute. See *2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 741 n.10 (3d Cir. 2004)*.

The Third Circuit recently summarized the doctrine [*51] of antitrust injury, flowing from the Supreme Court's decision in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*, as follows:

> In Brunswick Corp. [ ], tthe Supreme Court held that a antitrust plaintiff must do more than show that it would have been better off absent the violation; the plaintiff must establish that it suffered an antitrust injury. An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made

possible by the violation." Id.; see also *Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)* ("[An] injury, although causally related to an antitrust violation, nevertheless will not qualify as an 'antitrust injury' unless it is attributable to ... a competition-reducing aspect or effect of the defendant's behavior.").

*West Penn Allegheny Health System, Inc. v. UPMC, 627 F.3d 85, 101 (3d. Cir. 2010).* The goal of the antitrust-injury requirement is "that the harm claimed by the plaintiff corresponds to the rationale [*52] for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for ... damages." Id. (quoting *Atl. Richfield, 495 U.S. at 342*). Hence "the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market." *Id. at 102*.

The remaining elements of the antitrust standing inquiry find their genesis in the Supreme Court's decision in *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. Under Associated General, courts are directed to consider:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; [*53] and (5) the potential for duplicative recovery or complex apportionment of damages.

*2660 Woodley Road, 369 F.3d at 740-41*. See also *McCullough v. Zimmer, Inc., 382 Fed.Appx. 225, 228 n.2 (3d Cir. 2010)*.

Here, JAFI alleges that Rutgers engaged in anti-competitive conduct by utilizing its exclusive licensing program. These allegations are reminiscent of those in McCullough, where the Third Circuit held that a commission-based sales representative, who was neither a competitor nor a consumer, failed to allege antitrust injury. *382 Fed.Appx. at 227*. According to that court, "mere intermediaries in the supply chain . . . suffer[ ] no cognizable antitrust injury as a result of [a manufacturer's] alleged anticompetitive conduct." Id. The same appears to hold true for JAFI, who merely served as an intermediary to bring Rutgers' plant varieties to the end-using farmers. [21]

> 21 Although the SAC alleges that JAFI would be a competitor of Rutgers but for Rutgers patents, the court in McCullough rejected a similar characterization, noting that "the balance of [plaintiff's] allegations established [it] only as [broker] who did business with competitors and consumers . . . not as competitors or consumers [*54] themselves." *382 Fed.Appx. at 229*.

There are a few cases that have found antitrust injury sufficiently alleged by a distributor against a manufacturer. In *U.S. Horticultural Supply, Inc. v. Scotts Co., No.A-03-773, 2004 U.S. Dist. LEXIS 11859, 2004 WL 1529185 (E.D.Pa. 2004)*, for example, the court held that a distributor, who had been denied the opportunity to distribute the defendant-manufacturer's fertilizer products because it refused to cease selling a competitor's fertilizer products, sufficiently alleged antitrust injury. In that case, the plaintiff alleged that it was restrained in its ability to compete based upon the manufacturer's actions. *2004 U.S. Dist. LEXIS 11859, [WL] at *3*. There, "the plaintiff's injury was not incidental to the harm intended for [the manufacturer's competitor]; rather, it was the very means by which the defendant sought to restrain or destroy competition." *2004 U.S. Dist. LEXIS 11859, [WL] at *4*. Importantly, McCullough acknowledges this line of cases and distinguishes them from cases where the alleged injury was not an "integral aspect" of the alleged anticompetitive conduct. *382 Fed.Appx. at 229-30*. Thus, in order to withstand a subsequent motion to dismiss, Plaintiff would have to allege facts from which the Court could conclude that [*55] its harms were an integral aspect of Rutgers' conduct.

For the foregoing reasons, Defendant's motion to dismiss is granted with respect to the antitrust claim. Plaintiff, however, is granted one last opportunity to

amend its complaint to comply with the dictates of this opinion. While the Court has pointed out some of the perceived deficiencies with Plaintiff's antitrust claim, the aforesaid discussion is not exhaustive. It is Plaintiff's obligation to ensure that its newly amended complaint fully satisfies Federal Circuit and Third Circuit law.

**2. RICO**

Plaintiff brings both state and federal RICO claims, with the federal claim being asserted under *18 U.S.C. § 1962(c)*. [22] To state a federal RICO claim, a plaintiff must allege four elements:

> (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that the defendant participated through a pattern of racketeering activity that included at least two racketeering acts.

*Annulli v. Panikkar, 200 F.3d 189, 198 (3d Cir. 1999)* overruled on other [*56] grounds by *Rotella v. Wood, 528 U.S. 549, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000)*; *Andela v. American Ass'n For Cancer Research, 389 Fed.Appx. 137, 142 n.6 (3d Cir. 2010)* (citing Annuli). As an initial matter, Plaintiff conceded at oral argument that this claim, as plead in the SAC, is defective because, as held by the Federal Circuit, "inequitable conduct before the PTO cannot qualify as an act of mail fraud or wire fraud for purposes of the predicate act requirement." *University of West Virginia Board of Trustees v. Van Voorhies, 278 F.3d 1288, 1303 (Fed. Cir. 2002)* (quoting *Semiconductor Energy Laboratory Co. v. Samsung Electronics Co., 204 F.3d 1368, 1380 (Fed. Cir. 2000)*). Accordingly, the SAC fails to properly allege that Defendant utilized the mails in connection with the alleged scheme to defraud the patent office. [23] After conceding this deficiency, which candor the Court appreciates, Plaintiff requested leave to amend to cure this deficiency. For the reasons explained herein, Plaintiff's request is denied because Plaintiff's inability to plead RICO standing would render amendment of its RICO claim futile.

22   Section (c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise [*57] engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

23   The Court is aware of the alternative use of mails allegations made in connection with the state RICO claim. See e.g., SAC, ¶ 181 (stating that exclusive license agreements were "negotiated and consummated in writings that were transmitted either by mail or electronically."). However, as explained *infra*, the state RICO claim fails for lack of standing.

Defendant correctly argues that Plaintiff has not alleged (and can not sufficiently allege) RICO standing because Plaintiff does not assert the type of financial loss redressable by RICO. "Apart from the *Article III* constitutional and prudential standing requirements . . ., plaintiffs seeking recovery under RICO must satisfy additional standing criterion set forth in *section 1964(c)* of the statute." *Maio v. Aetna, Inc., 221 F.3d 472, 482 (3d Cir. 2000)*. According to *18 U.S.C. § 1964(c)*, a RICO plaintiff must show: "(1) that the plaintiff suffered an injury to business or property; and (2) [*58] that the plaintiff's injury was proximately caused by the defendant's violation of *18 U.S.C. § 1962*." *Id. at 483*.

Defendant argues, first, that the Plaintiff fails to allege standing because its injuries are to an intangible property interest, and such injuries are insufficient to allege an injury-in-fact. Defendant cites to Maio in support of its argument. Maio held that the reduction in value of an intangible property interest created by contract, without more, does not constitute RICO injury. *221 F.3d at 490*. See also *Anderson v. Ayling, 396 F.3d 265, 271 (3d Cir. 2005)*. To show RICO harm when contractual rights are at stake, a plaintiff must allege that the defendant failed to perform under the parties' agreement such as by providing an inferior product or service. Id.

While JAFI alleges that Rutgers misrepresented that it had valid patents to support the large fees and royalties it charged, JAFI does not allege that Rutgers provided inferior parent plants or support services in connection with the exclusive licensing arrangement. As stated by the Third Circuit, "[c]ase law does indicate that a plaintiff who is fraudulently induced to enter into a transaction does not suffer injury [*59] within the meaning of *§ 1964(c)* until the defendant fails to perform--that is, until it becomes clear that the plaintiff will not get the benefit of the bargain." Id. (citation omitted). Here, JAFI received the benefit of its bargain though, allegedly, at an inflated price. This is not the sort of harm RICO redresses. Accordingly, Defendant's motion to dismiss is granted with respect to Plaintiff's federal RICO claim. [24]

> [24] Moreover, to the extent Plaintiff's injury allegations are interpreted to be consistent with those alleged in McCullough, discussed *supra* in connection with my antitrust standing analysis, that case confirms that dismissal of Plaintiff's RICO claim is appropriate. The court reasoned:
>
>> The McCulloughs' lack of standing to bring an antitrust action likewise prevents them from pursuing their RICO claims. The Supreme Court has extended much of the Associated General analysis for antitrust standing to RICO cases. A plaintiff lacks standing to sue under RICO where, as here, he suffers injury that is only indirectly related to a defendant's alleged misconduct. Accordingly, even if the McCulloughs had properly alleged the essential elements of a RICO claim, they would lack standing [*60] to sue under RICO for the same reasons they lack standing to sue under the [antitrust laws].
>
> *382 Fed.Appx. at 231 n.7* (internal citations omitted).

Because the same analysis applies to Plaintiff's state RICO claim, that claim is also dismissed. See *State v. Ball, 268 N.J.Super. 72, 98, 632 A.2d 1222 (App.Div.1993)*, aff'd, *141 N.J. 142, 661 A.2d 251 (1995)* (stating that New Jersey's RICO statute "borrows its structure, purpose and remedies from Federal RICO" and heeds federal case law in construing its statute); *Newman-Steele v. Mayor and Council of Borough of Tinton Falls, Docket No. L-1444-05, 2010 N.J. Super. Unpub. LEXIS 2009, 2010 WL 3257935, *4 n.3 (N.J. App. Div. Aug. 17, 2010)* (noting that state RICO statute, like its federal counterpart, also requires a plaintiff to allege "an injury to its business or property"). [25]

> [25] Because New Jersey does not treat unreported decisions as precedential, any unreported state decision cited in this opinion is cited as persuasive authority. The Court, further, acknowledges that New Jersey has "historically taken a much more liberal approach on the issue of standing than have the federal cases." *In re Six Month Extension of N.J.A.C. 5:91-1 et seq., 372 N.J.Super. 61, 86, 855 A.2d 582 (App. Div. 2004)* (quoting *Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 101, 275 A.2d 433)*). [*61] Nonetheless, New Jersey courts apply federal decisional law in interpreting the RICO standing requirement. *Interchange State Bank v. Veglia, 286 N.J.Super. 164, 180, 668 A.2d 465 (App. Div. 1995)* (discussing U.S. Supreme Court precedent).

### 3. Declaratory Judgment Act

In the Declaratory Judgment Act claim, Plaintiff seeks a ruling on the validity of Defendant's asparagus variety patents. While Plaintiff contends that its factual allegations present a justiciable controversy, Defendant argues that there is no actual case or controversy presented. Citing to *MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)*, and Federal Circuit decisions interpreting that decision, Defendant argues, specifically, that a justiciable controversy exists only "where the patentee takes a position . . . that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." Def. Open. Br. at 27.

The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other

> legal relations of any interested party [*62] seeking such declaration, whether or not further relief is or could be sought.

*28 U.S.C. § 2201*. The Act itself does not provide an independent basis for jurisdiction, but "as long as the suit meets the case or controversy requirement of *Article III*, a district court may have jurisdiction over a declaratory judgment action." [26] *Prasco, LLC v. Medicis Pharmaceutical Corp., 537 F.3d 1329, 1335 (Fed Cir. 2008)*. And, "[s]ubject matter jurisdiction over actions for a declaratory judgment of patent non-infringement comes from *28 U.S.C. § 1338*." *Id. at 1335 n.3*. The burden of establishing jurisdiction falls on the plaintiff. *Benitec Australia, Ltd. v. Nucleonics, Inc., 495 F.3d 1340, 1344 (Fed. Cir. 2007)*.

> 26   It is clear that district courts have original jurisdiction over civil actions arising under any federal law relating to patents and plant variety protection. *28 U.S.C. § 1338(a)*.

MedImmune "reaffirmed that the proper test for subject matter jurisdiction in declaratory judgment actions is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant [*63] the issuance of a declaratory judgment." *Prasco, 537 F.3d at 1335*. There is no bright-line rule for determining whether jurisdiction exists. Rather, courts must engage in an analysis "calibrated to the particular facts of each case." *Id. at 1336* (citation omitted).

Although there is no bright-line jurisdictional test, Federal Circuit decisions interpreting MedImmune have held that "the existence of a patent is not sufficient to establish declaratory judgment jurisdiction." *Prasco, 537 F.3d at 1338*. Even where there is an adversely held patent, a potential competitor is free to market its product and, therefore, faces no imminent threat of injury. Id. Where, however, the patent holder has asserted its rights against the potential competitor, the Federal Circuit has found that imminent harm has been alleged and a definite and concrete dispute exists. See *Hewlett-Packard Co. v. Acceleron LLC, 587 F.3d 1358, 1364 (Fed.Cir. 2009)*.

Here, Plaintiff conceded at oral argument that the SAC does not sufficiently allege that Rutgers attempted to enforce its patents against JAFI. To the extent the SAC makes such an allegation, it does so only conclusorily.

Moreover, while the SAC alleges that Rutgers [*64] "has no right to prevent JAFI from asexually reproducing a plant that is the subject of an invalid plant patent," id. at ¶ 193, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal, 129 S.Ct. at 1949*. Plaintiff asserted at oral argument that, if granted leave to amend, it would add a more specific allegation that Rutgers attempted to enforce its patents as late as August 2010. However, JAFI did not provide any further detail as to the exact date of the alleged attempt to enforce, nor detail as to the substance of the proposed amended allegations.

There remain substantial questions whether JAFI can sufficiently plead a viable DJA claim. To the extent that JAFI bases its assertion-of-patent-rights allegation on Rutgers' attempt to retrieve the parent plants, the license agreement language suggests that Rutgers could seek recovery of those plants through the bailment relationship. Bailment (or consignment) relationships have long been used in agricultural contracts to define growing and selling relationships. See Neil D. Hamilton, Why Own the Farm If You Can Own the Farmer (and the Crop?): Contract Production [*65] and Intellectual Property Protection of Grain Crops, *73 Neb. L. Rev. 48, 70 (1994)*; cf. *Wilson v. Burch Farms, Inc., 176 N.C.App. 629, 627 S.E.2d 249 (2006)* (provision of sweet potatoes to another party for sale to third parties constituted a bailment/consignment). [27] Moreover, were JAFI to rely on Rutgers' attempt to collect past-due royalties, such an allegation may be insufficient to suggest that Rutgers relied on its *patent* rights to collect royalties after the expiration of a patent. While Rutgers was entitled to grant a patent-based license for the use of its patented plants, it is not clear from the face of the license agreement that Rutgers relied upon its patent rights, as opposed to merely referring to them, in granting JAFI the license to sell the hybrid seeds. [28] However, a demand for royalty payments based on a patent can create a justiciable controversy as to the validity of a patent. *Prasco, 537 F.3d at 1339*. In short, in order for Plaintiff to properly state a DJA claim, an amended complaint must allege more than that Rutgers attempted to retrieve its plants; it must allege that Rutgers otherwise enforced or threatened to enforce its *patent* rights against JAFI. [29] Plaintiff is, therefore, [*66] granted leave to amend if it can do so consistent with this dictate.

> 27   A consignment exists where an consignor leaves his property with a consignee who is

"substantially engaged in selling the goods of others," and will work to sell the goods on behalf of the consignor. After selling the goods, the consignee must account to the consignor with the proceeds from the sale. See *Nasco Equipment Co. v. Mason, 291 N.C. 145, 154, 229 S.E.2d 278, 285 (1976)*. While the consignee may or may not receive the specific property of the consignment back, depending on if it is sold, this Court has recognized that a consignment creates a bailment between the parties. See *Strang v. Hollowell, 97 N.C.App. 316, 387 S.E.2d 664 (1990)*; see also, 642 8 C.J.S. Bailments § 11, at 384 (2005) ("The rule that where a person receiving property is not bound to return the identical thing received, but may account therefor in money or other property, or thing of value, the transaction is a sale, is not applicable to bailments or consignments for sale.... A consignment is a type of bailment where the goods are entrusted for sale...."); BLACK'S LAW DICTIONARY 152 (8th ed.2004) (definition of bailment for sale is "[a] [*67] bailment in which the bailee agrees to sell the goods on behalf of the bailor; a consignment."). Thus, where a consignment relationship may have existed between plaintiff and defendant, the relationship was also that of a bailment.

Moreover, New Jersey law also treats consignments as a type of bailment (bailment for sale). However, New Jersey law suggests that such agreements may fall within, and should be interpreted under, the UCC. See *Charles Bloom & Co. v. Echo Jewelers, 279 N.J.Super. 372, 382, 652 A.2d 1238 (App. Div. 1995)* (stating in case involving consignment of diamonds for sale to third parties after being placed into setting that "[w]hile consignment of the diamonds to Echo Jewelers might previously have been considered a bailment, and indeed is a type of bailment, the rights of contracting parties have since been refined and explained in the Uniform Commercial Code, *N.J.S.A. 12A:1-101 et seq.*") (internal citations omitted).

28 "In many cases, licensed uses or licensed subject matter is defined by reference to products that may embody intellectual property rights, but the product, not the rights, defines the scope of the license." Raymond T. Nimmer, et al., MODERN LICENSING LAW § 6:13 (2010). [*68] So, too, may a license refer to patent rights without actually relying upon those rights.

29 The Court reiterates that any allegation that Rutgers attempted to enforce its patents must include specific facts to support that assertion, and not merely conclusory statements. For example, the SAC states in paragraph 196 that "Rutgers continues to assert: (a) that JAFI must pay royalties if JAFI produces seed from plants . . .; (b) that JAFI cannot asexually reproduce such plants ...." This sort of allegation does not contain sufficient factual matter under Twombly because it does not specify how or when Rutgers asserted patent-based rights against JAFI.

**B. Motion to Amend**

In light of the Court's rulings, the Court denies Plaintiff's motion to amend and file its proposed SAC and dismisses the claims in the Amended Complaint. However, the Court grants Plaintiff leave to file a Third Amended Complaint within twenty (20) days regarding the antitrust and DJA claims, and that is otherwise consistent with this Opinion.

**III. CONCLUSION**

For the foregoing reasons, the Court grants Defendant's motion to dismiss with respect to the federal and state RICO claims with prejudice. With respect to the antitrust [*69] and DJA claims, those claims are dismissed without prejudice. Plaintiff's motion to amend to file its proposed Second Amended Complaint is denied; however, Plaintiff is granted leave to file a Third Amended Complaint within 20 days of the date of the Order accompanying this Opinion. An appropriate Order will follow.

Dated: May 31, 2011

/s/ Freda Wolfson

Honorable Freda L. Wolfson

United States District Judge